EX.C

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

IN RE: THE PROGRESSIVE
INSURANCE CORPORATION
UNDERWRITING AND RATING
PRACTICES LITIGATION

CASE NO. 1:03-cv-01519-MP-AK

**O R D E R**

This matter is before the Court on an Order from the Eleventh Circuit, which affirmed

this Court's January 3, 2007, approval of the Amended Settlement Agreement, but vacated the

award to Plaintiffs of attorneys' fees and costs, and remanded this case for the purpose of

determining findings of fact and conclusions of law setting forth the bases for the award of

attorneys' fees. Doc. 469. In support of Plaintiffs' award of attorneys' fees and costs, the Court

sets forth its findings of fact and conclusions of law as follows.

I. Background

On August 17, 2006, the Consolidated Plaintiffs submitted a Motion for Final Approval

of the Amended Settlement and for Final Judgment and Incorporated Memorandum of Law. A

fairness hearing was held on August 23 and 24, 2006, at which the Court heard and considered

the positions of the parties, their respective counsel, and those Class Members and objectors who

appeared to be heard on the matters presented at the hearing.

After considering the parties' pleadings, supporting expert declarations, reports and other

evidence, the Amended Settlement, any and all objections, and the positions of the parties, as

presented at the fairness hearing, the Court entered an Order on January 3, 2007, in which it held

the Amended Settlement to be fair and reasonable, and awarded Plaintiffs attorneys' fees and

costs in the amount of $3 million.  On remand, Consolidated Plaintiffs moved for entry of an

order setting forth findings of fact and conclusions of law in support of the $3 million award.

Doc. 457.  Responses in opposition were filed by objectors at Docs. 463 and 464.  The parties

were then ordered to conduct negotiations to resolve all issues related to the award of attorneys'

fees and report the outcome of their negotiations to the Court.  Doc. 482.  Subsequently, the

objections at Docs. 463 and 464 were withdrawn.  Docs. 497 and 500.  Upon consideration of the

Eleventh Circuit's March 26, 2008, Order, the Court now awards Plaintiffs attorneys' fees and

costs in the amount of $3 million.

## II.  The Amended Settlement

Under the Amended Settlement Agreement reached by the parties, the Settlement

benefits made available to all 10.3 million Class Members in this Action are: (1) a class action

notice that, in addition to setting forth the terms of the Settlement, serves to advise Class

Members that Progressive took adverse action against them in connection with the setting of

their insurance premiums; (2) an agreement that, as a result of the pending case and the terms of

the Settlement, Progressive has instituted new procedures providing specific adverse action

notices; (3) a Settlement brochure explaining the importance of credit reports, how they are used,

how they affect the financial well-being of consumers, and an explanation of the rights provided

to consumers by the FCRA; (4) a credit report from Experian, the agency originally used by

Progressive, which is in addition to any other credit reports the consumer may have received or

be entitled to otherwise, a document for which Experian charges $10 in the ordinary course of

business; (5) a period of 180 days within which Class Members may request their free credit

reports, which provides flexibility to the Class with regard to the timing of receipt and which

period is three times greater than the period of 60 days set forth in the FCRA, within which a consumer may request a free copy based on adverse action; (6) an Experian Credit Score and Analysis, providing specific information to consumers regarding the relative status of their credit standing, together with information as to items in the credit report adversely affecting their credit status, a document for which Experian charges $5.95 in the ordinary course of business; (7) a website available to Class Members to assist them during the entire process; (8) the availability of cash payments or immediate premium reductions based on errors in the current credit reports and the number of policy periods insurance policies were in effect, which relief is not available under the requirements of the FCRA; (9) safeguards built into the claims process requiring Defendants to use specific underwriting algorithms in recalculating premiums based on corrected reports, and providing for auditing of such procedures by Class Counsel; and (10) payment by Defendants of all costs of the mailings, publications, claims administration, and payment of all Class Members attorneys' fees due to Class Counsel.

### III. The Proposed Award of Attorneys' Fees

Pursuant to Section VIII of the Amended Settlement Agreement, Class Counsel have sought approval of an award of attorneys' fees and costs in the amount of $3 million. Settling Defendants have agreed not to oppose Class Counsel's application for an award in this amount. A fee agreement between parties in the settlement of a class action is encouraged where, like here, the parties negotiated attorneys' fees separately from the underlying settlement and only after the terms of the settlement were reached. Indeed, the Supreme Court has addressed the value of negotiating fees, stating that "[a] request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee." Hensley v.

Eckerhart, 461 U.S. 424, 437 (1983); Accord Matter of Continental Illinois Sec. Litig., 962 F.2d 566, 568-70 (7th Cir. 1992) (market factors, best known by negotiating parties themselves, should decide amount of attorneys' fees). See also Evans v. Jeff D., 475 U.S. 717, 734-38, n.30 (1986) (parties can negotiate fees in addition to settlement).

Rule 23(h) of the Federal Rules of Civil Procedure provides that "[i]n an action certified as a class action, the court may award reasonable attorney fees and nontaxable costs authorized by law or by agreement of the parties . . . ." Fed. R. Civ. P. 23(h).  The record reflects that the fee negotiations were conducted at arm's length and only after the parties had agreed upon all material terms of the Amended Settlement.  As the Amended Settlement terms provide that, in addition to the agreed upon recovery for the Class Members, a fee award would be paid directly by Progressive to Class Counsel, Progressive had the incentive to bargain to reduce Plaintiffs' counsel's fees as low as possible.  "The conclusion that the parties did not collude in arriving at a settlement involved a negative analysis:  whether there is reason to believe otherwise." In re Domestic Air Transportation Antitrust Litigation, 148 F.R.D. 297, 313 (N.D. Ga. 1993).  There is no record evidence before the Court indicating that Class Counsel's fee agreement was the result of collusion.  In the absence of evidence of collusion, the trial court gives great weight to the agreement of the parties concerning the negotiated amount of fees to be paid to Plaintiffs' counsel. Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 720 (5th Cir. 1974) ("...we encourage counsel on both sides to utilize their best efforts to understandingly, sympathetically, and professionally arrive at a settlement as to attorney's fees.").

IV.  The Appropriate Method for Calculating Attorneys' Fees

Courts in the Eleventh Circuit use the percentage-of-the-common-fund method for

awarding fees in common fund cases. <u>Camden I Condominium Assoc. v. Dunkle</u>, 946 F.2d 768

(11th Cir. 1991). When the Settlement in the instant action created a recovery for the Class and

a negotiated amount for Plaintiffs' counsel's fees, the action became a common fund case. <u>Diaz</u>

<u>v. Hillsborough County Hosp. Auth.</u>, WL 1682918 (M.D. Fla. 2000) (although the case began as

a statutory fee shifting case, the settlement agreement converted the litigation to a common fund

case); <u>Bowen v. Southtrust Bank of Alabama</u>, 760 F.Supp. 889 (M.D. Ala. 1991) (action that

began as a statutory fee shifting case under ERISA and was subsequently settled would not be

governed by the fee shifting provision of ERISA but would instead be a common fund case for

determination of the fee award to plaintiffs' counsel). In <u>McLendon v. The Continental Group,</u>

<u>Inc.</u>, 872 F.Supp. 142, 152 (D. N.J. 1994), the court, citing <u>Bowen</u>, reasoned that, "Because the

settlement achieved in this litigation extinguished any liability defendants might have had under

the statutes for plaintiffs' attorneys' fees, the settlement converted the . . . litigation into a

common fund case, notwithstanding the fact that the causes of action arose under fee-shifting

statutes."

In <u>Camden I</u>, the Eleventh Circuit considered an appeal in which the trial court calculated

class counsel fees based upon a lodestar and added an enhancement for risk. The Eleventh

Circuit vacated and remanded with the instructions that, "[h]enceforth in this circuit, attorneys'

fees awarded from a common fund shall be based upon a reasonable percentage of the fund

established for the benefit of the class." <u>Camden I</u>, 946 F.2d at 774. The Eleventh Circuit

further observed, "The majority of common fund fee awards fall between 20% to 30% of the

fund . . . . [D]istrict courts are beginning to view the median of this 20% to 30% range, i.e., 25%,

as a 'bench mark' percentage fee award which may be adjusted in accordance with the individual

circumstances of each case, as opposed to the lodestar hourly fee used in statutory fee awards."

Id. at 774.

However, this is not a typical common fund case, since the benefits in the instant settlement largely consist of credit reports and scores, rather than a cash award. In cases where a centerpiece of a class action settlement is an award of credit reports and scores, courts have taken a number of approaches to calculating reasonable attorneys' fees. See, e.g., Yeagley v. Wells Fargo & Co., 2008 WL 171083 (N.D. Cal. 2008) (slip copy); Perry v. FleetBoston Fin. Corp., 229 F.R.D. 105 (E.D. Pa. 2005). In Yeagley, the court awarded a fee based on the percentage-of-the-common-fund method, which the court calculated by multiplying the price of the credit reports and scores by the number of reports actually claimed. 2008 WL 171083 at *6-7. The court used a 25% benchmark to calculate attorneys' fees and then added back in 25% of that total, since attorneys' fees are included in the common fund. Id. In Perry, the court noted that credit reports and scores "simply do not lend themselves to precise measurement," particularly in light of consumers' ability to obtain free credit reports. 229 F.R.D. at 120. Similar to the settlement in this case, the settlement in Perry also included educational benefits to the class, which the court also had difficulty valuing. Id. The court used the loadstar method but cross-checked its fee award by using the percentage method. The court concluded that "[t]he most straightforward calculation of the size of the fund is to multiply the market value of the credit reports and credit scores . . . by the number of individuals in the class." Id. at 123. Using the percentage method cross-check, the fee award in Perry equaled 14.9% of the fund.

In the instant case, Class Counsel urges the Court to use the percentage-of-the-common-fund method and to calculate the value of the fund in part by multiplying the total number of

class members by the market value of the credit reports and scores. However, the Court is persuaded by the methods and reasoning in <u>Yeagley</u>. The Court finds that the appropriate method for calculating the fund in this case is to multiply the market value of the credit reports and scores by the number of class members who have submitted claims–in this case, 900,000. <u>See</u> Doc. 346 at 7. This method of calculation is in line with the Class Action Fairness Act ("CAFA"), which requires that in cases where the settlement benefits are in the form of coupons, "the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed." 28 U.S.C. § 1712(a). It is unclear whether CAFA applies to the instant case; the act does not define "coupons." In any event, the act is instructive. Also, given the nature of the settlement in this case, the Court also finds that it is appropriate to use the loadstar method as a cross-check.

Applying this method of calculation, the portion of the common fund attributable to the free credit reports and scores is $14,355,000 (900,000 claims multiplied by $15.95, the market value of a credit report and score). As for the remainder of the settlement, Consolidated Plaintiffs presented expert testimony from Professor Mark Cohen to peg the value of the educational benefits, discovery of errors on the credit report, proxy damages, and potential early detection of identity theft at $9.6 million, $37.7 million, $2.7 million, and $18.7 million, respectively. <u>See</u> Doc. 346 at 34-35; Doc. 300 at 4. In Consolidated Plaintiffs' proposed order setting forth finds of fact and conclusions of law, Consolidated Plaintiffs include only the $9.6 million figure–presumably because Consolidated Plaintiffs' method of valuing the credit reports and scores creates a large enough settlement to justify a $3 million award. At the fairness hearing, there was some dispute as to the availability and value of proxy damages and as to

whether the value of discovering errors or identity theft through one's credit report is subsumed in the value of the credit report itself. It is also difficult to value the benefit of having Progressive change its adverse notification procedures. For purposes of setting attorneys' fees, the Court will use a conservative estimate of $9.6 million to value all benefits in addition to the credit reports and scores. Thus, the total value of the settlement for the purpose of calculating a fee award is approximately $24 million ($14,355,000 plus $9,600,000).

As held in Elkins v. Equitable Life Ins. Co. of Iowa, 1998 WL 133741 (M.D. Fla. 1998), where a defendant agrees upon benefits for the class members and agrees to a separate additional amount of money to be paid to plaintiffs for attorneys' fees, the aggregate of both recoveries is the common fund for purposes of determining the percentage of the fund to be paid as attorneys' fees. In Elkins, the court found that a settlement constituting general policy relief valued at $28.9 million, together with a separate and additional payment of attorneys' fees from defendant to plaintiffs' counsel of $5 million, was the total common fund for the purpose of determining if the attorneys' fees were within the range of reasonableness established in Camden I. See also Ingram v. The Coca-Cola Co., 200 F.R.D. 685 (N.D. Ga. 2001) (the "common fund" for determining the percentage attorneys' fees for purposes of the Camden I analysis is the aggregate of the recovery for the class and additional attorneys' fees); The Manual for Complex Litigation, ¶ 21.7 (4th Ed. 2004):

> If an agreement is reached on the amount of a settlement fund and a separate amount for attorney fees and expenses, both amounts must be disclosed to the class. Moreover, the sum of the two amounts ordinarily should be treated as a settlement fund for the benefit of the class, with the agreed-on fee amount constituting the upper limit on the fees that can be awarded to counsel. The total fund could be used to measure whether the portion allocated to the class and to attorney fees is reasonable.

Thus, the total value of the common fund in this case is $27 million (the $24 million

settlement value plus the $3 million award of attorneys' fees).

## A. The <u>Johnson</u> Factors

As held by the Eleventh Circuit in <u>Camden I</u>, the factors outlined in <u>Johnson v. Georgia Highway Express, Inc.</u>, 488 F.2d 714 (5th Cir. 1974) remain vital to the determination of the appropriate percentage of the common fund to be awarded as attorneys' fees. The <u>Johnson</u> factors include: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. While each of the these factors may be considered, "the factors which will impact upon the appropriate percentage to be awarded as a fee in any particular case will undoubtedly vary." <u>Camden I</u>, 946 F.2d at 775.

### 1. The Time and Labor Required

The Amended Settlement in this action is the result of six (6) years of litigation by the parties and several months of arms' length negotiations. The record in this case reflects that the parties fought vigorously against one another for the duration of the action. Both sides were clearly committed to the prosecution and defense of this case. As established in the record, Class Counsel have spent in excess of 5,000 hours for an approximate total of $1.8 million prosecuting their FCRA claims against Progressive and negotiating the eventual Settlement of these claims. Class Counsel estimate that, upon the conclusion of this case, they will have spent more than

6,000 hours or $2 million.  In addition, costs accrued by Class Counsel exceed $60,000.

Moreover, Class Counsels' labor did not end upon reaching the Amended Settlement.  Class

Counsel committed a substantial amount of time and labor to representing the Class in

connection with all appellate proceedings before the Eleventh Circuit.  While Class Counsel

spent significant time and effort defending the approved Settlement on appeal, they seek no

attorneys' fees or expenses beyond those awarded by this Court in its Order dated January 3,

2007.  Accordingly, the Court finds that the hours expended and costs incurred are reasonable

given the magnitude and complexity of this case.

### 2. The Novelty and Difficulty of the Questions Involved

There is no doubt that this litigation was novel and difficult.  This case required a review

and extensive knowledge of the Fair Credit Reporting Act, the FCRA's adverse action

requirements, and Progressive's insurance underwriting and form notice practices.  As

established by the record, there was a lack of certainty as to the merits of the FCRA claims

brought against Defendants and much debate as to whether Progressive's conduct rose to the

level of "willfulness."  Indeed, Progressive emphatically defended its adverse action notice

procedures.

Moreover, the protracted nature of this litigation reflects the complexity of the questions

involved in this action.  Plaintiffs prepared and filed, among other things, a complaint, an

amended complaint, two motions for partial summary judgment, a motion for class certification,

two settlement agreements, a response to Defendant's motion for summary judgment, and

motions for preliminary and final approval of the settlement.  In addition, the parties only

reached settlement after months of negotiations.  Finally, the difficulty of suing this particular

Defendant – one of the major companies within the auto insurance industry – made this case particularly novel and difficult, and resulted in the implementation of a new nationwide policy regarding Progressive's adverse action notice procedures.

### 3. The Skill Requisite to Perform the Legal Services Properly

The need for experienced and qualified counsel was necessary for the proper litigation of a case of this magnitude. As discussed above, this litigation involved difficult subject matter calling for specialized legal knowledge of the FCRA, as well as familiarity with and an understanding of the insurance industry and underwriting practices. Class Counsel had to possess complex litigation skills and extensive knowledge of the FCRA and its requirements in order to meet the challenge of litigating against such knowledgeable and experienced defense counsel. The Court is satisfied that the results achieved in light of the aforementioned challenges attests to the skills and legal abilities of Class Counsel.

### 4. The Preclusion of Other Employment by the Attorney Due to Case Acceptance

The economics of prosecuting a class action is one of the factors to be considered in determining the attorneys' fees. Camden I, 946 F.2d at 775. Class Counsel has prosecuted this case entirely on a contingency fee basis, with the receipt of any fee dependent foremostly upon the result of the case, as well as the Court's discretion in granting any award. Class Counsel accepted representation and have pursued this action throughout with the understanding that, if successful in obtaining recovery for the Class, they would seek fees and reimbursement of their costs from any such recovery. The inherent risk in contingency representation warrants a commensurate fee. City of Detroit v. Grinnell Corp., 495 F.2d 448. 470 (2d Cir. 1974) (holding that no one expects a lawyer whose compensation is contingent upon his success to charge, when

successful, as little as he would charge a client who in advance has agreed to pay for his services, regardless of success); In re Continental Illinois Sec. Litig., 962 F.2d 566 (7th Cir. 1992) (holding that when a common fund case has been prosecuted on a contingent basis, plaintiff's counsel must be compensated adequately for the risk of non payment.).  Contingency of fees substantially delays the receipt of payment, which has also been held to be a factor warranting the increase of a fee award. See, e.g., Mashburn v. National Healthcare. Inc., 684 F.Supp. 679 (M.D. Ala. 1988); Oppenlander v. Standard Oil Co., 64 F.R.D. 597, 613 (D. Colo. 1974).  In Beherns v. Wometco Enterprises, Inc., 118 F.R.D. 534, 548 (S.D. Fla. 1988), aff'd without op., 988 F.2d 21 (11th Cir. 1990), the court noted that:

> Generally, the contingency retainment must be promoted to assure representation when a person could not otherwise afford the services of a lawyer . . .
>
> A contingency fee arrangement often justifies an increase in the award of attorneys' fees. This rule helps assure that the contingency fee arrangement endures.  If this "bonus" methodology did not exist, very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing.

(citations omitted).

In the instant action, the risk involved in Class Counsel's contingency arrangement was compounded by the vast number of hours expended with respect to the opportunity cost of pursuing this case over others.  Based upon the number of hours Class Counsel spent (as discussed above), their ability to accept other cases as a result of this ongoing litigation was no doubt affected.  As made clear by the record, the hours expended and the expenses which have been advanced presented a financial burden on Class Counsel.  "This guideline involves the dual consideration of otherwise available business which is foreclosed because of conflicts of interest which occur from the representation, and the fact that once the employment is undertaken the

attorney is not free to use the time spend on the client's behalf for other purposes." Johnson, 488 F.2d at 10-11.

### 5. The Customary Fee

Here, Class Counsel is requesting a fee award in the amount of $3 million. In Camden I, the Court noted that district courts had begun to coalesce around a "benchmark" for attorneys' fees of 25% the common fund. 946 F.2d at 774-775 (citing H. Newberg, Attorney Fee Awards § 2.08 at 51-52 (1986)); accord Thomas E. Willing, Laural L. Hooper & Robert J. Niemic, Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules at 69, 146-47 figs. 67 & 68 (Federal Judicial Center 1996) (noting that an award of 25% to 30% of the common fund is typical); see also Pinto v. Princess Cruise Lines, Ltd., 513 F.Supp.2d 1334, 1339-1341 (S.D. Fla. 2007) (holding that the contingency nature of the fee, the financial burden carried by the class, and the economics of prosecuting a class action supported a 30% award and noting that class action fees, regardless of case size, average approximately 32% of the settlement). In light of the aforementioned statistics and case law, the $3 million in fees provided for Class Counsel under the Amended Settlement, representing 11.11% of the available common fund, falls well below the typical range of common fund awards to counsel in other class actions subsequent to Camden I, bringing it well within the range of appropriate and justified fee awards.

### 6. Whether the Fee Is Fixed or Contingent

As discussed in section (4) above, Class Counsel undertook this representation at a high degree of financial risk to themselves with no assurances of any compensation. Whether the attorney assumes a contingency risk to earn a fee is an important factor in determining the fee

award. See Jones v. Central Soya Co., 748 F.2d 586, 591 (11th Cir. 1986); Pinto, 513 F.Supp.2d at 1339. This case was prosecuted by Class Counsel solely on a contingent fee basis, which presented a considerable risk to them, given the six year duration of this litigation. Class Counsel would be paid only if they achieved a successful result for the Class. In the event that Plaintiff's case proved unsuccessful, Class Counsel would receive no compensation, regardless of the fact that they spent several years prosecuting this case. Here, Class Counsel's risk of no recovery was coupled with the uncertainty of whether the case would be certified or whether Plaintiff would prevail on the merits.

### 7. Time Limitations Imposed by the Client or the Circumstances

The Court must consider the time limitations imposed by the client or the circumstances. This case, which spanned approximately six years and 5,000 hours, constituted a significant undertaking to Class Counsel. Class Counsel was obviously committed to this case and litigated all aspects zealously, including ten months of mediated settlement discussions and the more recent appellate proceedings. This action demanded constant attention and effort on the part of Class Counsel as a result of Defendant's vigorous defense of its positions, and in meeting the objections of other attorneys representing objectors to the settlement. "Priority work that delays the lawyer's other legal work is entitled to some premium." Johnson, 488 F.2d at 718. Accordingly, the Court finds that this factor supports the award of attorneys' fees and costs in the amount requested by Class Counsel.

### 8. The Amount Involved and the Results Obtained

As discussed above, the Court values the settlement in this case at $24 million. The Court considers this to be a fair and reasonable outcome given the merits of this case.

### 9. The Experience, Reputation, and Ability of the Attorneys

This Court recognizes Class Counsel as professional, experienced, and skilled practitioners. They are experienced in complex civil litigation and class action cases. Throughout this litigation, Class Counsel demonstrated their collective knowledge of the FCRA and insurance industry and completed the work necessary to secure the aforementioned Settlement benefits on behalf of all 10 million Class Members. Moreover, Class Counsel were opposed by a formidable Defendant, as well as 25 objectors, 21 of which were filed by nine different attorneys. As made clear by the record, there is absolutely no evidence of collusion in this case. Class Counsel only addressed the issue of attorneys' fees and costs after reaching a successful settlement on behalf of the Class.

### 10. The "Undesirability" of the Case

This litigation was not highly desirable in 2000, when Class Counsel first began their investigation into Progressive's insurance underwriting and ratings practices. The time span of this litigation is a testament to the magnitude and complexity of the issues involved. As previously noted by the Court, Class Counsel has pursued this case on a purely contingency basis since it was first filed in late 2000. Adding to the undesirability of the case was the uncertainty as to whether the Class would be certified or whether Plaintiff would succeed on the merits. At the time of filing, the only guaranteed result was that Defendant would vigorously defend itself against Plaintiff's claims that its policies and procedures violated the FCRA's adverse action notice requirements. Also noteworthy are the participation of 25 objectors in the case (21 of whom were represented by nine attorneys), and the considerable delays and hurdles they presented to Class Counsel after six years of litigation and reaching not one, but two Settlement

Agreements on behalf of 10 million Class Members.

11. The Nature and Length of the Professional Relationship with the Client

Class Counsel initiated their professional relationship with the named Plaintiffs in 2000, when Class Counsel were retained under a contingency fee agreement and thereafter initiated their investigation into Defendant's insurance underwriting and ratings practices. Counsel have maintained their professional relationship with Plaintiffs throughout this litigation and have consistently communicated with Plaintiffs, keeping them informed regarding case status and developments.

12. Awards in Similar Cases

As discussed in section (5) above, Class Counsel's requested fee award of $3 million is in accordance with awards in similar common fund cases.

### B. The Lodestar Method Provides a Useful Cross-Check

Some courts use the lodestar method to cross-check a fee award under the percentage-of-the-common-fund approach. See Pinto, 513 F.Supp.2d at 1343-1344; In re Sunbeam Securities Litigation, 176 F.Supp.2d 1323 (S.D. Fla. 2001); Waters v. Intern. Precious Metals Corp., 190 F.3d 1291, 1298 (11th Cir. 1999) (stating that although lodestar calculations are improper in common fund cases, they may be referred to for purposes of comparison). The Court finds that a loadstar cross-check is particularly warranted in this case, given the difficulty of valuing the settlement. The lodestar is calculated by multiplying the number of hours reasonably spent times a reasonable hourly rate. Resolution Trust Corp. v. Hallmark Builders, Inc., 996 F.2d 1144, 1147 (11th Cir. 1993). Here, a lodestar analysis of the fee requested by Class Counsel and not objected to by Settling Defendants results in the amount of $1.8 million. The multiplier in this

case would be 1.63 ($3,000,000 minus expenses of $60,000 = $2,940,000, divided by $1,800,000). A multiplier of 1.63 is well below the average multiplier awarded in other class cases. See, e.g., Roberts v. Texaco, Inc., 979 F. Supp. 185 (S.D. N.Y. 1997) (court approved using multiplier of 5.5 in class action); Ingram v. The Coca-Cola Co., 200 F.R.D. (N.D. Ga. 2001) (holding multipliers between 2.5 and 4 as reasonable); Elkins v. Equitable Life Ins. of Iowa, No. CivA96-296-Civ-T-17B, 1998 WL 133741 (M.D. Fla. Jan. 27, 1998) (holding multiplier of 2.34 as reasonable); Behrens v. Wometco Enterprises, Inc., 118 F.R.D. 534 (S.D. Fla. 1988) (holding that "the range of lodestar multipliers in large and complicated class actions runs from a low of 2.26 . . . to a high of 4.5"). The use of a multiplier is proper where counsel's work is performed on a contingency basis and the work performed is of high quality. Camden I, 946 F.2d at 772. As previously discussed, Class Counsel's work on this case over the past eight years has been on a contingency basis. The Court also finds that the performance of the litigators in this complex case justifies the use of a multiplier.

The Court is familiar with Class Counsel's fees, as attorney time records were submitted to the Court over the course of litigation, as required pursuant to the Initial Scheduling Order entered on February 5, 2001. Notably, Class Counsel performed significant additional work in dealing with the recent appeals in this case; the attorneys' fees and expenses associated with those appeals are not included in the lodestar figure discussed above. Subsequent to this Court's entry of Final Judgment on January 3, 2007, Class Counsel spent an additional $118,950 in fees and incurred costs totaling $2,384 in relation to the aforementioned appeals. Had these additional fees been factored into Class Counsel's lodestar, the total would be approximately $1.9 million with the even lower multiplier of 1.53.

Using the common fund approach, as cross-checked by the lodestar, the Court finds that the requested award of fees and costs in the amount of $3 million to be fair and reasonable compensation in this matter. Even if the lodestar approach were to be used exclusively in this matter, the Court finds that an award of $3 million based on a lodestar of approximately $2 million is fair and reasonable, especially given the Johnson factors as outlined above. Congress has viewed the privacy rights under the FCRA important enough to have created a private attorney general-type fee provision to encourage enforcement even where the effort required by counsel to enforce the Act is likely to disproportionately exceed the difficult-to-value privacy injury that would be suffered by consumers for violations of the FCRA. Indeed, courts have found that "[p]roportionality of attorneys fees to the amount recovered is not required in every action brought pursuant to the FCRA." Northrup v. Hoffman of Simsbury, Inc., Nos. 3:96CV00097 AVC, 3:98CV01219 AVC, 2000 WL 436612, at *5 (D. Conn. March 15, 2000) (citing Yohay v. City of Alexandria Employees Credit Union, 827 F.2d 967, 974 (4th Cir. 1987). "Since there will rarely be extensive damages in an FCRA action, requiring that attorneys fees be proportionate to the amount recovered would discourage vigorous enforcement of the Act." Id. Moreover, reasonable attorneys' fees are not conditioned upon and need not be proportionate to an award of damages. Lewis v. Kendrick, 944 F.2d 949, 957 (1st Cir. 1991) (holding that "the fee is not limited by the size of the recovery, but may, in appropriate instances, greatly exceed it."). For all of the above reasons, the Court is of the opinion that an award of fees and costs of $3 million is fair and reasonable and consistent with the Johnson factors, the case law, and the

evidence in this case. Accordingly, it is hereby

### ORDERED AND ADJUDGED:

1. The motion at Doc. 457 is GRANTED. Plaintiffs' Class Counsel are hereby awarded attorneys' fees and costs in the amount of $3,000,000, to be paid directly to Class Counsel by Defendant pursuant to the terms of the Amended Settlement between the parties, as approved by this Court on January 3, 2007, and as approved by the Eleventh Circuit on March 26, 2008.

2. The motion for a fairness hearing at Doc. 504 is DENIED. A fairness hearing has already been held on all matters related to the Settlement, including the value of the settlement and the reasonableness of the fee award. The mandate of the Eleventh Circuit requires only that the Court issue findings of fact and conclusions of law clarifying its previous order and explaining its award of fees.

3. Any requests for a portion of the fee award are to be directed to Terry A. Smiljanich, lead counsel for Plaintiffs. The parties must make a good faith effort to settle any disputes arising from any such requests. The parties have until Wednesday, October 15, 2008, to file notice with the Court of any outstanding disputes concerning the apportionment of the fee award.

4. The "Motion for Default Judgment" (Doc. 495) and "Amended Motion for Default Judgment" (Doc. 499), filed by Gwanjun Kim, are DENIED.

**DONE AND ORDERED** this __*1st*__ day of October, 2008

*s/Maurice M. Paul*

Maurice M. Paul, Senior District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-60695-Civ-Martinez/Brown

FRESCO et. al.

v.

R.L. Polk & Co. and Acxiom Corporation

# FORMAL OBJECTION LETTER

| | |
|---|---|
| Letter Received: | October 15, 2009 |
| Postmark Date: | October 9, 2009 |
| Sender: | The Corea Firm P.L.L.C. The Renaissance Tower 1201 Elm St, Ste 4150 Dallas, TX 75270 |
| Page Count: | 14 |





7006 2150 0000 2169 8621

USPS
PITNEY BOWES
02 1P          $ 006.32⁰
0003953508  OCT 09 2009
MAILED FROM ZIP CODE 75201

THE COREA FIRM P.L.L.C.

The Corea Firm, PLLC
Attn: Lola Mayhall
The Renaissance Tower
1201 Elm St, Ste 4150
Dallas, Texas 75270

To: Fresco Notice Administrator
The Garden City Group, Inc.
P.O. Box 9000, # 6520
Merrick, NY  11566-9000


THE GARDEN CITY GROUP INC.
OCT 15 2009





GCG Receiving
TO: Receiving Station (300)
Route: 1
Ext:
Mailstop:
  Serial Carrier:
  Object Code:
  Manufacturer:
  Purchase Order

10/15/2009 10:53:34 AM

7006215000021698621



# THE COREA FIRM PLLC
### National Trial Lawyers

Renaissance Tower, 1201 Elm Street, Suite 4150, Dallas, Texas 75270
www.corealaw.com

October 9, 2009

**VIA FIRST CLASS MAIL**
Attn: Fresco Notice Administrator
The Garden City Group, Inc.
P.O. Box 9000, #6520
Merrick, NY  11566-9000

Re:   Richard Fresco, et al v. R.L. Polk & Co. et al

To Whom It May Concern:

Enclosed please find the Objection letter for James Roberts.

Please let this confirm that Jeremy Wilson and Thomas Corea represent Mr. Roberts.

If you have any questions or need any additional information, please do not hesitate to contact our office.  I appreciate your immediate attention in this matter.

Cordially,

Jeremy R. Wilson



**THE COREA FIRM** PLLC

*National Trial Lawyers*

RENAISSANCE TOWER
The Forty First Floor
1201 Elm Street, Suite 4150
Dallas, Texas 75270

Jeremy R. Wilson
jwilson@corealaw.com

(Tel) 214 953-3900
(Fax) 214 953-3901

Objections – Fresco Notice Administrator
The Garden City Group
P.O Box 9000, #6520
Merrick, New York 11566-9000

     Re: Case No. 0:07-cv-60695-JEM; *Richard*
       *Fresco, et al v. Acxiom.*, et al, United States District Court
       for the Southern District of Florida

Dear Sir or Madam:

  Pursuant to the Court's Order Certifying Settlement Class, Appointing Class Counsel, Preliminarily Approving Class Action Settlement, Approving and Directing Notice Plan and Appointing Notice Administrator (doc. 90), I hereby file my Objection to the Proposed Class Action Settlement and request that this case be decertified so that I may proceed with my lawsuit against the Settling Defendants (and their subsidiaries) originally filed in the United States District Court for the Eastern District of Texas, Docket No. 07-01 and currently pending before the United States Court of Appeals for the Fifth Circuit, Docket No. 08-41083 (the "Texas Litigation").

  My name and address are as follows:

  James Patrick Roberts
  11614 South Oswego Avenue
  Tulsa, Oklahoma 74145

**Statement of the Objection and Summary of the Reasons for the Objection**

Specifically, I object to the proposed settlement for the following reasons:

First, this settlement class was improperly certified pursuant to Federal Rules of Civil Procedure 23(b)(2) as it involves waiver of statutory and punitive damages under the Drivers' Privacy Protection Act, 18 U.S.C. §2721, *et. seq.* I also object because the settlement agreement provides for the waiver of the use of the class action device, which is also improper in a Rule 23(b)(2) class. I also object because the certification does not give me the right to opt out of this class action. There is no authority for allowing the waiver of these rights in the context of a Rule 23(b)(2), non-opt out settlement class. Furthermore, the statutory liquidated damages of $2,500 and the punitive damages available to me and other class members are not merely incidental to this lawsuit. Allowing them to be waived to certify a Rule 23(b)(2) class is contrary to law.  I and other members of the conditionally certified class should be allowed to proceed with the Texas Litigation.

Second, I object because the class was improperly certified in that it does not meet the requirements of Rule 23(a). I object on this basis first because DPPA violations in various states should not be treated as a national class action because of the varying degrees of culpability involved in how Defendants obtained personal information from the various state governments. I also object on this bases because, as outlined below, the named plaintiffs claims are not typical of those of the class and the named plaintiffs, by virtue of the large incentive awards and attorneys' fees awards, cannot adequately represent class's interests.

Third, I object that the terms of the settlement itself are not fair, reasonable, or adequate because the only relief obtained for the conditionally certified class is injunctive relief. While the attorneys for the named plaintiffs have secured for themselves attorneys fees of up to $7,500,000, there is no provision for monetary relief for the class at all. The named Plaintiffs have also been promised significant sums of money, but again, there is no monetary compensation provided for the class. In fact, should the Court award less than the attorneys fees and incentive awards sought, the remaining money will be returned to the Defendants, not to the class.  Given the statutory and punitive damages available under the DPPA, I contend that this is insufficient relief for the class and that the class should be given monetary relief of some amount to compensate them for the statutory and punitive damages provided for in the DPPA.

Each of these objections are addressed in detail below.  First, however, a brief overview of the DPPA and its subsequent amendments illustrates the various causes of actions asserted by the two lawsuits at issue.

## 1.   The DPPA

The DPPA was part of crime fighting legislation enacted in response to the murder of a young woman in Los Angeles, California, in 1989. Rebecca Schaeffer was an actress who starred on the television show *My Sister Sam* in the late 1980's. One of Ms. Schaeffer's "fans" retained a private investigator who recorded Ms. Schaeffer's license plate number. The investigator then went to the California State Department of Motor Vehicles where, for a nominal fee, he obtained Ms. Schaeffer's home address. Armed with Ms. Schaeffer's home address, the assailant went to her home and murdered her.

In 1994, Congress enacted the Violent Crime Control and Law Enforcement Act of 1994, of which the DPPA was a part. Through the DPPA, Congress intended to prevent stalkers, harassers, would-be criminals, and other unauthorized individuals from obtaining and using personal information from state motor vehicle records. The act included a number of exceptions and created civil liability for any person or entity who obtained or used "personal information" as that term is used by the act.

Under the 1994 version of the DPPA, the release of personal information to direct marketers was subject to an "opt-out" requirement. In other words, an entity could obtain "personal information" from a state motor vehicle record for essentially any purpose as long as the individual whose information was obtained had not "opted out" by signing a document requesting that the state not sell his information.

However, in 1999, Congress amended the DPPA to require states to have an "opt-in" policy to prohibit direct marketers from obtaining an individual's personal information from states' departments of motor vehicles without the individual's express consent. The effective date of this amendment was June 1, 2000. As a result of this amendment, a state's department of motor vehicles cannot disclose an individual's driver's license information without express permission from the individual about whom the information pertains.

### a.   Florida's reaction to the 1999 amendment.

For unknown reasons, the State of Florida waited almost four years, until May 13, 2004, to amend its public records statute to comply with the DPPA.[1] Consequently, third parties, including Settling Defendants, accessed, and continue to unlawfully access, Plaintiffs' and the Class Members' personal information (obtained between 2000 and 2004) in direct violation of the DPPA. This failure on the part of the State of Florida to safeguard drivers' license records is the heart of this Florida Litigation and the focus of Defendants' liability. Defendants in this Florida Litigation claim they believed that the State of Florida was in compliance with the DPPA and that, as a result, they are at most guilty of "technical violations."

---

[1] *See* FLA. STAT. § 119.07(3)(aa)(12); 2004 Fla. Sess. Law Serv. 2004-62 (West).

b.  **Texas reaction to the 1999 amendment.**

Contrary to the DPPA's requirements that drivers "opt in" before the State can disclose their personal information for marketing or solicitation, the State of Texas chose not to implement such a procedure. Thus, Texas also does not obtain express consent from any driver for the release of their personal information. Unlike Florida, however, the State of Texas only sells "personal information" from a motor vehicle record to "persons" who certify that they have a lawful purpose for the information and/or have obtained the specific written consent of the Texas driver or identification card holder for the release of their information. Once a "person," as that term is defined by the DPPA, certifies to the State of Texas that they have a lawful purpose for some personal information and/or have obtained any requisite consent (and agrees to indemnify the State of Texas for any damages that State might incur by this procedure), the State of Texas, through its Department of Public Safety, provides that person with a copy of the State's entire database of names, addresses, and other personal information – some twenty (20) million plus residents of the State of Texas.

Each Settling Defendant (or one of their subsidiaries) purchased this entire database of names from the Texas Department of Public Safety. Settling Defendants (or one of their subsidiaries) each have a signed contract with the State of Texas whereby they certify to the State of Texas that they have a proper purpose for obtaining each piece of personal information and/or have obtained requisite written consents. Significantly, these contracts also inform Defendants that the State of Texas has not obtained express consent for distribution for the names and requires Defendants to indemnify the State of Texas for any liability it might incur for Defendants wrongfully obtaining the personal information contained in the database.

Although Defendants may have a permissible use under the DPPA for obtaining "personal information" for some of the people in the database, they do not have a permissible purpose to obtain all twenty million names in Texas' database.

These allegations are the central basis for Objectors' claims in the Texas Litigation.[2] It is alleged that the Defendants in the Texas Litigation have knowingly violated the act. For this reason, Objectors assert that the violations involved in the Texas Litigation are significantly more severe than those involved in the Florida Litigation and certification of a national class is inappropriate.

---

[2] *See* Exhibit 1.

### a. The Proposed Class Does Not Meet the Requirements of F.R.C.P. 23(a).

For the reasons discussed above, I assert that certification of national putative class is inappropriate because such a class does not meet the requirements of Rule 23(a).

Rule 23(a) provides for certification of a class only if:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Thus, the four prerequisites of Rule 23(a) are: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. The numerosity requirement examines whether the class is so large that joinder of all members would be impracticable.[3] The requirements of commonality, typicality, and adequate representation overlap and tend to merge.[4] Generally, typicality and commonality examine "whether a sufficient nexus exists between the legal claims of the named class representatives and those of individual class members to warrant class certification."[5] "Adequacy of representation" means that the class representative has common interests with unnamed class members and will vigorously prosecute the interests of the class through qualified counsel.[6]

Although the proposed class clearly meets the numerosity requirement, it is clear that none of the other tests are satisfied. Because commonality and typicality tend to blend together, this Objection will discuss them simultaneously. The allegations in the Texas Litigation are that Defendants knew, because it was stated in their contract with the State of Texas, that the State had not implemented an "opt-in" procedure in compliance with amended the DPPA. Also, in the Texas Litigation, Defendants knew that they were obtaining the State's entire database containing personal information on over twenty million individuals. Defendants also knew they did not have a permissible purpose for all twenty million pieces of information. It is alleged that Defendants intentionally chose to ignore the provisions of the DPPA because it was less expensive to obtain the entire database rather than obtain information on an individual basis. This choice is not only a factor in whether the Court should award liquidated damages, but will likely expose Defendants to punitive damages.

---

[3] Fed.R.Civ.P. 23(a)(1).
[4] *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 626 n. 20 (1997).
[5] *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1346 (11th Cir.2001).
[6] *See id.*

Thus, while the Florida Litigation may be dealing with "technical" violations of the DPPA, the Texas Litigation deals with allegedly knowing, willful violations of the DPPA. For this reason, the named Plaintiffs are simply not typical of the plaintiffs of a nation-wide class. Presumably, alleged violations of the DPPA in other states will involve other types of violations as well. In short, the type of violation drives the culpability of Defendants and determines what types of remedies are available. Just because Class counsel and the proposed named Plaintiffs determined that injunctive relief is the appropriate remedy in Florida does not mean that it is appropriate for a national putative class.

This naturally leads to questions of whether the proposed class representatives are adequately addressing the concerns of the proposed national class as a whole. The allegations in the Texas Litigation have not been fully explored. It is clear from the proposed settlement agreement that it is based entirely on class counsel's understanding of the violations in Florida. The motions and briefs on file with the Court focus exclusively on Defendants' actions in Florida. The entire rest of the nation appears to be an afterthought.

Also, this settlement involves payment of millions of dollars of attorneys' fees and thousands of dollars of incentive awards. Courts have recognized that in these circumstances, there is strong reason to doubt whether the class representatives are representing the interests of the class as a whole.

Under these circumstances, Objectors assert that the proposed class representatives have not and are not adequately representing the interests of a national putative class. For this reason, certification of a national class should be denied.

### b. Certification of this Class Does Not Meet the Requirements of Federal Rule of Civil Procedure 23(b)(2)

Federal Rule of Civil Procedure 23(b) provides that "[a]n action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition: . . . the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."[7] While the conditionally certified class and preliminarily approved settlement involve such injunctive relief, the parties also seek, on behalf of the class, to *waive* the rights of absentee class members to statutory and punitive damages. The named plaintiffs failed to direct the Court to a single appellate court opinion approving of a settlement class involving a *waiver* of damages in a Rule 23(b)(2) class context.

---

[7] FED. R. CIV. P. 23(b)(2).

While the parties correctly note holdings f that "[m]onetary relief may be *obtained* in a Rule 23(b)(2) class action so long as the predominant relief sought is injunctive or declaratory,"[8] they err in determining that the *waiver* of statutory and punitive damages by class members makes certification under Rule 23(b)(2) proper.

The United States Supreme Court has specifically held that "when a district court, as here, certifies for class action settlement only, the moment of certification requires heightened attention."[9] This is because, in contrast to a class certified under Rule 23(b)(3), members of a Rule 23(b)(2) class do not have the right to opt-out.[10] Thus, the Supreme Court has repeatedly expressed concern over the constitutionality of certifying a mandatory class that includes claims for money damages because of the serious due process problems with resolving such claims on behalf of absentee class members.[11] As noted by the Eleventh Circuit:

> The explanation [for the differing levels of procedural safeguards] lies in the nature of the (b)(2) class and its basis of action. Because the interests and the relationship to the defendant as regards the alleged wrong are, by the very terms of the (b)(2) definition, substantially identical among all class members, notice that their rights are being litigated would add little or nothing. This is particularly true since the primary relief contemplated under (b)(2) is class-wide injunctive or declaratory relief and, by definition, the class comprises all those who will share in or be directly affected by the grant or denial of such relief. Thus, it was thought that those (b)(2) members who were not notified or given

---

[8] *Murray v. Auslander* 244 F.3d 807, 812 (11th Cir. 2001)(emphasis added).

[9] *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 848-49 (1999).

[10] *See Ticor Title Ins. Co. v. Brown*, 511 U.S. 117, 121, (1994) (per curiam) *See generally* 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, *Federal Practice and Procedure* § 1775 (2d ed.1986).

[11] *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846 (1999) (noting that certification of a mandatory class that includes money damages potentially compromises the Seventh Amendment and due process rights of individual claimants); *cf. Ticor Title Ins. Co. v. Brown*, 511 U.S. 117, 121, (1994) (dismissing writ of certiorari on the question of whether there is a constitutional right to opt out of any class action involving monetary damages but stating that it is "at least a substantial possibility" that class actions seeking money damages can only be certified under Rule 23(b)(3) in light of the constitutional considerations implicated); *see also In re Telectronics Pacing Sys.*, Inc., 221 F.3d 870, 881 (6th Cir.2000) (stating that the Supreme Court has stressed in interpreting Rule 23 that "principles of sound judicial management and constitutional considerations of due process and the right to jury trial all lead to the conclusion that in an action for money damages class members are entitled to personal notice and an opportunity to opt out.").

an opportunity to exclude themselves from the class were in no way deprived of due process since their claims rested on precisely the same grounds as all the other members and all the issues they would or could have raised were, in fact, adjudicated in the context of class. Too, their relief, if any-since it was of an injunctive nature-was also intended to be identical: a halt to the alleged wrongful actions or policies. The (b)(3) class, on the other hand, since it was envisioned as heterogeneous, was recognized as pregnant with potential tensions and interest-antagonisms between class members. For this reason, notice was mandated for (b)(3) members, and it was required that they be given an opportunity to opt out of the class.[12]

Thus, it is clear that the entire rationale for allowing the certification of a class under Rule 23(b)(2) and not allowing members to opt-out lies in the fact that the relief obtained *benefits* the absentee class members.   Here, the parties seek to *waive* statutory and punitive damages on behalf of absentee class members and not allow them to opt-out of the case.   This procedure is clearly an abuse of the Rule 23(b)(2) procedure and the Eleventh Circuit has recognized that a named plaintiff who would agree to such a procedure may not have the best interests of the class at heart.[13]

Except for one district court opinion, which cited no case in support of its determination, the named plaintiffs failed to present any authority for the proposition that a settlement class which specifically *waives* entitlement to statutory and punitive damages is properly certifiable under Rule 23(b).   In fact, at least one other Circuit has ruled that it was error to certify such a class.[14]

---

[12] *Holmes v. Continental Can Co.* 706 F.2d 1144, 1157 (11th Cir. 1983).

[13] *Cooper v. Southern Co.*, 390 F.3d 695, 721 (11th Cir. 2004)("The plaintiffs argue, nevertheless, that the district court could have certified a class under Rule 23(b)(2) only as to the injunctive and declaratory prayer for relief, thereby excluding altogether the damages issues from class certification. However, to the extent the named plaintiffs were willing to forego class certification on damages in order to pursue injunctive relief that consisted of an admonition to follow general principles of settled law, *it is far from clear that the named plaintiffs would adequately represent the interests of the other putative class members.* Indeed, to many of the class members (and especially to those who no longer work for the defendants), the monetary damages requested might be of far greater significance than injunctive relief, stated at a high order of abstraction, that simply directs the defendants not to discriminate. ")(emphasis added).

[14] *Molski v. Gleich* 318 F.3d 937, 950-951 (9th Cir. 2003)("Appellants also assert that the procedural safeguards were necessary because the monetary damages released by the consent decree were substantial, thus triggering minimum due process requirements. We agree. The certification of a mandatory class that includes treble damages may be violative of the absent class members' due process rights. We have held that statutory treble damages can be substantial and, thus, render the action a hybrid suit, in which minimum due process requires the right to opt-out.").

The unfairness of such a procedure is striking. Defendants get to provide the named plaintiffs with $6,500 each and pay their attorneys $7,500,000 in attorneys' fees. In exchange, they get to remove the possibility of a suit anywhere in the nation involving statutory damages or punitive damages and need not be concerned about the formation of a class action, as that procedure has been waived as well. No member of the class can opt out, so everyone is bound by the agreement. What a wonderful situation for a defendant to find ones' self. Under the circumstances, it is clear that the statutory damages are not incidental to the injunctive relief. Their waiver is the consideration used to entice the settling defendants to agree to this class certification. If the statutory and punitive damages were not waived, the settling defendants would not agree to certification. Thus, the predominate relief is the waiver of the statutory and punitive damages. For these reasons, as discussed above, using Rule 23(b)(2) to secure a waiver of statutory and punitive damage is an abuse of the injunctive class procedure.

Rule 23(b)(2) was designed to allow claims for injunctions to seek redress of civil rights violations. The law evolved to allow Rule 23(b)(2) class actions, even if it meant that the declaratory relief would *entitle* the class to damages. To allow conditional certification of a settlement class for the specific purpose of *waiving* the class's right to statutory or punitive damages and insulating a defendant from any class action seeking damages is simply an abuse of the process. While a non-opt-out class might make sense when damages follow from the injunctive relief, (because nonparty class members will receive a benefit, without a corresponding detriment) it is a deprivation of due process to waive the right to punitive and statutory damages on behalf of nonparty litigations who are not given a chance to opt-out of the class. For the Court to allow such a class to be even conditionally certified would be erroneous.

### c. The Terms of the Proposed Settlement are not Fair, Reasonable, or Adequate.

Finally, I submit, as stated above, that the terms of this settlement are not fair, reasonable, or adequate. Significant money that could be used to provide monetary relief to the class is being promised to the named plaintiffs and to class counsel. Monetary relief should be provided to the class, rather than injunctive relief. Defendants are not acknowledging any wrong-doing and nothing about this settlement provides a disincentive to stop them from engaging in this type of behavior in the future. The terms of the injunctive relief are fairly illusory as they can be disregarded if they are deemed to place a defendant at a "competitive disadvantage." For these reasons, I submit that this settlement agreement provides only negligible benefit to the class. Given the significant violations of the DPPA at issue, the class should be given enhanced monetary relief.

<u>**Statement Regarding Objector's Lawyers Speaking at the Final Approval Hearing**</u>

**My attorneys, Jeremy Wilson and Thomas Corea, of the Corea Firm, PLLC assisted me in the preparation of this objection letter.  I ask that these attorneys be allowed to speak on my behalf at the Final Approval Hearing in this matter.**

<u>**Points to be Addressed at Final Hearing**</u>

The points I would like them to speak about are generally outlined above, but in summary, they will speak about:

1) The propriety of certifying a non-opt out Rule 23(b)(2) class that waives the class's rights to statutory and punitive damages and which waives the class action device;

2) Why the certification under Rule 23(a) is improper due to the varying nature of the circumstances surrounding the DPPA violations in the various states, including Texas, and due to the promises of economic incentives to the class representative and their attorneys;

3) Why the settlements terms are not fair, reasonable, or adequate because it does not provide for any monetary relief to the class.

**My attorneys request thirty (30) minutes to discuss these issues.**

<u>**Attorneys' Relevant Class Action Experience**</u>

My attorneys at the Corea Firm, PLLC, have been involved in the following class action lawsuits:

1) *Fresco, et. al. v. Auto Data Direct,* Cause No. 03-61063, United States District Court for the Southern District.

Attorneys Wilson and Corea represented me and other objectors in seeking limited intervention and subsequently in objecting to the terms of the proposed settlement.  Ultimately, the settlement was approved over the objections.

2) *Taylor v. Acxiom, et. al.,* Cause No. 07-01, United States District Court Eastern District of Texas.

Attorneys Wilson and Corea represent me and twenty-four other Plaintiffs in this class action lawsuit.  No class counsel have been appointed in this case,

which is currently on appeal the United States Court of Appeals for the Fifth Circuit.

3) *Harris v. Blockbuster,* Cause No. 09-217, United States District Court Northern District of Texas

Attorneys Wilson and Corea represent the named plaintiffs in this class action lawsuit. No class counsel have been appointed in this case, which is currently on appeal the United States Court of Appeals for the Fifth Circuit.

4) *King v. Good Shepherd Health Systems, Inc.* Cause No. 2007-1137-A, District Court of Gregg County, Texas 188th Judicial District

Attorneys Wilson and Corea represent the named plaintiffs in this class action lawsuit. No class counsel have been appointed in this case. Discovery is proceeding.

5) *Champion v. Good Shepherd Heath Systems Inc.*, District Court of Gregg County, Texas, 188th Judicial District.

Attorneys Wilson and Corea represent the named plaintiffs in this class action lawsuit. No class counsel have been appointed in this case. Discovery is proceeding.

c.

## CONCLUSION

As discussed above, the claims involved in the Texas Litigation are significantly different than the claims involved in the Florida Litigation. The claims in the Texas Litigation have not been explored or addressed in the Florida Litigation, yet a proposed settlement has already reached which will resolve all DPPA claims around the Country. All of the named Plaintiffs in the Florida Litigation are Florida residents and their claims are not typical of those of the entire class and they are not adequate representatives of a national putative class. The certification of this national settlement class is improper under Rule 23 (a) and (b)(2) of the Federal Rules of Civil Procedure. Finally, the proposed settlement is not fair, reasonable, or adequate, because all of the monetary relief provided for is to be awarded to the named plaintiffs and their attorneys.

Submitted By:

JEREMY R. WILSON
Florida Bar No. 0545511

For all of the foregoing reasons, I ___James Roberts___ , hereby request that the Court deny approval of the proposed settlement in this action. I further request that this action be de-certified and that I be allowed to proceed with my lawsuit in Texas against the Settling Defendants.

_____
Signature

Enclosure

## CERTIFICATION

I, ___James Roberts___ , state that I have read the foregoing Objection to Class Action Settlement Objection. By signing below, I certify that I have fully reviewed the foregoing Objection Letter and have discussed this matter with my attorneys.

_____
Signature

_____10/05/09_____
Date

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-60695-Civ-Martinez/Brown

FRESCO et. al.

v.

R.L. Polk & Co. and Acxiom Corporation

# OBJECTION LETTER

| | |
|---|---|
| Letter Received: | October 20, 2009 |
| Postmark Date: | October 14, 2009 |
| Sender: | Robert Falkner<br>20826 Almar Rd.<br>Shaker Hts, OH 44122 |
| Page Count: | 5 |





UNITED STATES POSTAGE

PITNEY BOWES

$ 000.44⁰

02 1P
0002670463   OCT 14 2009
MAILED FROM ZIP CODE 44122

Fresco Notice Administrator
The Garden City Group, Inc.
PO Box 9000, #6520
Merrick, NY 11566-9000

11566+9000

ROBERT FALKNER
20826 Almar Rd.
Shaker Hts Ohio 44122

October 14, 2009

Fresco Notice Administrator
The Garden City Group, Inc.
P.O. Box 9000 #6520
Merrick, N.Y. 11566-9000

  Re: R.L. Polk & Co and Acxiom Corp., Case No. 07-60695 (JEM)

Dear Administrator:

  Please consider these to be my objections to the proposed settlement of this class action. I have an Ohio driver's license; I live at 20826 Almar Rd., Shaker Heights, Ohio 44122; my telephone number is (216) 991-4589. I realize that this letter is a few days late, but urge the administrator to accept these objections and to forward them to the appropriate parties since the few days delay will not prejudice anyone else's rights.

  I currently have no plans to appear at the Fairness Hearing.

  I believe that the proposed Class Action Settlement is inadequate, unfair, and unreasonable for the following reasons:

  1.  <u>ATTORNEY'S FEES:</u>

  Class Counsel indicates that it will be requesting attorney's fees and expenses of up to $7.5 Million Dollars at the Settlement Hearing. This is objected to because there is **NO** evidence on the record of how this amount was derived. The Order certifying the Settlement Class and Preliminary Approving the Settlement (Docket No. 90) states that counsel are to file material in support of the fee petition no later than November 9, 2009.

Clearly, I am not able to review the fee petition before filing these objections and therefore reserve the right to supplement these objections after I review the fee petition.

It is axiomatic that the amount of the attorney's fees must bear a rational relationship to the benefit obtained on behalf of the Class. This is especially true in a case like this where there are serious questions as to whether there is really any benefit to the Class at all (see following sections) and whether the attorneys did a good job. Nowhere in the Notice or the Settlement Agreement is there any estimate of the total possible monetary benefit to the Class. The injunctive relief requires the defendants to abide by the law in the future and to do some in-house training. There is no quantifiable consideration coming to the Class for the total release that it is being asked to give. It appears that Class Counsel are accepting $7.5 million from the defendants to drop this case and to cause the Class to release any and all claims that it could have against the Defendants.

Furthermore, this Court ruled in *Fresco I* that attorneys' fees in a class action of this kind were limited to Class Counsel's lodestar. Since no evidence of lodestar has yet been submitted, it is impossible to determine the amount of the fee, if any, to which Class Counsel is entitled.

One of my big questions that is not answered anywhere in the Notice or the Settlement Agreement is: **How do the legal fees in this Settlement relate to those in** *Fresco I* **(03-cv-61063(JEM)?** This case was severed from *Fresco I* in 2007. The attorneys in *Fresco I* originally requested $25 million for fees and expenses, were awarded less, then appealed that award. Will the fees awarded in this matter constitute

2

"double counting" or are they only attributable to the work performed for the Class against these defendants?

2.   DRIVER'S PRIVACY PROTECTION ACT

This case was brought to enforce rights granted under the Driver's Privacy Protection Act 18 U.S.C. §§ 2721-2725 ("DPPA"). DPPA provides for statutory liquidated damages in the amount of $2,500 per person for each violation of the Act, 18 U.S.C. §2724(b) (1).   In this case, no monetary benefit is going to the Class and the Class is being asked to give a complete release of all past and future violations of the Act. This is grossly unfair.   The Settlement Agreement states that it applies to at least 200,000,000 drivers.  Assuming that each person's information is wrongfully disclosed only one time, the potential damages to the Class are astronomical: **Five hundred trillion dollars ($500,000,000,000).**  To give a total release for zero dollars is unconscionable.  It appears that the attorneys who supposedly represented the Class have sold out to their clients for 7.5 (Million) pieces of silver.

In the Eleventh Circuit, actual damages do not have to be shown in order to recover liquidated damages under the DPPA.  In *Kehoe v. Fidelity, 421 F. 3d 1209 (11th Cir. 2005)* the Court held that one need not prove any actual damages in order to recover liquidated damages for a violation of the Act.

3.   CLASS CANNOT BE CERTIFIED

This class cannot be certified.  As the Supreme Court said in *Anchem Products Inc. v. Windsor 521 U.S. 591 (1997)* a "sprawling class" like this one cannot be certified. To be certified, the class must meet the Rule 23 (b) (3) criteria that common questions "predominate over any questions affecting only individual members" and that class

resolution be "superior to other available methods for the fair and efficient adjudication of the controversy." *Id. at 592.* Here the class is too large (consisting of every licensed driver in the United States), unmanageable and unwieldy. The identity of the individual class members on a nationwide basis is not easy to ascertain, nor is this class action superior to any other method. Those whose information was used are different from those whose identity was not compromised. In a settlement like this (which purports to release claims of every licensed driver in the U.S.), there is an obvious lack of certainty as to whether an individual is in the class. The only ones who are truly in the Class are those whose information has been used. But here, without a Claims Process or other means of identification, there is a total lack of certainty. And this lack of certainty is such that the class as defined in the Notice is not manageable and is not clearly identifiable and therefore fails to comply with the requirements of Rule 23. See also *Ortiz v. Fibreboard 527 U.S. 815 (1999).*

   4. I respectfully adopt and incorporate into these Objections all other well-taken, timely filed Objections that are not inconsistent with these Objections.

Very Truly Yours,

Robert Falkner

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-60695-Civ-Martinez/Brown

FRESCO et. al.

v.

R.L. Polk & Co. and Acxiom Corporation

# FORMAL OBJECTION LETTER

| | |
|---|---|
| Letter Received: | October 20, 2009 |
| Postmark Date: | October 15, 2009 |
| Sender: | Marvin L. Union, Esq.<br>13530 Heath Rd.<br>Novelty, OH 44072 |
| Page Count: | 8 |



MARVIN L. UNION
ATTORNEY-AT-LAW
13530 HEATH ROAD
NOVELTY, OHIO 44072

Objections Telseco Notice Administrator
c/o Garden City Group Inc
PO Box 6000
#6530,
Merrick NY 11566-9000



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-60695 (JEM)

|  |  |  |
|---|---|---|
| RICHARD FRESCO, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| Vs. | ) | **OBJECTIONS** |
| | ) | |
| AUTOMOTIVE DIRECTIONS, INC. | ) | |
| A Wisconsin Corporation, et al. | ) | |
| | ) | |
| Defendants, | ) | |

## OBJECTIONS TO THE PROPOSED SETTLEMENT OF CLASS ACTION

Now comes Marvin L. Union, holder of an Ohio Driver's License, who resides at

13530 Heath Road, Novelty, Ohio, whose telephone number is (440) 338-8185

("Objector") and hereby file these objections to the proposed settlement of this Class

Action. The undersigned recognizes that these objections are a few days late, but believes

that no prejudice will be visited upon anyone if this objection is accepted and taken into

consideration.

## NOTICE OF INTENT TO NOT APPEAR

Objector hereby gives notice that he does not intend to appear at the Fairness

Hearing currently scheduled for December 7, 2009 at 10:00 a.m. in the U.S. District

Court for the Southern District of Florida before the Honorable Jose E. Martinez, in

courtroom 10-2, at the U.S. Courthouse, 400 North Miami Avenue, Miami, Florida

33128, but will rest on these written objections.

1

## **OBJECTIONS**

The proposed Class Action Settlement is inadequate, unfair, and unreasonable for the following reasons:

1.   ATTORNEY'S FEES:

Class Counsel indicates that it will be requesting attorney's fees and expenses of up to $7.5 Million Dollars at the Settlement Hearing. This is objected to because there is **NO** evidence on the record of how this amount was derived. The Order certifying the Settlement Class and Preliminary Approving the Settlement (Docket No. 90) states that counsel are to file material in support of the fee petition no later than November 9, 2009. Clearly, the undersigned objector is not able to review the fee petition before filing these objections and therefore reserves the right to supplement these objections after he reviews the fee petition.

It is axiomatic that the amount of the attorney's fees must bear a rational relationship to the benefit obtained on behalf of the Class. This is especially true in a case like this where there are serious questions as to whether there is really any benefit to the Class at all (see following sections) and whether the attorneys did a good job. Nowhere in the Notice or the Settlement Agreement is there any estimate of the total possible monetary benefit to the Class. The injunctive relief requires the defendants to abide by the law in the future and to do some in-house training. There is no quantifiable consideration coming to the Class for the total release that it is being asked to give. It appears that Class Counsel are accepting $7.5 million from the defendants to drop this case and to cause the Class to release any and all claims that it could have against the Defendants.

2

Furthermore, this Court ruled in *Fresco I* that attorneys' fees in a class action of this kind were limited to Class Counsel's lodestar. Since no evidence of lodestar has yet been submitted, it is impossible to determine the amount of the fee, if any, to which Class Counsel is entitled.

2.   DRIVER'S PRIVACY PROTECTION ACT

This case was brought to enforce rights granted under the Driver's Privacy Protection Act 18 U.S.C. §§ 2721-2725 ("DPPA"). DPPA provides for statutory liquidated damages in the amount of $2,500 per person for each violation of the Act, 18 U.S.C. §2724(b) (1). In this case, no monetary benefit is going to the Class and the Class is being asked to give a complete release of all past and future violations of the Act. This is grossly unfair. The Settlement Agreement states that it applies to at least 200,000,000 drivers. Assuming that each person's information is wrongfully disclosed only one time, the potential damages to the Class are astronomical: **Five hundred trillion dollars ($500,000,000,000).** To give a total release for zero dollars is unconscionable. It appears that the attorneys who supposedly represented the Class have sold out to their clients for 7.5 (Million) pieces of silver.

In the Eleventh Circuit, actual damages do not have to be shown in order to recover liquidated damages under the DPPA. In *Kehoe v. Fidelity, 421 F. 3d 1209 (11th Cir. 2005)* the Court held that one need not prove any actual damages in order to recover liquidated damages for a violation of the Act.

3.   CLASS CANNOT BE CERTIFIED

This class cannot be certified. As the Supreme Court said in *Anchem Products Inc. v. Windsor 521 U.S. 591 (1997)* a "sprawling class" like this one cannot be certified.

3

To be certified, the class must meet the Rule 23 (b) (3) criteria that common questions "predominate over any questions affecting only individual members" and that class resolution be "superior to other available methods for the fair and efficient adjudication of the controversy." *Id. at 592.* Here the class is too large (consisting of every licensed driver in the United States), unmanageable and unwieldy. Identifying each individual class member on a nationwide basis is not easy, nor is a class action superior to any other method. Those whose information was used are different from those whose identity was not compromised. In a settlement like this (which purports to release claims of every licenses driver in the U.S.), there is an obvious lack of certainty as to whether an individual is in the class. The only ones who are truly in the Class are those whose information has been used. But here, without a Claims Process or other means of identification, there is a total lack of certainty. And this lack of certainty is such that the class as defined in the Notice is not manageable, is not clearly identifiable and therefore fails to comply with the requirements of Rule 23. See also *Ortiz v. Fibreboard 527 U.S. 815 (1999).*

4.     REQUEST TO CONDUCT DISCOVERY

It is well established that Objectors have the right to pursue discovery from the settling parties. *See In Re: General Motors Corp. Engine Interchange Litig.,* 594 F 2d 1106 (7th Cir. 1979). (The Trial Court abused its discretion by preventing Objectors from showing through discovery that negotiations prejudice the best interest of the class); A. Conte, *Newburg on Class Actions,* § 11.57, pp. 11-140 to 11-114 (3d ed., 1992) (reviewing case law and noting that Objectors generally have a right to conduct independent discovery).

4

This Objector wish to exercise this right, and if granted leave to do so, would like to serve a limited number of narrow and carefully drafted Requests for Production and Interrogatories upon each of the settling Parties. The discovery will go to the heart of these Objections to the proposed Settlement. This Court should not preliminarily approve the Settlement before this Objector has received responses to such discovery, and has had an opportunity to file supplemental materials in support of his Objections. The Objector wishes to take discovery on the following crucial questions:

### A. How Did Class Counsel Conduct the Negotiations Relating to This Settlement?

Class members are entitled to learn the details of the negotiations in light of the possibility, strongly suggested by the settlement's terms, that Class Counsel might have compromised the absent Class Member's interests to obtain a 7.5 million dollar fee. *Ficalora v. Lockheed Calif. Co.,* 751 F2d 995, 996 (9th Cir. 1985) ("The attorney also can be forced into a situation in which his or her own fee can be enlarged or reduced by concessions made by the class or by members of the class in order to achieve settlement.")

### B. What are Class Counsel's Time and Expenses in This Case?

Class Counsel has not provided any detailed information about the actual time spent on the case. Detailed time records (redacted and submitted under seal if appropriate) should be submitted to this Court for review. This Court should permit discovery on Class Counsel's lodestar as a check

upon the reasonableness of the requested fee award. This information is completely absent from the papers currently on file.

**C.    What Is The Value of the "Benefit" That The Class Members Will Receive?**

The Settlement Agreement and Notice fail to disclose the value of the benefits Class Members will receive for the so-called "injunctive relief." Without disclosing an estimate of the value of benefits, or any basis to establish an estimated value, absent Class Members lack adequate information to make an informed decision concerning their options.

**D.    How do the legal fees in this Settlement relate to those in *Fresco I* (03-cv-61063(JEM)?**

This case was severed from *Fresco I* in 2007. The attorneys in *Fresco I* originally requested $25 million for fees and expenses, were awarded less, then appealed that award. Will the fees awarded in this matter constitute "double counting" or are they only attributable to the work performed for the Class against these defendants?

5. Objector respectfully adopts and incorporates into these Objections all other well-taken, timely filed Objections that are not inconsistent with these Objections.

6. The Class members have a legally protectable interest in this litigation. That interest will be impacted by the proposed settlement agreement, particularly the legal fees that are being requested.

WHEREFORE, Objector respectfully requests that this Court:

A.    Upon proper hearing, sustain these Objections;

B.    Continue the issue of attorneys' fees and expense reimbursement

for a subsequent hearing;

C.    Upon proper hearing, enter such Orders as are necessary and just to

adjudicate these Objections and to alleviate the inherent unfairness,

inadequacies and unreasonableness of the Settlement and the requested

attorneys' fees and expenses.

Marvin L. Union

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-60695-Civ-Martinez/Brown


FRESCO et. al.

v.

R.L. Polk & Co. and Acxiom Corporation


# OBJECTION LETTER


Letter Received:         October 20, 2009

Postmark Date:         October 9, 2009

Sender:         Douglas L. Taylor
                        1761 Schillinger Road S.
                        Mobile, AL 36695

Page Count:         2

Douglas L. Taylor
1761 Schillinger Road S.
Mobile, AL 36695

$0.440
US POSTAGE
FIRST-CLASS
FROM 36542
OCT 09 2009
stamps.com

The Garden City Group, Inc.
#6520
PO Box 9000
Merrick NY 11566-9000



**Douglas L. Taylor**
1761 Schillinger Road S.
Mobile, AL 36695
(251) 422-8100

October 9, 2009

The Garden City Group, Inc.
P.O. Box 9000, #6520
Merrick, New York 11566-9000

Re:   *Fresco*, et al. *v. R.L. Polk & Co. and Acxiom Corporation*,
      No. 07-60695-Civ-Martinez/Brown

To Whom It May Concern:

My name is Douglas L. Taylor and I reside at 1761 Schillinger Road S., Mobile, AL 36695. My phone number is 251-422-8100. I am writing to object to the Proposed Settlement in the case listed above. I object to the Proposed Settlement because the settlement provides no benefit to class members other than an illusory injunction which only says that the defendants will comply with the law—which they already have to do anyway. Yet, the class attorneys are getting millions of dollars in fees. Just because the class attorneys have done a lot of work is no basis to pay them millions. Obviously, the settlement is being entered into just to get rid of the case, pay the lawyers a lot of money and give defendants a release. Everybody wins but class members. The Notice of the Proposed Settlement includes the information upon which I base my objection. The difficulty a class member has to go to object is extraordinary.

Sincerely,

Douglas L. Taylor