**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 07-60695-Civ-Martinez/Brown**

**RICHARD FRESCO, CARLOS BARRETT,
JEFFREY HY, MARY ANN COLLIER, ROY
McGOLDRICK, ROBERT PINO, KENNETH
W. HERETICK, RUSSELL V. ROSEN and
JOEL LEVINE,**

        **Plaintiffs,**

                **vs.**

**R.L. POLK & CO., a Delaware corporation;
and ACXIOM CORPORATION, a Delaware
corporation,**

        **Defendants.**

**PLAINTIFFS' MOTION FOR ENTRY OF AN ORDER APPROVING
DEFENDANTS' PAYMENT OF AGREED UPON INCENTIVE AWARDS TO
<u>CLASS REPRESENTATIVES AND ATTORNEYS' FEES AND EXPENSES</u>**

**AND**

**<u>MEMORANDUM OF LAW AND AUTHORITIES IN SUPPORT</u>**

Plaintiffs Richard Fresco, Carlos Barrett, Jeffrey Hy, Mary Ann Collier, Roy McGoldrick, Robert Pino, Kenneth Heretick, Russell V. Rosen, and Joel Levine (collectively, "Named Plaintiffs"), on behalf of themselves and all others similarly situated, seek entry of an Order approving the agreement on Incentive Awards and Attorneys' Fees set forth in Section VII of the Parties Settlement Agreement [DE 82-1] for the reasons set forth below.

**I.    <u>INTRODUCTION</u>**

**A.  History Of The Litigation**

Named Plaintiffs assert claims against Defendants R.L. Polk & Co. ("Polk") and Acxiom Corp. ("Acxiom") (collectively "Defendants") for alleged violations of the Driver's Privacy

Protection Act ("DPPA"), 18 U.S.C. §§ 2721-2725. This action arose in 2003, when some of the Named Plaintiffs brought an action in this U.S. District Court styled as *Fresco v. Automotive Directions, Inc.*, Case No. 03-cv-61063-JEM ("*Fresco I*"). Those Named Plaintiffs claimed that Defendants and others knowingly obtained, used, or disclosed "Personal Information" and "Highly Restricted Personal Information," as those terms are defined by the DPPA, from motor vehicle and drivers license records maintained by the State of Florida's Department of Highway Safety and Motor Vehicles in violation of the DPPA. After filing this case, a series of eleven other DPPA cases – which had also been filed in other Florida U.S. District Courts – were transferred to this Court and merged into *Fresco I*, *sub nom*.

On December 20, 2006, Named Plaintiffs and six *Fresco I* defendants filed motions to approve a settlement class. Defendants were not part of that settlement. Subsequently, this Court approved the *Fresco I* settlement and certified a nationwide settlement class ("*Fresco I* Class"). To manage the remaining litigation efficiently, the Court severed Named Plaintiffs claims' against Defendants and directed the Clerk of the Court to open a separate case known as *Fresco v. R.L. Polk & Co. and Acxiom Corp.*, Case No. 07-CV-60695-JEM ("*Fresco II*").

Pursuant to this Court's Order severing the case, Named Plaintiffs filed a Second Amended Complaint, which sought injunctive relief on behalf of a nationwide class of all drivers and motor vehicle record holders ("Class") for actual damages, statutory liquidated damages, and attorneys' fees and expenses. In response, Defendants denied each of the claims and filed Answers denying Plaintiffs' allegations. [DE Nos. 31, 32] Defendants later filed Motions for Judgment on the Pleadings. [DE Nos. 48, 49] Defendants continue to deny liability and that the action could be litigated on the merits on a class-wide basis. After severance, the parties engaged in motion practice and extensive discovery, inclusive of obtaining numerous documents from

Defendants, seeking requests for admissions, and took lengthy depositions of Defendants' representatives.

On April 21, 2008, while discovery proceeded, the Court ordered the parties to mediation. The parties agreed on the choice of mediator and on May 5, 2008, the Court approved the selection of James Chaplin, Esq., as the mediator. The mediation was protracted, being conducted over a period of eight months and involving numerous in person and telephonic sessions. Throughout the course of the mediation, the parties routinely updated the Court on the status. Those efforts were ultimately successful and produced the proposed resolution of this litigation.

On March 10, 2009, the Named Plaintiffs filed the Parties' Settlement Agreement [DE 82-1], their Motion for Preliminarily Approval of Proposed Settlement [DE 81], and accompanying Memorandum in Support of Motion for Preliminary Approval of Proposed Settlement. [DE 82]. On June 16, 2009, the Court entered an order preliminarily approving the Settlement Agreement and certifying preliminarily the Class. [DE 90] ("Preliminary Approval Order"). The Court also appointed Named Plaintiffs to serve as Class representatives and the attorneys who would serve as Class Counsel and Lead Counsel.[1] Notice was provided to the Class in accordance with the Preliminary Approval Order.

### B. The Proposed Settlement Would Greatly Enhance Privacy Protections

The proposed Settlement will provide important and significant safeguards for the protection and advancement of the privacy rights of the Class. Defendants – who are significant players in the information aggregation industry – will be required to adopt and implement a

---

[1] The Court appointed the following attorneys to serve as counsel for the Class: Tod Aronovitz, Aronovitz Law; John Yanchunis, James, Hoyer, Newcomer, Smiljanich & Yanchunis, P.A.; Joel S. Perwin, Joel S. Perwin, P.A.; Lawrence D. Goodman, Devine Goodman Rasco & Wells, P.A.; James K. Green, James K Green, P.A.; Peter Portley, Portley and Sullivan, P.A.; Jack Scarola, Denney Scarola Barnhart & Shipley, P.A.; and David D. Welch. Attorneys Tod Aronovitz and John Yanchunis were appointed as Lead Class Counsel.

number of measures to safeguard the privacy rights of the Class. Moreover, the measures will be monitored by credentialed privacy professionals to ensure that Defendants will implement and comply with the requirements of the Injunctive Relief. Also, Defendants will be enjoined from violating the DPPA, and obtaining, using, or disclosing Class members' information in any manner which violates the DPPA. The economic value of the Injunctive Relief, according to a leading privacy expert, exceeds $3 billion. *See,* Ponemon Decl. and Report, filed contemporaneously with this Memorandum. Accordingly, Named Plaintiffs' and Class Counsel's efforts have resulted in the settlement relief discussed below, which provides substantive, tangible benefits to the Class.

Class Counsel seeks Court approval of incentive payments in the amount of Four Thousand Five Hundred Dollars ($4,500) to each Named Plaintiff for their initiative and effort in pursuing this litigation to such a favorable outcome for the Class. Defendants have agreed to pay these incentive awards separately from the benefits Class Members will receive under the Settlement. These amounts are reasonable and should be approved.

In addition, Class Counsel requests the Court to approve the payment of attorneys' fees and expenses in the amount of Seven Million Five Hundred Thousand Dollars ($7,500,000), which Defendants have agreed to pay subject to Court approval as a negotiated term of the Settlement Agreement. The approval of the agreed amount of attorneys' fees will not reduce or affect in any way the settlement benefits being provided to the Class, and a decision to not award the amount sought will not create a pot of money for Settlement Class Members but will instead be returned to Defendants. Moreover, the amount of fees and costs requested is reasonable and supported by the Declarations of Class Counsel, Professor Theodore Eisenberg, Dr. Larry Ponemon, Attorney Ervin Gonzalez, Professor Daniel Solove, Attorney Steven Schwartz, and

Professor Linda Mullenix. The sum of $7,500,000 will compensate Class Counsel not only for services performed and expenses incurred in preparation of the instant case, but also for services and expenses necessary to obtain final approval of the Settlement. It will also cover all future services necessary to defend the Settlement on appeal, and to monitor each Defendant's compliance with the Settlement for the next ten years. Moreover, Class Counsel has agreed that if the Court approves the fee as agreed, Class Counsel will not seek additional sums from Defendants for legal services and expenses required to be performed in the future, even if those services exceed the sum approved to be paid by Defendants.

## II.    THE SETTLEMENT

The Settlement if approved requires Defendants to change how they do business with respect to DPPA protected information. Along with the measures obtained in *Fresco I* against the other significant information aggregation companies*,* such business practices changes will result in meaningful industry reform of the information aggregation industry concerning the obtainment, use, and disclosure of DPPA information.

In addition to making sure Defendants comply with the letter and spirit of the DPPA, the proposed Injunctive Relief would set in place a comprehensive compliance scheme. First, each Defendant must conduct its own internal assessment to evaluate its compliance with the DPPA and DPPA-State equivalents. Then a qualified Third Party Assessor will conduct his, her or its evaluation of each Defendant's Compliance Program. The Third Party Assessor for each Defendant will report its assessment to senior management. Any material deficiencies must be addressed. After reassessment, Class Counsel and the Court will be provided a summary of the Third Party Assessment. There will be three such assessments, once after approval of the Settlement, and the next two at 24- and 48-month intervals. Defendants must also develop and

implement a DPPA Compliance Program, which must be reviewed and updated annually, and develop detailed written procedures for the Compliance Program. Defendants must designate a DPPA Compliance Director, who will report directly to senior management and general counsel. In addition, each Defendant must develop procedures for customer credentialing and notification to customers of DPPA requirements. The customer restrictions will be written into customer contracts and Defendants will have the right to terminate any such contract if they find out that the relevant customer misuses DPPA information. Defendants are also required to develop and implement employee education concerning each Defendant's DPPA Compliance Program. The proposed Injunctive Relief will continue for seven years and is set forth in detail in the Settlement Agreement and Defendants are required to comply with the DPPA for ten years. *See* Settlement Agreement at 17-33 [DE 82-1].

Before agreeing to such relief, Class Counsel conducted a thorough examination and evaluation of the relevant law and facts to assess the merits of Named Plaintiffs' claims and potential claims to determine how best to serve the interests of the Named Plaintiffs and the Class. Both formal and informal discovery has been conducted. Class Counsel assigned a full-time investigator to this litigation.[2] In the course of the investigation and litigation, Class Counsel reviewed thousands of pages of documents provided by Defendants and obtained from public record requests, and deposed numerous employees of Defendants at locations across the United States.

During mediation – and based upon further investigation, discovery, sworn testimony, and evaluation of the facts and law relating to the matters alleged in the pleadings – the Parties reached an agreement to settle this action in accordance with the terms set forth in the Settlement

---

[2] James Ross is a veteran investigative reporter, a former employee of the Florida Office of the Attorney General, and a certified forensic fraud examiner.

Agreement. Agreement was reached only after considering such factors as: (1) the benefits to Named Plaintiffs and the Class under the terms of this Settlement Agreement; (2) the strength of Named Plaintiffs' case weighed against the settlement offer; (3) the attendant risks and uncertainty of litigation, especially in complex actions such as this, which involve allegations relating to privacy and violations based on the DPPA; (4) the attendant risks and uncertainty of establishing liability and damages; (5) Defendants' vigorous defense of the litigation and continued denial of the claims and facts contained in the Third Amended Complaint; (6) the desirability of consummating this Settlement Agreement promptly, to safeguard the privacy and security of Named Plaintiffs and the Class Members' personal information; (7) the preservation of claims for actual damages against the settling Defendants; and (8) the potential for the recovery of liquidated and punitive damages against third parties as a consequence of other similar violations of the DPPA. Those factors are considered and discussed more fully in Plaintiffs' Memorandum in Support of Motion for Preliminary Approval of Proposed Settlement. *See* Memorandum at 19-33 [DE 82]. The Settlement proposes certification of a settlement class under Fed. R. Civ. P. 23(b)(2) ("Plaintiff Class") and is for injunctive relief only. Members of the Class will retain their respective claims, if any, to actual damages and punitive damages based on any actual damages. Each Named Plaintiff agreed to the terms of the Settlement Agreement.

As supported by the Declarations of the mediator, James Chaplin, and lead class counsel, Tod Aronovitz and John Yanchunis, only after reaching an agreement on the merits of the settlement, did the parties turn to the issue of incentive awards to the Named Plaintiffs. *See* Declarations of James Chaplin, Tod Aronovitz and John Yanchunis. And only after an agreement was reached on both the merits and incentive awards did the parties then negotiate the issue of

7

attorneys' fees and expenses. This evidences that there was no collusion between Defendants' Counsel and Class Counsel to the detriment of the Class in the settlement of the case. Declaration by L. Mullenix at 26-34, ¶¶ 102, 109, and 113; Declaration by Theodore Eisenberg at 15. As they had for all other aspects of the mediation, Class Counsel did considerable groundwork in preparation for the mediation on attorneys' fees, and negotiated in good faith to reach a meaningful settlement. Faced with an impasse, Class Counsel repeatedly took the position that they were willing to have the amount of fees and expenses be determined by this Court after hearing arguments from the parties. Defendants, however, were unwilling to proceed in that manner. Further discussions between the parties eventually led to a settlement through mediation of the fees and expense issue.

Based on the following analysis, Named Plaintiffs and Class Counsel believe this is a fair, adequate and reasonable settlement, which they ask the Court to approve.

### III.   NAMED PLAINTIFFS ARE ENTITLED TO INCENTIVE AWARDS

Class Counsel requests approval of an incentive award to the Named Plaintiffs in the amount of Four Thousand Five Hundred ($4,500) each. Named Plaintiffs have been the class representatives in this case from the litigation's commencement until the present. Defendants do not oppose these awards and will pay them, if approved, as provided by the Settlement Agreement.

"Federal courts consistently approve incentive awards in class action lawsuits to compensate named plaintiffs for the services they provide and burdens they shoulder during litigation." *Camp v. Progressive Corp.*, 2004 WL 2149079 at *8 (E.D. La. 2004) (omitting internal citations); *see also Carraba v. Randall's Food Markets, Inc*., 191 F. Supp. 2d 815, 835 (N.D. Tex. 2002) (recognizing practice of awarding incentive awards). Moreover, under

circumstances where a private class action suit serves as a means to enforce laws "designed for the protection of the public," "[c]ourts have found it appropriate to specially reward named class Plaintiffs for the benefits they have conferred." *Pinto v. Princess Cruise Lines*, 513 F. Supp. 2d 1334, 1344 (S.D. Fla. 2007). The DPPA is clearly a law designed for the protection of the public, and as such, Named Plaintiffs should be awarded incentives.

Based on Class Counsel's experience, the amounts requested here are consistent with or below the amounts typically awarded in similar litigation. *See, e.g., Camp*, 2004 WL 2149079, at *7 (awarding up to $10,000 to each named plaintiff as incentive awards, for a total payment of $102,000); *In re Lease Oil Antitrust Litigation (No. II),* 186 F.R.D. 403, 449 (S.D. Tex. 1999) (awarding named plaintiffs up to $10,000 each for participating in lawsuit); *In re Granada P'ship Sec. Litig.*, 805 F. Supp. 1236, 1247 (S.D. Tex. 1992) (granting request for incentive award of $5,000 to representative class action plaintiffs); *Purdie v. Ace Cash Express, Inc*., No. Civ. A. 301CV1754, 2003 WL 22976611, at *7 (N.D. Tex. Dec. 11, 2003) (awarding the three named plaintiffs a combined incentive award of $16,665); *In re Catfish Antitrust Litig.*, 939 F. Supp. 493, 504 (N.D. Miss. 1996) (awarding each of four named plaintiffs a $10,000 incentive award).

Each Named Plaintiff has actively followed this case and participated in the discovery process, pre-trial motion practice process, and negotiation phase of the case during the past two years. *See* Declarations of all Named Plaintiffs. The Named Plaintiffs have demonstrated a keen interest in the enforcement of DPPA and the protections that it affords Americans. *Id.* The incentive awards requested are justified in light of the Named Plaintiffs' willingness to devote their time and energy to prosecuting a representative action and reasonable in consideration of the overall benefit conferred on the Class, and should be approved.

IV.     **LEGAL FEES AND EXPENSES SOUGHT BY CLASS COUNSEL**

The Settlement Agreement also provides that Defendants will pay Class Counsel attorneys' fees and expenses of up to $7,500,000 in consideration of the services performed by counsel in the past and to be performed for ten years in the future, for all subsequent services to ensure Defendants' compliance with the proposed Injunctive Relief detailed in the Settlement, and to defend the final judgment on appeal. Settlement Agreement at 34-35 [DE 82-1]. Notably, the amount Defendants have agreed to pay is not based on the fee-shifting provisions of the DPPA. Rather, it is based upon the agreement of the Parties. The Settlement Agreement states: "Class Counsel will not be requesting attorneys' fees under the fee shifting provisions of the DPPA, *but rather pursuant to this Settlement Agreement between the Parties and because of their role as counsel to the proposed Settlement Class.*" *Id.* at 35 (emphasis supplied). Moreover, under a common benefit analysis, the fees and expenses requested for court approval are but an infinitesimal percentage of the economic value of the proposed Injunctive Relief, namely 0.2245%, or roughly two-tenths of one percent. Thus, the fees are fair and reasonable, and will not impact the economic benefit to the Class.

A.      **The Attorneys' Fees Requested Are Based on the Parties' Settlement**

Parties to a class action settlement often agree that a defendant will pay attorneys' fees to plaintiffs' counsel. Such an arrangement poses no particular problem for court approval, where the amount of the fee is reasonable under the circumstances. Rule 23(h) embodies this principle: "In an action certified as a class action, the court may award reasonable attorney fees and nontaxable costs authorized by law *or by agreement of the parties*." Fed. R. Civ. P. 23(h) (emphasis supplied). Federal courts at all levels encourage litigants to resolve fee issues by agreement whenever possible and such agreements are generally entitled to deference. As the

10

United States Supreme Court explained, "[a] request for attorneys' fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983); *see also*, *Johnson v. Ga. Hwy. Express, Inc.*, 488 F.2d 714, 720 (5th Cir. 1974) ("In cases of this kind, we encourage counsel on both sides to utilize their best efforts to understandingly, sympathetically, and professionally arrive at a settlement as to attorneys' fees."). Accordingly, courts are permitted to award attorneys' fees and expenses where all parties have agreed to the amount, subject to court approval, especially where the amount is in addition to and separate from the defendant's settlement with the class. *See*, *e.g.*, *Local 56, United Food & Commercial Workers Union v. Campbell Soup Co.*, 954 F. Supp. 1000, 1005 (D.N.J. 1997) (granting class counsel the maximum amount of fees agreed to by defendant under the settlement agreement, where "class members . . . retain all that the settlement provides [and] do not lose any of the negotiated benefits on account of an attorneys' fee and costs award that equals the 'cap' on such an award set forth in the settlement."). Indeed, the Supreme Court has suggested that such agreements be encouraged as a matter of public policy. *See Hensley*, 461 U.S. at 437.

The benefit of a fee negotiated by parties at arms' length is that it sets a market price for the work performed resulting from opposing interests based on real market conditions: Defendants have an interest in minimizing the fee, whereas plaintiffs have an interest in maximizing it. The negotiations that result in an agreement are informed by the parties' knowledge of the work done and result achieved and their views on what the court may award if the matter were litigated. In *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566 (7th Cir. 1992), the Seventh Circuit endorsed such a market-based approach to evaluating fee requests. According to Judge Posner, "it is not the function of judges in fee litigation to determine the equivalent of the

medieval just price." *Id.* at 568. Moreover, "[i]t is to determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order." *Id.* "Markets know market values better than judges do." *Id.* at 570. "The object in awarding a reasonable attorney's fee . . . is to give the lawyer what he would have gotten in the way of a fee in an arms' length negotiation, had one been feasible." *Id.* at 572.

Additionally, as explained in *McBean v. City of New York*, 233 F.R.D. 377 (S.D.N.Y. 2006), a court need not review an application for attorneys' fees with a heightened level of scrutiny where, as here, the parties have contracted for an award of fees that will not be paid from a common fund. "If money paid to the attorneys comes from a common fund, and is therefore money taken from the class," the *McBean* court reasoned, "then the Court must carefully review the award to protect the interests of the absent class members." *Id.* at 392 (citing *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 123-24 (2d Cir. 2005) and *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000)). The *McBean* court further stated that "[i]f, however, money paid to attorneys is entirely independent of money awarded to the class, the Court's fiduciary role in overseeing the award is greatly reduced, because there is no conflict of interest between attorneys and class members." *Id.* The *McBean* court concluded that the parties' agreement for attorneys' fees was objectively reasonable because it was the product of arm's length negotiations. *Id.*

Like the case here, true arm's-length negotiations between competing interests indicate that the settlement is fair and reasonable. In *In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.,* MDL No. 901, 1992 WL 226321, at 4 (C.D. Cal. June 10, 1992), *appeal dismissed*, 33 F.3d 29 (9th Cir. 1994), the district court approved a negotiated fee of $8 million. That district court found:

> The fee was negotiated at arm's length with sophisticated defendants by the attorneys who were intimately familiar with the case, the risks, the amount and value of their time, and the nature of the result obtained for the class. Where there is such arm's length negotiation and there is no evidence of self-dealing or disabling conflict of interest, the Court is reluctant to interpose its judgment as to the amount of attorneys' fees in the place of the amount negotiated by the adversarial parties in the litigation.

*Id.* The rationale espoused by the Seventh Circuit, the *First Capital* court, and other courts applies equally here.[3] Defendants sought to minimize the fees that they must pay in addition to the benefits they will provide to the Class, and therefore Defendants had a keen interest in negotiating the smallest amount their clients would have to pay. Class Counsel, on the other hand, after negotiating the best settlement that it could obtain for the Class, wished to receive full compensation, as the law encourages, for undertaking this litigation and devoting the resources and skill necessary to successfully overcome Defendants' legal and factual arguments and bring this case to a successful conclusion.

Significantly, the fee requested was negotiated at arms' length and only after agreement on the merits had taken place. *See* Declarations of James Chaplin, Tod Aronovitz, and John Yanchunis. It was negotiated by sophisticated counsel who were knowledgeable and well informed about the case generally and the risks of continued litigation. Moreover, counsel for both sides were aware of the result obtained for the Class, the customary fees awarded by courts

---

[3] *See also Malchman v. Davis*, 761 F.2d 893, 905 n.5 (2d Cir. 1985) ("an agreement 'not to oppose' an application for fees up to a point is essential to completion of the settlement, because the defendants want to know their total maximum exposure and the plaintiffs do not want to be sandbagged."); *Lobatz v. U.S. West Cellular of Cal., Inc.*, 222 F.3d 1142 (9th Cir. 2000) (affirming award of fees and expenses, where defendant had agreed not to oppose request for fees and expenses up to a negotiated ceiling and to be paid separately from class settlement benefits); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998) (upholding the district court's award of attorneys' fees, citing lack of abuse of discretion, where the court had approved attorneys' fees and costs of $5.2 million that were negotiated after the final settlement was achieved); *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 671 F. Supp. 819, 829 (D. Mass. 1987) ("Whether a defendant is required by statute or agrees as part of the settlement of a class action to pay the plaintiffs' attorneys' fees, ideally the parties will settle the amount of the fee between themselves.").

in similar types of cases, and the magnitude of the fee the Court may award if the matter were litigated.

Finally, even if the Court were to approve less than the agreed upon amount of attorneys' fees, that would not confer a greater benefit upon the Class, but rather would only benefit Defendants' coffers. Thus, this Court should give the agreed-upon fee deference and adopt the agreement as an order of the Court.

### B. The Attorneys Fees and Costs Agreed to be Paid by Defendants Are a Small Percentage of the Common Benefit of the Settlement to the Class

This settlement involves a substantial common benefit to the Class. Data breaches have negative economic consequences. As supported by the work of Dr. Larry Ponemon,[4] the proposed Injunctive Relief will reduce the number of data breaches by half over the next seven years. As a result, two million less Class Members will experience data breaches. Dr. Ponemon opines that the injunctive relief will result in an economic benefit to the Class Members of $3.34 billion dollars over the seven year period of the proposed Injunctive Relief. Dr. Ponemon's reasoning is set forth in Appendix 1 to his Declaration and is based on data from Javelin Strategy & Research's *2008 Identity Fraud Survey Report* and *2006 Identity Fraud Survey: Consumer Report*.

Professor Daniel Solove[5] has reviewed the proposed Injunctive Relief. Solove Decl. at 5. In his Declaration, he discusses what privacy is and the value of privacy in economic (identify theft and data breaches) and personal terms (dignitary harm and physical danger). *Id.* at 5-8, 9-15. Professor Solove also opines on the proposed Injunctive Relief and finds that it addresses the

---

[4] Dr. Larry Ponemon is a leading privacy expert. He is Chairman and Founder of the Ponemon Institute, an organization dedicated to privacy and data protection practices. Among other duties, he served on the Advisory Committee for Online Access & Security for the U.S. Federal Trade Commission. He currently serves on the Data Privacy and Integrity Advisory Committee for the U.S. Department of Homeland Security.

[5] Professor Solove is a law professor at George Washington University Law School. He focuses his research on information privacy law. He has been published extensively on the subject, including as the co-author of the casebook, *Information Privacy Law,* Aspen Publishers (3rd ed. 2009).

harms that he discusses in his Declaration. *Id.* at 19-20. Although Professor Solove does not quantify the economic damage as did Dr. Ponemon, he finds that the Injunctive Relief component of the Settlement "will significantly improve the way Defendants handle DPPA-regulated information and ensure that the laudable goals of DPPA are effectively carried out in practice."[6] *Id.* at 5.

In light of the value of the Injunctive Relief, the payment of $7,500,000 in attorneys' fees is but a small fraction of the $3.34 billion economic benefit and in percentage terms is roughly two-tenths of 1% (.2245%). This percentage serves as a cross-check for the reasonableness of the agreement on fees and expenses, which Class Counsel seeks approval by this Court. In a related DPPA case, this Court approved a negotiated fee settlement of $2,850,000 based on a valuation of $44,000,000, or approximately 6.47% of the total economic benefit. Final Judgment Approving Class Action Settlement and Awarding Attorney's Fees, Expenses and Class Representatives' Incentive Awards, *Mary Ann Collier et al. v. Fred O. Dickinson, III et al.*, Case No. 04-21351-CIV-Martinez-Brown, S.D. Fla., at 8, ¶ 16 and 10, ¶ 23 (document 292, entered 6/29/09). It is worth noting that the valuation of the injunctive relief relied upon by this Court in *Collier* was provided by Dr. Larry Ponemon ($35 million), the same expert utilized to value the injunctive relief in this instant case. *Id.*

---

[6] In his Declaration, Professor Solove goes on to say:

> By providing a dedicated privacy official for overseeing DPPA-regulated information, and mandating that Defendants engage in a compliance assessment and develop a compliance program, the settlement will ensure that the Defendants (1) become better aware of DPPA's requirements; (2) gain greater internal knowledge and control over their practices with regard to DPPA-regulated information; (3) recognize the consequences of their practices on privacy; and (4) establish a systemic approach toward DPPA compliance, carried out over a long duration, that prevents drift and engrains DPPA compliance within institutional culture.

*See* Solove Decl. at 5-6.

This percentage is also well below the amount allowed by federal courts throughout the country and this Circuit, where a range of 20%-30% of a common fund, with an upper limit of 50%, is the general rule and 25% of the common fund is a "benchmark" which may be adjusted in accordance with the individual circumstances of each case. *Camden I Condominium Ass'n., Inc. v. Dunkle*, 946 F.2d 768, 774-75 (11th Cir. 1991); *Waters v. International Precious Metals Corp.*, 190 F.3d 1291 (11th Cir. 1999) (33.25% of $40 million common fund); *In re Sunbeam Securities Litigation*, 176 F.Supp.2d 1323 (S.D. Fla. 2001) (25% of $110 million common fund). Moreover, the 25% benchmark in not a ceiling or a floor. *Sunbeam,* 176 F.Supp. at 1323.

In Rule 23(b)(2) cases where equitable relief predominates over damages – as is the case here – courts can look at the overall benefit to the class in determining the amount of the fee based upon the economic benefit to the class. *See Shaw v. Toshiba America Information Systems, Inc., et al.*, 91 F.Supp.2d 942 (E. D. Tex. 2000) ($147.5 million legal fee on $1 billion coupon settlement) (14.75%); *Gonzalez v. Abercrombie & Fitch Stores, Inc.,* Nos. 03-3817 SI, 04-4730 and 04-4731 (N.D. Cal.) ($7.25 million legal fee on $42.5 million settlement) (17%); *Butler v. Home Depot, Inc.*, Nos. C-94-4335 SI, C-95-2182 SI, 1997 WL 605754, N.D. Cal. Aug. 29, 1997 ($22.5 million legal fee on $87.5 million settlement) (25.7%); *Stender v. Lucky Stores, Inc.,* No. C-88-1467 MHP, 1993 WL 557652, (N.D. Cal. December 15, 1993) ($13.75 Million legal fee on $107.25 million settlement) (12.8%); *Kraszewski et al v. State Farm General Insurance Co.,* 139 F.R.D. 156 (N.D. Cal. 1991) ($65 million legal fee on $240 Million settlement) (27%); *Haynes v. Shoney's, Inc.,* 1993 WL 19915 (N.D.Fla. 1993) ($24.4 million legal fee on $130.5 million settlement) (18.6%); *Shores v. Publix Super Markets, Inc.,* No. 95-1162-CIV-T-25E, 1997 WL 714787 (M.D. Fla. January 27, 1997) ($16.7 million legal fee on $81.5 million

settlement) (20.4%); *Babbitt v. Albertson's, Inc.,* 1993 WL 150300 (N.D.Cal. 1993) ($4.5 million legal fees on $29.4 million settlement) (15.3%).

Significantly, the fact that a case initially was brought under a fee-shifting statute, does not preclude the Court from approving fees based on a settlement or a common fund. *See Diaz v. Hillsborough County Hosp. Auth.*, No. 8:90-CV-120-T-25B, 2000 WL 1682918, at *7 (M.D. Fla. 2000) (fee-shifting under 42 U.S.C. § 1988); *Bowen v. Southtrust Bank of Ala.*, 760 F.Supp. 889, 895 (M.D. Ala. 1991) (fee-shifting under ERISA). *See generally,* A. Hirsch and D. Sheehey, Awarding Attorneys' Fees and Managing Fee Litigation at 61 (Federal Judicial Center Publication). The Second, Third, Seventh, and Tenth Circuits have allowed the use of the equitable common-fund doctrine in granting attorneys' fees even where a fee-shifting statute exists as the basis for filing suit. *Florin v. Nationsbank of Ga.*, 34 F.3d 560, 562 (7th Cir. 1994) (fee-shifting under ERISA); *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1327 (2d Cir. 1990) (fee-shifting under RICO); *Skelton v. General Motors Corp.,* 860 F.2d 250, 255 (7th cir. 1989) (fee-shifting under the Magnuson-Moss Act); *In re Fine Paper Antitrust Litig.*, 751 F.2d 562, 582-83 (3d Cir. 1984) (fee-shifting under Clayton Act); *Eaves v. Penn*, 587 F.2d 453, 465 (10th Cir. 1978) (fee-shifting under ERISA); *see also McLendon v. Continental Group, Inc.*, 872 F. Supp. 142, 151 n.5 (D.N.J. 1994) (fee-shifting under ERISA and RICO).

## V.    THE PARTIES AGREED-UPON FEE IS REASONABLE

As discussed above, the parties agreed that Class Counsel would be paid a fee based upon a negotiated amount for all work performed and to be performed. Settlement Agreement at 35 [DE 82-1]. The fee agreement also includes all costs and expenses relating to such work.[7] Therefore, if the Court is satisfied that the Agreement is fair and reasonable and not based upon collusion then it need not look beyond the express language of the Settlement Agreement. *See*

---

[7] Class Counsel has incurred costs of $129,999.17 and expended 4,942.85 hours in prosecuting this case thus far.

Eisenberg Decl. at 14-15, ¶¶ 34-35. To ensure that the fees are fair and reasonable, however, the Court can consider factors that are typically considered when a court awards fees. Those factors are discussed below.

### A. Class Counsel Will be Required to Perform Additional Work and Bear Additional Expenses

Significantly, Class Counsel's work is not done after the ink dries on the Settlement Agreement. Instead, Class Counsel will defend the final judgment if any appeals are taken, and Class Counsel has the duty and obligation to perform post-judgment monitoring so that the terms and conditions set forth in the proposed Injunctive Relief are complied with in accordance with the terms of the Injunctive Relief. Settlement Agreement at 17-33 [DE 82-1].

In cases involving injunctive relief, Class Counsel has the responsibility to protect "those rights originally indicated by the consent judgment . . . regardless of the outcome of each individual post-judgment effort." *Turner v. Orr*, 785 F.2d 1498, 1504 (11th Cir. 1986), *citing Adams v. Mathis*, 752 F.2d 553, 554 (11th Cir. 1985). In *Duran v. Carruthers*, 885 F.2d 1492 (10th Cir. 1989), the Tenth Circuit found:

> As in other institutional reform litigation, the entry of the Court's judgment has not terminated the role of Plaintiffs' counsel. In important aspects, entry of a judgment has represented only a beginning. Without determined, competent and dedicated representation, the provisions of the Consent Decree might have had little practical significance for the class members.

*Id.* at 1496 (quoting *Brewster v. Dukakis*, 544 F.Supp. 1069, 1072 (D. Mass. 1987) modified on other grounds, 786 F.2d 16 (1st Cir. 1986). The reasoning underlying this duty is two-fold. First,

> "[c]omplex [] cases seldom end with the grant of a permanent injunction. The injunction must be implemented, that process must be monitored, and lingering or new disputes over interpretation of the decree must often be presented to the court for resolution. These functions take time and effort by the prevailing party's attorney. Therefore, it is generally accepted that prevailing

18

> plaintiffs are entitled to post-judgment fee awards for legal
> services necessary for reasonable monitoring of the decree."

*Association for Retarded Citizens of North Dakota v. Schafer*, 83 F.3d 1008, 1010-11 (8th Cir. 1996). Second, the nature of the relationship between the plaintiff and the defendant, after a judgment in plaintiff's favor, changes, or should change, dramatically. For pre-judgment fees and expenses, the plaintiff and the defendant have divergent goals, and each is viewed as having lost or won depending upon in whose favor the court has found. By contrast, after a judgment in the plaintiff's favor, the plaintiff and the defendant have an essentially common goal: compliance with the judgment. Thus, in the post-judgment years, both the plaintiff and the defendant prevail when the defendant reaches full compliance: the plaintiff prevails because he has obtained the relief he sought, and the defendant prevails because it can now be released from the judgment. *See also, Mills v. Freeman*, 118 F.3d 727, 733-34 (11th Cir. 1997) (recognizing the well-settled judicial approval of statutory attorney's fees "for post-judgment monitoring").

Compliance with the proposed Injunction in accordance with the terms of the Settlement Agreement will require Plaintiffs' Counsel to engage in seven years of post-judgment monitoring of extensive Injunctive Relief as well as ten years of post-judgment monitoring of Defendants' compliance with the DPPA. *See* Settlement Agreement at 17-33, [DE 17-33]. Compliance is an important component of the Settlement. *See* Solove Declaration at 19-20. Professor Eisenberg opines, that based upon this Court's award in *Fresco I,* the allocation of fees for each of the six *Fresco I* defendants for post final judgment monitoring is approximately $2.5 million. Eisenberg Decl. at 22, ¶. 50. In this case, Professor Eisenberg reasons "with two additional defendants [Polk and Acxiom], that approach would yield $5 million in fees and costs per defendant." *Id.* Thus, Professor Eisenberg concludes: "This amount, when combined with the pure lodestar

19

amount based on plaintiffs' counsels' declarations, supports the reasonableness of the negotiated $7.5 million fee award." *Id.*

Finally, the Court should take into account the attorney time associated with defending the Settlement Agreement against professional objectors, including any work on appeal. In *Fresco I,* a group of objectors sought to derail the settlement agreement, sought to intervene, and filed interlocutory and final appeals. Some of the same professional objectors have already filed objections to the Settlement Agreement and appeals in this case.[8] Thus, Class Counsel must deal with these Objectors and their professional Objector Counsel, even if their claims are specious.

### B.    The Litigation was Novel and Undesirable

This case was undoubtedly novel and complex, which in turn made it risky and undesirable. The results under the Settlement are thus all the more significant. At the outset, Defendants' conduct was not prohibited under the Florida's analogue to the DPPA, which provided a facile defense for anyone in Defendants' position. Moreover, the case involved litigating a claim with little or no legal precedent on such key issues as damages and Defendants' *scienter.*

This case when filed presented substantial risks and uncertainties making it far from certain that any relief for the Class would be obtained. Continued litigation through trial would have delayed any recovery to the Class. Class Counsel carefully considered the threat of protracted proceedings and the probability that Class Members' personal information remained in limbo, thereby subjecting their personal information to further compromise and potentially exposing Class Members to identity theft or other improper use.

---

[8] *See* Notice of Appeal by Sharon Taylor, Attorney Jeremy Wilson [DE 91, 92]; Notice of Objections filed by Sharon Taylor, Objector, Attorney Jeremy Wilson [DE 98, 99]; Objections to Proposed Settlement filed by D.J. Powers, Objector, Attorney Jeffrey Weinstein. DE 95.

Likewise, this is the type of litigation that most other firms would shy away from because the subject matter is too esoteric or "technical." Even now there is not a well-developed body of DPPA law. Many of the issues and legal territory here were largely uncharted. The issues were complex and the legal hurdles were many and substantial. Also, although Class Counsel had a good faith basis to believe that they would develop a convincing case, they were also aware of practical difficulties associated with the prosecution of cases, which do not readily demonstrate actual monetary damages and with many cases based on privacy.

Despite the undesirability of these cases, Class Counsel's commitment resulted in significant benefits to the Class. Ponemon Decl. at 3-5, ¶¶ 13-15; Solove Decl. at 19-20.

### C.      Plaintiffs' Counsel Bore Significant Risk and Financial Burden Due to the Contingent Nature of the Fee

Class Counsel took on this litigation solely on a contingent-fee basis. Contingency fee arrangements serve important functions in our legal system by providing access to legal services to many individuals who could not otherwise pay for them. Moreover, such arrangements foster efficient use of resources by attorneys.

It is an established practice to reward attorneys for taking the risk of non-payment by paying them a premium over their normal hourly rates for winning contingency cases. *See* Eisenberg Decl. and "Quantitative Analysis" at 26-33, ¶¶ 58-68; *see also* R. Posner, Economic Analysis of Law § 21.9, at 534-35 (3d ed. 1986). Contingent fees that may exceed the market value of the services if rendered on a non-contingent basis are accepted in the legal profession as a legitimate way of assuring competent representation for plaintiffs who could not afford to pay on an hourly basis regardless of whether they win or lose. *In re Washington Public Power Supply Sys. Sec. Litig*., 19 F.3d 1291, 1299 (9th Cir. 1994).

Indeed, courts have consistently recognized that the risk of receiving little or no recovery is a major factor in considering an award of attorneys' fees. For example, in awarding attorneys' fees in a contingent fee case, a district court noted the risks that plaintiffs' counsel had taken:

> Although today it might appear that risk was not great based on Prudential Securities' global settlement with the Securities and Exchange Commission, such was not the case when the action was commenced and throughout most of the litigation. Counsel's contingent fee risk is an important factor in determining the fee award. Success is never guaranteed and counsel faced serious risks since both trial and judicial review are unpredictable. Counsel advanced all of the costs of litigation, a not insubstantial amount, and bore the additional risk of unsuccessful prosecution.

*In re Prudential-Bache Energy Income P'ships Sec. Litig.*, No. 888, 1994 WL 202394, at *6 (E.D. La. May 18, 1994).

Moreover, this Court has found that "[a] contingency fee arrangement often justifies an increase in the award of attorneys' fees." *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 548 (S.D. Fla. 1988) (citations omitted) (King, J.). In *Behrens* Judge King stated that "[t]his rule helps assure that the contingency fee arrangement endures. If this 'bonus' methodology did not exist, very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing." *Id.*

The same is true here. From the outset, Class Counsel understood that it was embarking on complex, expensive, and lengthy litigation with an uncertain outcome. When *Fresco I* (from which this case was severed) was initially filed, no one had prosecuted a class case under the DPPA. This case presented a number of legal issues and challenges, which had been the subject of very little previous jurisprudence. In fact, Defendants raised these novel and complex issues in their Motions for Judgments on the Pleadings. [DE Nos. 48, 49, 50] And unlike Defendants' counsel, who were compensated on a current basis, Class Counsel has received no compensation

from this case, and has expended more than 4,942.85 hours and advanced $129,999.17 in costs and expenses through October 31, 2009. Class Counsel undertook this representation with no guarantee that the Class Members would obtain any relief from Defendants, which would have resulted in Class Counsel receiving nothing for their work on behalf of Named Plaintiffs and the Class. The concurrently-filed Declarations of Class Counsel detail the expenses incurred in the prosecution of this matter.

Class Counsel bore these risks and was prepared to litigate these cases to trial and on further appeal, if necessary. Yet despite these risks and the fact that few, if any, other cases had been successfully litigated under the DPPA, Class Counsel accepted *Fresco I* and the instant case in an attempt to address Defendants' violations of the DPPA. In addition to the substantial risks borne by Class Counsel, as discussed above, the Court should take into consideration the additional future services needed and expenses to be incurred in obtaining final judgment, defending the Settlement on appeal, and monitoring Defendants' future compliance with the Settlement terms.

### D.    This Litigation Required Significant Legal Acumen

Class Counsel was involved in the Eleventh Circuit's decision in *Kehoe v. Fidelity Federal Bank and Trust*, 421 F.3d 1209 (11th Cir. 2005), which was a case of first impression in the Eleventh Circuit relating to the prerequisites required to obtaining statutory damages under the DPPA. Further, it was not any easy task or a guaranteed result to obtain an injunction requiring Defendants to: (i) substantially change their business practices; (ii) employ enhanced privacy protection measures; (iii) be subject to oversight by independent third-party assessors and this Court; and (iv) warrant the non-use and destruction of its records – all of which will provide the Class Members far greater privacy protection than mere compliance with the DPPA.

23

The quality of Class Counsel's efforts to obtain maximum relief for the Class is also evidenced by Class Counsel's vigorous opposition to Defendants' motions, including a motion to bifurcate and motions for judgment on the pleadings. Independent experts have found Class Counsel's work to be excellent based upon the results achieved in the face of stiff opposition. Declaration of L. Mullenix at 26-34, ¶¶ 99, 101, 109, 113-117, 120, and 122; *see also* Declarations of Gonzalez, Eisenberg, Solove, L. Mullenix Decl. [*Fresco I,* DE 555-2]; and A. Miller Decl. [*Fresco I,* DE 571-3]. Moreover, this litigation required specialized experience and expertise in privacy law, remedies, software, and information technology that few firms may have been willing to master to prosecute the litigation successfully.

### E.    The Requested Fee is Customary for This Type of Case

Class Counsel's hourly rates are reasonable for this type of case. In determining the reasonableness of hourly rates, courts consider the experience, reputation and ability of the attorney and the skill required by the attorneys. *Shipes*, 987 F.2d at 320. Here, the members comprising Class Counsel are among the most experienced and skilled practitioners in class action fields. And the high quality of Class Counsel's work is not unique to these litigation proceedings. Co-lead counsel, Tod Aronovitz has advocated consumer class actions cases on a nationwide basis for more than a decade. Likewise, co-lead counsel, John Yanchunis and his firm, James, Hoyer, Newcomer, Smiljanich & Yanchunis P.A., have been involved in the successful prosecution of more than 100 class action lawsuits on a nationwide basis over the past fifteen years. Other firms representing the Named Plaintiffs have had substantial class action experience. *See* Declarations of Class Counsel filed in Support of this Memorandum. As such, Class Counsel's rates reflect the competitive market hourly rates for national cases involving complex and class action litigation, as well as the reputation, experience and success of the

lawyers and firms involved. Considering the complex nature of this case and Class Counsel's experience, reputation, and skill, Class Counsel's rates, which do not include a contingency component, are reasonable.

Moreover, the agreed-upon fee is reasonable in light of the non-contingent hourly rates charged at law firms across the country that represent commercial clients and the United States government. Each year, the National Law Journal, through surveys conducted by Incisive Legal Intelligence, publishes the results of surveys detailing the billing rates and practices of the top 100 law firms in America. Among other data, the survey specifies the firm, the major branch of the firm, the hourly billing low and high amounts, and other ways in which fees are generated. The 2004 through 2008 surveys are attached hereto.[9]

The survey also includes the average billing rates of Defendant R.L.Polk's counsel, Nixon Peabody:

| Nixon Peabody (Counsel for Defendant R.L.Polk) | | | |
|---|---|---|---|
| Position | Billing Rate High | Billing Rate Low | Average |
| Partner | $845 | $565 | $570 |
| Associate | $350 | $230 | |

In addition, Incisive Legal Intelligence also collected data specifically on attorney fees in Florida.[10] The majority of the respondents to this 2008 survey came from the South Florida area. For example, Defendant Acxiom's counsel, Hunton and Williams, had the following rate schedule:

| Hunton and Williams (Counsel for Defendant Acxiom) | |
|---|---|
| Position | Hourly Billing Rates (range) |
| Partner | $395-$520 |
| Associates | $200-$325 |

---

[9] The National Law Journal Billing Rate Surveys are attached to this document as follows: the 2008 Survey is Exhibit "A"; the 2007 Survey is Exhibit "B"; the 2006 Survey is Exhibit "C"; the 2005 Survey is Exhibit "D", and the 2004 survey is Exhibit "E."
[10] The 2008 Florida Billing Rates survey is attached hereto as Exhibit "F."

Also attached to this Memorandum as Exhibit "G", is a chart showing hourly rates of other law firms.

In light of these fees, the general trend of hourly rate fee increases from 2004-2008, and the fact that the fees sought are intended to cover both past services and services required to be rendered ten years into the future, the agreed-upon fee for Class Counsel is reasonable. Such fees fall clearly within the fee hierarchies of other law firms of similar experience, skill, and reputation in charging for comparable work in complex litigation and class action proceedings. Looking at the fees charged across the nation, Class Counsel's fees fall within the ranges noted, and are actually lower than the fees charged by many firms. In addition, Class Counsel agreed to take on this case without any guarantee of fees, as opposed to Defendants' Counsel and other similar defense firms, where the fees are payable regardless of the outcome of the matter. In this case, Class Counsel successfully negotiated a Settlement with primary focus on the benefit to the Named Plaintiffs and Class, and only after the Settlement was resolved to the satisfaction and benefit to the Named Plaintiffs, was the matter of attorney fees broached. This negotiated-fee should be approved.

Accordingly, the agreed-upon fee for Class Counsel, broken down individually (as set forth below), is well within the hourly fee ranges for firms representing commercial clients and have been approved by federal judges. *See* Order Granting Interim Compensation, *In re Lehman Bros. Holdings, Inc.*, 08-1355 (Bankr. S.D.N.Y. Aug. 13, 2009). The work required of these commercial firms is just as complex and requires substantially similar legal skill and creativity to the work done by Class Counsel in representing the important privacy interests of hundreds of millions of individuals in the instant case. Moreover, the United States government has approved of and agreed to the non-contingent hourly rates in excess of those sought here. *See* U.S. Dep't of

Treasury, Procurement Servs. Div., contract with Cadwalader, Wickersham & Taft, LLP (Jan. 27, 2009); U.S. Dep't of Treasury, Procurement Servs. Div., contract with Cadwalader, Wickersham & Taft, LLP (Mar. 30, 2009); U.S. Dep't of Treasury, Procurement Servs. Div., contract with Sonnenschein, Nath, & Rosenthal, LLP (Mar. 30, 2009). In light of these fees, the agreed-upon fee for Class Counsel, as stated in the Settlement, is reasonable.

>    **F.    The Results Achieved by Class Counsel**
>         **Provide Substantial Benefits to Class Members**

Through the extensive and aggressive prosecutorial and investigative efforts of Class Counsel, a settlement was n reached with Defendants establishing a comprehensive benefits package for the Class. "Perhaps no better indicator of the quality of representation here exists than the result obtained." *See Behrens v. Wometco Enter., Inc*., 118 F.R.D. 534, 547 (S.D. Fla. 1988), *aff'd*, 899 F.2d 21 (11th Cir. 1990). Empirical research indicates the outcome achieved is a key determinant in assessing the reasonableness of a fee. In this case, Dr. Larry Ponemon has determined that the economic value to the Class is $3.34 billion. *See* Ponemon Decl.

In short, Class Counsel has achieved a settlement with substantial, ascertainable benefits, at a high degree of financial risk to themselves and without any assurance of either compensation for their services or reimbursement for their expenditures. The proposed Injunctive Relief is significant and ensures the protection of important privacy rights for the Class. Solove Decl. at ¶¶ 19-20; Ponemon Decl. at 3-5, ¶¶ 13-15. If approved finally by the Court, the relief will provide increased privacy and security protections of personal information contained in an individual's motor vehicle record.

>    **G.    A Lodestar Analysis Supports the**
>         **Reasonableness of the Fee Requested As A "Cross-Check"**

Class Counsel is not seeking an attorneys' fee award under a "fee-shifting" statute, but rather pursuant to an agreement negotiated with Defendants, whereby the Defendants have agreed to pay the sum of $7,500,000 subject to Court approval, without reducing the benefits of the Settlement being provided to the Class.[11] This distinction is important because cases cited for the proposition that there is a strong presumption that the lodestar[12] represents a "reasonable fee" and should not be "enhanced" for contingency risk, and other such factors *apply only to fees awarded under fee-shifting statutes. See City of Burlington v. Dague*, 505 U.S. 557 (1992).[13] *See also*, *Kenny A. ex rel. Winn v. Perdue*, 532 F. 3d 1209, 1216 (11th Cir. 2008). In recognition of this, the Eleventh Circuit in K*enny* took note that "the district court gave final approval to the settlement between the plaintiff class and Fulton and DeKalb Counties; ***the parties agreed to an attorneys' fees award in that part of the case; the district court entered that award, and it has not been appealed." Kenny***, 532 F. 3d at 1216.

Since attorney's fees are not being sought under a fee shifting statute, *Dague's* and *Kenny's* use of lodestar is not applicable to the fee agreement here. Eisenberg Decl. at 20. The Court's role here is to review the agreed-upon fee for reasonableness. *Id.* As such, the Court is not burdened with the task of determining and awarding a fee in the context of a contested fee proceeding under a fee-shifting statute. As the Eleventh Circuit has noted in other settled class

---

[11] Agreed upon fees are not only *authorized* by Fed. R. Civ. P. 23(h), they are *encouraged* by the courts. *See* cases cited *supra* at Section IV.B).

[12] Lodestar is the product of reasonable hours times a reasonable rate.

[13] The Court had for consideration an attorney's fee award under an environmental fee-shifting statute (33 U.S.C. § 1365(d), 42 U.S.C. § 6972(e)). In that case, the Supreme Court held as follows:

> The "lodestar" figure has, as its name suggests, become the guiding light of our *fee-shifting* jurisprudence. We have established a "strong presumption" that the lodestar represents the "reasonable" fee, and have placed upon the fee applicant who seeks more than that the burden of showing that "such an adjustment is *necessary* to the determination of a reasonable fee". . . [W]e hold that enhancement for contingency is not permitted under the *fee-shifting* statutes at issue.

*Id.* at 563, 567 (internal citations omitted) (emphasis supplied).

actions involving fee-shifting statutes, when the matter is settled by agreement the district court is not bound to the lodestar methodology: "Although the FCRA [Fair Credit Reporting Act] provided for an award of costs and reasonable attorneys' fees to prevailing parties . . . *the district court is not limited to applying a lodestar analysis for a statutory fee-shifting award because the suits were resolved by a class settlement agreement* . . . ." (emphasis supplied). *Dikeman v. Progressive Exp. Ins. Co.,* 2007 WL 786618, 312 Fed. Appx. 168, 172 (11th Cir. 2008).

Although lodestar is not the appropriate measure of attorneys' fees in the instant case, the following computation of the professional hours spent and advanced costs incurred is offered, but *only* as a "cross-check" on the reasonableness of the agreed-upon fee. *See* Eisenberg Decl. at 11-13, ¶¶ 24-28. Prior to the severance of this case, Class Counsel spent a total of approximately 11,800 hours related to the prosecution of the case against Defendants Polk and Acxiom, for a total lodestar of approximately $5,672,220. As to the lodestar worked on this case post severance, the cumulative totals as supported by the Declarations of Plaintiffs' counsel which are attached to this Motion, consists of 4,937.35 hours for a total lodestar of $2,176,512,25 as follows:

| LAW FIRM | RATES | HOURS | LODESTAR | COSTS |
|---|---|---|---|---|
| James, Hoyer, Newcomer, Smiljanich & Yanchunis | $180.00 to $600.00 | 2,489.70 | $979,661.00 | $64,401.62 |
| Aronovitz Law | $115.00 to $550.00 | 1,399.65 | $640,356.25 | $54,390.01 |
| Devine Goodman Rasco & Wells | $125.00 to $550.00 | 493.50 | $245,925.00 | $3,785.14 |
| James K. Green | $500.00 to $575.00 | 176.10 | $95,710.00 | $5,926.50 |
| Portley & Sullivan | $550.00 | 159.50 | $87,725.00 | $0.00 |
| David D. Welch | $550.00 | 106.00 | $58,300.00 | $0.00 |
| Search Denney Scarola Barnhard & Shipley | $250.00 to $800.00 | 77.40 | $44,235.00 | $1,495.90 |
| Joel Perwin | $600.00 | 41.00 | $24,600.00 | $0.00 |
| | TOTALS | 4,942.85 | $2,176,512.25 | $129,999.17 |

The above calculations show the amount of time Class Counsel spent working on the instant case, including drafting pleadings, motions, discovery and documents, conducting discovery, attending mediations, and collaborating with other counsel to ensure competent representation for millions of affected Class members. Moreover, Eleventh Circuit precedent has established that "exceptional" results – results that are "out of the ordinary, unusual or rare" – may result in the enhancement of a fee above the lodestar. *Norman v. Housing Auth. of Montgomery*, 836 F.2d 1292, 1302 (11th Cir. 1998). "Any enhancement begins with the finding that the results are exceptional." *Id.* at 1306. "Even if the court found the results obtained to be exceptional, no enhancement for these results would be justified unless the court also finds that class counsel's representation was superior to that which would have been expected considering the rates requested." *Id.* (citing *Blum v. Stenson*, 465 U.S. 886, 899 (1984)). In other words, to award attorney's fees in excess of the lodestar, the Court must find that "the superb quality of their representation *far exceeded what could reasonably be expected for the standard hourly rates* used to calculate the lodestar." *Kenny A. ex. rel. Winn v. Perdue*, 547 F.3d 1319, 1324 (11th Cir. 2008) (Wilson, J., concurring) (emphasis supplied).

In this case the Court need not conduct such an analysis, but if the Court did, an upward adjustment of Class Counsel's lodestar is warranted. *See Rutherford v. Harris County, Tex.*, 197 F.3d 173, 192 (5th Cir. 1999). First, the proposed Injunctive Relief has an economic value in excess of $3 billion. *See* Ponemon Decl. at 5. Second, lodestar does not reflect the exceptional results achieve by Class Counsel in this case, which protect the important privacy rights of consumers, as well as the undesirability of this litigation, the high risk born by its contingent nature, or the fact that the fee award requested is comparable to that awarded in similar complex class action litigations.

30

Approval of the agreed-upon fee will not result in an excessive multiplier. Instead, a multiplier is necessary for establishing a reasonable fee – one Defendants have already agreed to pay. *Dague*, 505 U.S. 557 at 562. Courts have set forth numerous factors that need to be considered in upwardly adjusting the lodestar. *See e.g.*, *Hensley,* 461 U.S. at 434 n.9; *Rutherford*, 197 F.3d at 192 ("[After calculating the lodestar] [t]he court was next obligated to consider whether the lodestar amount should be adjusted upward or downward, depending on the circumstances of the case and after addressing the *Johnson* factors."). The results achieved here – as supported by the expert testimony of Dr. Ponemon, Professor Eisenberg, Professor Solove and Mr. Gonzalez – demonstrate that the agreed upon sum of attorneys' fees and expenses of $7,500,000 is fair and reasonable and should be approved.

## VI.    <u>CONCLUSION</u>

Based on the foregoing, Class Counsel respectfully request that the Court: (i) approve the agreed-upon incentive awards in the amount of $4,500.00 for each Named Plaintiff and (ii) enter an order approving Defendants' payment of $7,500,000 for attorneys' fees and expenses for all work performed and to be performed in the future, in accordance with the Parties as set forth in the Settlement Agreement, and grant to Class Counsel and Class Representatives such other and further relief as is appropriate.

DATED:  November 9, 2009                    Respectfully submitted,

                                          By:  */s/ Tod Aronovitz*
                                             **Tod Aronovitz**
                                             **ARONOVITZ LAW**
                                             777 Brickell Avenue, Suite 850
                                             Miami, FL 33131
                                             305-372-2772 Telephone
                                             305-397-1886 Facsimile

**John A. Yanchunis**
**JAMES HOYER NEWCOMER & SMILJANICH, P.A.**
One Urban Center, Suite 550
4830 West Kennedy Boulevard
Tampa, Florida 33609
813-286-4100 Telephone
813-286-4174 Facsimile

**David D. Welch**
**DAVID D. WELCH LAW OFFICES**
2211 East Sample Road, Suite 203
Lighthouse Point Professional Building Lighthouse
Point, Florida 33064
954-943-2020 Telephone
954-782-1552 Facsimile

**Joel S. Perwin**
**JOEL S. PERWIN, P.A**.
169 E. Flagler Street
Alfred I. DuPont Building, Suite 1422
Miami, Florida 33131
305-779-6090 Telephone
305-779-6095 Facsimile

**Peter A. Portley**
**PORTLEY AND SULLIVAN**
Lighthouse Point Professional Building
2211 E. Sample Road, Suite 204
Lighthouse Point, Florida 33064
954-781-7600 Telephone
954-941-3469 Facsimile

**Lawrence D. Goodman**
**DEVINE GOODMAN  RASCO & WELLS, P.A**.
777 Brickell Avenue, Suite 850
Miami, Florida 33131
305-374-8200 Telephone
305-374-8208 Facsimile

**James K. Green**
**JAMES K. GREEN, P.A.**
Suite 1650, Esperante´
222 Lakeview Avenue
West Palm Beach, Florida 33401
561-659-2029 Telephone
561-655-1357 Facsimile

32

**Jack Scarola**
**David J. Sales**
**SEARCY DENNEY SCAROLA**
**BARNHART & SHIPLEY, P.A.**
2139 Palm Beach Lakes Boulevard
P. O. Drawer 3626
West Palm Beach, Florida 33402
800-780-8607 Toll free
561-686-6300 Telephone
561-478-0754 Facsimile

<u>**CERTIFICATE OF SERVICE**</u>

 **I HEREBY CERTIFY** that a true and correct copy of the foregoing has been electronically filed with the Clerk of the Court using CM/ECF this 9th day of November, 2009.  I further certify that the foregoing document is being served on all counsel of record identified on the attached Service List, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel who are not authorized to receive electronically Notices of Electronic Filing.

   By:___*/s/ Tod Aronovitz*_____

33

<u>SERVICE LIST</u>
<u>Fresco vs. R L Polk & Co. and Acxiom Corp.</u>
<u>Case No. 07-60695 Civ-Martinez/Brown</u>

**<u>ATTORNEYS FOR PLAINTIFFS:</u>**

Tod Aronovitz
ta@aronovitzlaw.com
**ARONOVITZ LAW**
777 Brickell Avenue, Suite 850
Miami, FL 33131
305-372-2772 Telephone
305-397-1886 Facsimile

John A. Yanchunis
jyanchunis@jameshoyer.com
**JAMES HOYER NEWCOMER &
SMILJANICH, P.A.**
One Urban Center, Suite 550
4830 West Kennedy Boulevard
Tampa, Florida 33609
813-286-4100 Telephone
813-286-4174 Facsimile

David D. Welch
ddw@123@bellsouth.net
**DAVID D. WELCH LAW OFFICES**
2211 East Sample Road, Suite 203
Lighthouse Point Professional Building
Lighthouse Point, Florida 33064
954-943-2020 Telephone
954-782-1552 Facsimile

Joel S. Perwin
jperwin@perwinlaw.com
**JOEL S. PERWIN, P.A**.
169 E. Flagler Street
Alfred I. DuPont Building, Suite 1422
Miami, Florida 33131
305-779-6090 Telephone
305-779-6095 Facsimile

Peter A. Portley
pportley@portleysullivan.com
**PORTLEY AND SULLIVAN**
Lighthouse Point Professional Building
2211 E. Sample Road, Suite 204
Lighthouse Point, Florida 33064
954-781-7600 Telephone
954-941-3469 Facsimile

Lawrence D. Goodman
lgoodman@devinegoodman.com
**DEVINE GOODMAN  RASCO & WELLS,
P.A**.
777 Brickell Avenue, Suite 850
Miami, Florida 33131
305-374-8200 Telephone
305-374-8208 Facsimile

James K. Green
jameskgreen@bellsouth.net
**JAMES K. GREEN, P.A.**
Suite 1650, Esperanté´
222 Lakeview Avenue
West Palm Beach, Florida 33401
561-659-2029 Telephone
561-655-1357 Facsimile

Jack Scarola
jsx@searcylaw.com
David J. Sales
djs@searcylaw.com
**SEARCY DENNEY SCAROLA
BARNHART & SHIPLEY, P.A.**
2139 Palm Beach Lakes Boulevard
P. O. Drawer 3626
West Palm Beach, Florida 33402
800-780-8607 Toll free
561-686-6300 Telephone
561-478-0754 Facsimile

**ATTORNEYS for Defendant, R.L. Polk & Co.**

**Lewis F. Collins, Jr.**
lcollins@butlerpappas.com
**Scott J. Frank**
sfrank@butlerpappas.com
**BUTLER PAPPAS WEIHMULLER KATZ CRAIG LLP**
777 S. Harbour Island Boulevard
One Harbour Place, Suite 500
Tampa, Florida 33602
813-281-1900 Telephone
813-281-0900 Facsimile

*Of Counsel:*
**Christopher M. Mason**
(Admitted *Pro Hac Vice*)
cmason@nixonpeabody.com
**NIXON PEABODY, LLP**
437 Madison Avenue
New York, NY 10021
212-940-3017 Telephone
212-940-3111 Facsimile

**ATTORNEYS for Defendant, Acxiom Corporation**

**Barry R. Davidson**
bdavidson@hunton.com
**Juan C. Enjamio, Esq**.
jenjamio@hunton.com
**Gustavo J. Membiela, Esq.**
gmembiela@hunton.com
**HUNTON & WILLIAMS LLP**
Mellon Financial Center, Suite 2500
1111 Brickell Avenue
Miami, Florida 33131
305-810-2500 Telephone
305-810-2460 Facsimile

**ATTORNEYS for Objectors, Jeffrey Weinstein and D.J. Powers**

Jeffrey L. Weinstein
518 Tyler Street
Athens, TX 75751
903-677-5333 Telephone
903-677-3657 Facsimile

**ATTORNEYS for Objectors, Jacqueline Pio and Anthony Pio**

John Pentz
2 Clock Tower Place, Suite 260G
Maynard, MA 01754
978-461-1548  Telephone
707-276-2925 Facsimile

- and –

Nicolas Gutierrez
Gutierrez & Zarraluqui, LLP
283 Catalonia Avenue, Suite 200
Coral Gables, Florida 33134
305-397-2005 Telephone

**Attorneys for Objector, Scott Owen Ashby**

Patrick Geraghty
Geraghty, Dougherty & Edwards, P.A.
P. O. Box 1605
Fort Myers, FL 33902-1605
239-334-9500 Telephone
239-334-8940 Facsimile

**ATTORNEYS for Objectors, James Patrick
Roberts, James Booker, Willie Booker,
Lowry Briley, Twilah Brown, James Clary,
Sharon Clary, Alice cooks, Arlando Thomas
Cooks, Elizabeth DeWitt, Kennety Gossip,
Sr., Kennice Gossip, Pamela Hensley, Robert
Holliness, Carolyn Holub, Brandi Jewell,
Tracy Lynn Karp, Venisia McGuire, David
Lee Patterson, Ronnie Phillips, Luz Ann
Roberts, Sharon Taylor, Kimberly
Underwood, Marilyn Whitaker, and
William Wilson_____**

Jeremy Wilson
The Corea Firm PLLC
Renaissance Tower
1201 Elm Street, Suite 4150
Dallas, Texas 75270
214-953-3900 Telephone
214-953-3901 Facsimile