UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.: 07-60695-Civ-Martinez/Brown

RICHARD FRESCO, et al.,

      Plaintiffs,

v.

R.L. POLK & CO., a Delaware corporation; and
ACXIOM CORPORATION, a Delaware
Corporation,

      Defendants.

_____/

**PLAINTIFFS' RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION TO THE
OBJECTIONS TO FINAL APPROVAL OF THE SETTLEMENT AGREEMENT**

      Plaintiffs, RICHARD FRESCO, CARLOS BARRETT, JEFFREY HY, MARY ANN

COLLIER, ROY McGOLDRICK, ROBERT PINO, JOEL LEVINE, KENNETH W.

HERETICK, and RUSSELL V. ROSEN, individually and on behalf of all others similarly

situated ("Named Plaintiffs" and the "Class Representatives"), respectfully submit this Response

and Memorandum of Law in Opposition to the Objections to Final Approval of the Settlement

Agreement. (the "Memorandum").  Named Plaintiffs[1] will address the few objections that were

timely filed in this case.  For the reasons set forth below, the Objections should be overruled and

the Settlement Agreement ("Settlement") approved.

---

[1] Capitalized words in this Memorandum refer to defined terms in the Settlement Agreement.  Docket
Entry ("DE") 82-1.

## I.      INTRODUCTION

Of a Settlement Class of more than 200,000,000, only a few individuals have objected. This Court preliminarily approved the Settlement on June 15, 2009. DE 90. After reviewing each objection, this Court's decision will not be altered.  The objections are brought by individuals who largely misunderstand the Driver's Privacy Protection Act or the Settlement.   Every argument raised in opposition to the Settlement is unsubstantiated and should be overruled.

Exacerbating matters, a few of the objectors are professionals who repeatedly file baseless objections to class action settlements in order to extract money from class counsel. These professional objectors previously objected to the settlement in *Fresco, et al. v. Automotive Directions, Inc., et al.*, Case No. 03-cv-61063-JEM ("Fresco I") only to later withdraw their objections with the settlement unchanged.  Here, the professional objectors are back, raising the same arguments that failed in the previous litigation.   In this case, the objections of the professional objectors, along with the few other objections from Settlement Class Members, lack merit and offer no reason for denying final approval of the Settlement.

## II.     REACTION FROM THE SETTLEMENT CLASS

### A.      The Few Objecting Settlement Class Members Overwhelmingly Indicates that the Settlement is Fair

In determining whether to grant final approval of a class settlement, courts consider, among other factors, the reaction to the settlement from class members. [2] *Leverso v. Southtrust*

---

[2] Courts in the Southern District place great weight on how the class responds to the proposed settlement. *Lipuma v. American Express Co.,* 406 F. Supp. 2d 1298, 1324. "A low percentage of objections points to the reasonableness of a proposed settlement and supports its approval. Conversely, a high percentage of objections signals that a proposed settlement is not fair and reasonable." *Id.* (citations omitted). In *Lipuma*, there were nearly 9,000,000 notices mailed, 1,159 opt-outs and 41 objections. That court found that 41 objections constituted an "infinitesimal" number (.00050%) when compared to the number of class members. *Id.*; *see Allapatah Servs. v. Exxon Corp.,* 2006 U.S. Dist. LEXIS 88829 (S.D. Fla. 2006) (courts may look at the lack of objections as an indication of the adequacy of the settlement).   In another case in this District, *In re Managed Care Litigation*, 2003 U.S. Dist. LEXIS 27228, the court held that the

2

*Bank Nat'l Ass'n*, 18 F.3d 1527, 1530 n.6 (11th Cir. 1994); *see also Bennett v. Behring Corp.*, 737 F. 2d 982, 986 (11th Cir. 1984); Declaration of Linda Mullenix.[3]   Here, the reaction is completely one-sided in support of final approval of the Settlement.

Pursuant to the terms of the Settlement and the Court's order preliminarily approving it, the Parties implemented an extensive and multifaceted Notice Program, planned by an expert Notice Administrator, and designed to reach a substantial number of the Settlement Class.   DE 82-2; DE 90; Mullenix Decl. at ¶¶ 38, 126. First, the Parties gave notice to the appropriate state and federal officials pursuant to the Class Action Fairness Act.   DE 89-1 (Declaration of Stephen Cirami). Second, The Garden City Group, a respected notice administrator, implemented the Notice Program that reached approximately eighty percent (80%) of the Settlement Class through (i) print publications with a circulation of more than 88,000,000; (ii) a toll-free informational hotline that fielded more than 1,800 phone calls; (iii) a class action settlement website; (iv) internet banners and advertisements that delivered more than 41 million impressions; and (v) a DMV outreach program. Declaration of Jeanne Finegan at ¶¶ 7-9.[4] These notices clearly set forth the details of the Settlement in both English and Spanish.   Finegan Decl. at ¶¶ 9, 13.

If the Settlement was questionable, one would expect a substantial outcry from the millions of Settlement Class Members who received notice. Yet, only a handful of objectors have surfaced. Indeed, some of the objectors are nothing more than serial, professional objectors who objected to Fresco I only to withdraw their objections with the terms of the settlement left

---

terms of the proposed settlement were fully and finally approved as fair, reasonable, and adequate, and in the best interests of the class, reasoning that the number of objectors was "miniscule" where there were only six (real) objectors, of 950,000 class members, targeting the substance of the settlement. *Id*. at 9.

[3] The Mullenix Declaration is being filed concurrent with this Memorandum.

[4] The Finegan Declaration is attached to Plaintiffs' Brief in Support of Adequacy of Notice Program.

unchanged. Even including these professional objectors, only seven (7)[5] objections were timely received. This figure is substantially less than one-millionth of the total number of Settlement Class Members and represents a ratio of 1 objector for every twenty-eight million Settlement Class Members.   Class action expert Professor Linda Mullenix opined that "this is an insignificant number of objectors to the settlement." Mullenix Decl. at ¶ 145.

Importantly, not a single one of the objectors is one of the more than 100 federal and state governmental officials who received the CAFA Notice. This is significant because governmental officials are most knowledgeable of the DPPA and DPPA State Equivalents, and thus would have an interest in protecting their departments of motor vehicles ("DMV") and their citizens if this Settlement was questionable. Mullenix Decl. at ¶ 146. Their lack of objection speaks volumes and provides strong support for the conclusion that the Settlement is fair, reasonable, and adequate.[6]

In contrast to the few voices heard objecting, renowned privacy and legal experts have submitted testimony to the Court supporting the Settlement.[7] These experts affirm that the

---

[5] The seven include:  Scott Ashby, Jeffrey Weinstein, D.J. Powers, Jacqueline Pio, Anthony Pio, William Mackenstadt, and the group of Taylor Objectors. Twenty-five individual objections were filed together by a group of people who all used the same attorney, made the same arguments, and who filed a putative class action in Texas that was dismissed with prejudice by the United States District Court - the *Taylor* case that is currently pending before the United States Court of Appeals for the Fifth Circuit, Docket No. 08-41083. Therefore, the 25 objectors are treated as a single group known as the "Taylor Objectors" for purposes of this Memorandum.

[6] *See, e.g., IUE-CWA v. Gen. Motors Corp.*, 238 F.R.D. 583, 590 (E.D. Mich. 2006) (granting final approval to proposed class action settlement and noting that "GM issued notice to the appropriate federal and state attorneys general pursuant to [the Class Action Fairness Act, 28 U.S.C. § 1332(d)] None submitted an objection."); *Access Now, Inc. v. Claire's Stores, Inc.*, No. 00-14017-CIV, 2002 WL 1162422 (S.D. Fla. May 7, 2002) ("The Court notes that in several recent Title III of the ADA class actions in this district which were similarly noticed, the Department of Justice and several state attorneys general filed objections. This has not been the case in this matter. The fact that no objections have been filed strongly favors approval of the settlement.").

[7] The following declarations are being filed concurrent with this Memorandum:  Declaration of Larry Ponemon, PhD; Mullenix Decl.; Declaration of Ervin Gonzalez; Declaration of Professor Daniel J. Solove; Declaration of Professor Theodore Eisenberg; Declaration of Steven Schwartz; and Declaration

4

Injunctive Relief secures for the Settlement Class "important and substantial improvements to privacy protections," which not only ensure compliance with the DPPA, but go far beyond what the DPPA requires to establish a model privacy program for Defendants' industry which will have the force of law.[8] In contrast, the few objectors present not a single declaration or scrap of evidence to support their unsubstantiated positions. In this case, the small number of objectors bringing unsubstantiated arguments from a huge Settlement Class, weighs heavily in favor of final approval of the Settlement.[9]

### B.   The Court Must Scrutinize Objectors Thoroughly

In class action litigation, objectors **may** serve as an important cross check, helping the Court probe the fairness of a settlement. Mullenix Decl. at ¶ 147. Here, they do not. For the reasons presented below, the Court should scrutinize the objectors thoroughly and carefully.

First, class action objectors can postpone the realization of the hard-fought, bargained-for benefits desired by the other class members while at the same time causing the unnecessary expenditure of the valuable resources of the parties and the court. *Rosenbaum v. McAllister*, 64 F.3d 1439, 1442 (10th Cir. 1995) (questioning wisdom of allowing one objector to prevent the

---

of Fred Cate. Each declaration supports the Settlement. Professor Cate's declaration is from Fresco I in which he detailed his opinions on the injunctive relief.  Since the Injunctive Relief here is virtually identical, his opinions are equally applicable in this case.

[8] Ponemon Decl. at ¶ 17; s*ee also* Solove Decl.; Mullenix Decl.; and Cate Decl.

[9] "A small number of objectors from a plaintiff class of many thousands is strong evidence of a settlement's fairness and reasonableness." *Ass'n for Disabled Ams., Inc. v. Amoco*, *Oil Co.*, 211 F.R.D. 457, 476 (S.D. Fla. 2002);  *see Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977); *Bennett v. Behring Corp.***,** 96 F.R.D. 343, 352-353 (S.D. Fla. 1982);  *In re Dennis Greenman Sec. Litig*., 622 F. Supp. 1430, 1442 (S.D. Fla. 1985);  *D'Amato v. Deutsche Bank*, 236 F.3d 78, 86-7 (2d Cir. 2001);  *In re Cendant Corp. Sec. Litig*., 264 F.3d 201, 235 (3d Cir. 2001) ("The District Court correctly found that [the small number of objectors] weighed strongly in favor of the Settlement.");  *Laskey v. Int'l Union*, 638 F.2d 954, 956 (6th Cir. 1980) (placing significance on the fact that "only seven out of 109 made any kind of objection");  *In re Beef Indus. Antitrust Litig*., 607 F.2d 167, 180 (5th Cir. 1979), *cert. denied*, 452 U.S. 905 (1981) ("virtually no objections from members of the settlement class" seen as a "significant element" of settlement fairness);  *Shlensky v. Dorsey*, 574 F.2d 131, 148 (3d Cir. 1978) (one of the factors used to determine the fairness of the settlement was that an "overwhelming majority" had not objected).

benefits of class settlement from passing to other class members). These points are especially relevant here when: (1) the Court determined that the Injunctive Relief "will benefit all settlement class members by enhancing the protection afforded their DPPA-regulated information;" (2) several detailed expert declarations attest to the fact that the Injunctive Relief will provide significant privacy protections;[10] and (3) there are tens of millions of other Settlement Class Members, and a host of governmental entities, who have not objected to the Settlement. DE 90 at 9. This Settlement is ripe for final approval and it would be a waste of the Court's and the Parties' resources to allow these few objections to withhold the substantial privacy benefits that are due to the enormous Settlement Class as a result of this complex six-year long Litigation.

Second, whether out of political or financial motivation, there is the tendency of objectors – as in the case here – to attempt to exploit or "free ride" off the significant efforts of the parties, who have prosecuted or defended the action for years and have negotiated an arm's length settlement. Certain objectors and their counsel objected to the Fresco I settlement without any previous involvement in that litigation, the settlement terms, or the negotiation process.[11] Now, the same objectors and their counsel have returned to attack this Settlement, again, without any previous involvement or work in it. Moreover, with the exception of counsel for Objector Ashby and the Taylor Objectors, who have modest experience in class action litigation and do not appear to be serial objectors, none of the other objectors or objectors' counsel have professed or demonstrated any level of competence in the areas of privacy law or class litigation.[12] Instead, certain of the objectors and objectors' counsel have an extensive history of filing objections to

---

[10] *See supra* note 7.

[11] Fresco I DE 417-1, 509, 517, and 526 (Objections of Weinstein, Pentz, and Taylor).

[12] DE 95-96 (Objections of Weinstein and Pentz).

class settlements to extort a payment of money in exchange for the withdrawal of their objections.  *See* § II.C, *infra,* detailing the history of Objector Weinstein and Objector Pio's counsel John Pentz.

Rather than taking a free-ride to the Settlement, the Parties have expended resources and extensive work over the last six years and can support their efforts through declarations and detailed memoranda. Indeed, in its preliminary approval order, this Court found that Class Counsel have demonstrated "vigorous and contentious motion practice from the beginning" and spent many months negotiating this Settlement.[13]  On the other hand, the objectors learned about this case through either the Court-approved notice[14] provided to Settlement Class Members, or through their experience in Fresco I. These objectors have a dearth of experience in this Litigation and the Settlement process, as compared to Class Counsel's well-documented efforts and experience in DPPA litigation.

Third, the Court should not lose sight of the significant burden objectors to class settlements must satisfy in order to derail approval of any aspect of a proposed class settlement. To approve a class action settlement, the Court must find it to be "fair, adequate, and reasonable." *Claire's Stores,* 2001 U.S. Dist. LEXIS 21481; *Bennett* 737 F.2d at 986. In the Court's order granting preliminary approval of the Settlement, the Court found the Settlement was fair, adequate, and reasonable subject to final approval. DE 90 at 12. Where a class settlement is preliminarily approved, it is "'presumptively reasonable' and an objector [whatever the motivation for the objection] must overcome a 'heavy burden' to prove the settlement is unreasonable." *Amoco,* 211 F.R.D. at 466 (quoting *Williams v. Vukovich,* 720 F.2d 909,921 (6th

---

[13] DE 90 at 10, 12; *see also* Mullenix Decl. at ¶¶ 97-122.

[14] That certain Settlement Class Members have chosen to exercise their rights to object is a testament to the efficacy of the Notice Program, and the fairness of the Settlement.

Cir. 1983)).  In this case, none of the objectors, be they "professional objectors" or legitimate

Settlement Class Members, has met his or her heavy burden.

> **C.**    **The Court must Scrutinize the Professional Objectors even more Thoroughly**

Settlement notice programs are meant to advise and offer the opportunity for input from

putative class members who may have a true interest in the case at hand. Often, however,

persons respond whose interests in the settlement are suspect. Some objectors to this Settlement

are so-called "professional objectors" who repeatedly object to class action settlements for

ulterior motives – namely, their own monetary or political gain. As the authors of NEWBERG ON

CLASS ACTIONS observe, the practice of professionally objecting to proposed class action

settlements has become a "big business."  *See* CONTE & NEWBERG, 4 NEWBERG ON CLASS

ACTIONS ("Newberg") (4th ed. West 2002) § 11:55 at p. 168.  On this point, another district court

discerned:

> Professional objectors can levy what is effectively **a tax on class action
> settlements**, a tax that has **no benefit to anyone other than to the objectors**.
> Literally nothing is gained from the cost: Settlements are not restructured and the
> class, on whose behalf [any] appeal [may] purportedly raised, gains nothing.

*Barnes v. Fleet Boston Financial Corp*., 2006 U.S. Dist. LEXIS 71702, at *1-2 (emphasis

added).[15] While the Court must consider all objections, including those of professional objectors,

their track records and motives require that they be even more carefully scrutinized. FEDERAL

JUDICIAL CENTER, MANAGING CLASS ACTION LITIGATION: A POCKET GUIDE FOR JUDGES 11

(2005) (explaining that courts should "[w]atch out…for 'canned objections filed by professional

---

[15] *See also Shaw v. Toshiba Am. Info. Sys., Inc*., 91 F.Supp.2d 942, 973 (E.D. Tex. 2000) (professional
objectors file "canned objections" in an attempt to extract a fee by lodging generic, unhelpful protests.);
*O'Keefe v. Mercedes-Benz USA*, 214 F.R.D. 266 (E.D. Pa. 2003) (court voicing suspicion of objector
represented by attorney who was a "professional objector").

objectors who seek out class actions to simply extract a fee by lodging generic, unhelpful protests.'").

It should be noted that some of the objectors or their counsel also objected to the Fresco I settlement – Jeffery Weinstein, John Pentz, and the Taylor Objectors (collectively the "Professional Objectors"). These Professional Objectors withdrew their objections to the same settlement which was approved by this Court without causing any change to the settlement benefits that each class member received. Now the Professional Objectors are objecting to a nearly identical settlement here and raising the same arguments that they raised and then abandoned in Fresco I.  As such, little weight should be given to these canned objections brought by Professional Objectors. Two of the Professional Objectors, Pentz and Weinstein, deserve special attention due to their infamous history objecting to class action settlements. Each is discussed in turn below.

### 1.      John Pentz

Massachusetts attorney John J. Pentz is a professional objector who heads up a firm called the "Class Action Fairness Group," which, according to his website, specializes in objections to class action settlements.  Website attached as Ex. 1.  Professional Objector Pentz, has been filing objections to class action matters since at least 2000 when he opened his practice.[16]  Professional Objector Pentz often challenges attorney's fees, apparently believing this objection to be the most effective way to extract a payment of money in exchange for the withdrawal of his objection.  *See, e.g.*, *Taubenfeld v. Aon Corp.*, 415 F.3d 597 (7th Cir. 2005)

---

[16] *See, e.g., Spark v. MBNA*, 48 Fed.Appx. 385, 2002 WL 31059209 (3rd Cir. 2002) (Pentz objecting on behalf of an entity denominated "the Objectors Group");  *Tenuto v. Transworld Systems, Inc*., 2002 WL 188569 (E.D.Pa.) (same); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 2003 WL 22417252, fn. 3 (D. Me. 2003) (noting Pentz's status as a repeat objector in class action cases and finding he filed a groundless objection); *In re Visa Check/MasterMoney Antitrust Litig*., 2004 U.S. Dist. LEXIS 8737 (E.D.N.Y. 2004).

(Pentz losing attorney's fee challenge).  On several occasions, Professional Objector Pentz has even sought (and was denied) his own fees based on a substantial multiplier for his bringing an objection.[17]

A news article published in *Corporate Counsel* labeled Professional Objector Pentz as "the holdup artist" for his pattern of holding hostage class action settlements by filing objections and appeals until his fee demands are paid. Lisa Lerer, *Fringe Player: The Objector,* vol. 11, issue 10, Corporate Counsel, Oct. 2004 attached as Ex. 2.  In fact, Professional Objector Pentz has acknowledged that he rarely is awarded fees by the court and that the bulk of his income is payments from counsel. *Id*. This is because his canned objections are almost always denied or deemed meritless by the courts.  For example, a U.S. District Court stated that Professional Objector Pentz's "'opposition' to class counsel's fee petition appears to be nothing more than an attempt to receive attorneys' fees.  The objector has done nothing more than propose an unsupported, alternative fee distribution scheme." *Spark*, 289 F.Supp.2d at 513.

It should be noted that this is not the first time Professional Objector Pentz has represented objector Jacqueline Pio to challenge a class settlement;  in addition to their objection in Fresco I, they have objected together on at least two previous known occasions.  *In re Initial Public Offering Securities Litigation*, 2009 WL 3397238 (S.D.N.Y. 2009); *In re Relafen Antitrust Litigation*, 231 F.R.D. 52 (D.Mass. 2005).  Their objections were overruled in both

---

[17] *See, e.g., In re VISA Check/Mastermoney Antitrust Litig.*, 297 F.Supp. 503, 516 (E.D.N.Y. 2003) (Pentz requesting and being denied a 12.8 multiplier of his lodestar); *Spark v. MBNA Corp*., 289 F.Supp.2d 510 (D .Del. 2003) (District court ruled that Pentz's objection made no contribution to the case and denied his request for attorney's fees); *Park v. Thomson Corp.*, 633 F. Supp. 2d 8 (S.D.N.Y. 2009) (Since Pentz billed excessively, the District Court denied his application for a 1.5 multiplier, reduced his lodestar by 20%, and denied his application for an incentive award for his client).

cases. *Id.* In his role as a professional objector, Pentz has also represented his relatives as class settlement objectors.[18]

Professional Objector Pentz has been criticized by numerous courts for his canned and counterproductive objections:

- *In re AOL Time Warner ERISA Litig.*, No. 02 Civ. 8853, 2007 WL 4225486, 3 (S.D.N.Y. 2007) (district court calling Pentz's arguments "counterproductive" and "irrelevant or simply incorrect" so that they "clouded rather than sharpened the issues.");

- *Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005) (court faulting Pentz for failing to articulate his client's argument and putting forth "conclusory assertions" in his client's written objection); and

- *In re Royal Ahold N.V. Sec.*, 437 F. Supp. 2d 467 (D. Md. 2006) (attached as Ex. 3) (noting that Pentz made a frivolous objection and essentially "high-jacked" the objection of one the *pro se* objectors in the case for his own purposes. The court stated that Mr. Pentz offered "absolutely nothing more than speculation that a better settlement could have been obtained," and that there is "simply no practical or logical reason… to believe that that would have happened.")

In August of 2009, Florida Circuit Court Judge Colby Peel bluntly found in *Ouellette v. Wal-Mart Stores, Inc*. that the conduct of Professional Objector Pentz and the other objectors' counsel "constituted an effort to extort money from the class and/or class counsel." Final Judgment attached as Ex. 4. The court based this conclusion on the lack of involvement and participation combined with "their attempt to inject themselves at the last minute into this eight year litigation." *Id*.

As one might suspect, comments about Professional Objector Pentz made by class counsel in various cases have been very unfavorable. "Joe Whatley of Birmingham-based

---

[18] *See, e.g., Barnes v. FleetBoston Fin. Corp.*, 2006 U.S. DIST. LEXIS 71072 (D. Mass. 2006) (Pentz represented his mother-in-law and was ordered to post an appeal bond of $645,111.60 to insure against his potentially frivolous appeal); *Alan S. Daniel v. AON Corporation,* No. 99 CH 16893 (Cir. Ct. Cook County, Ill) (Pentz represented his wife's business, Connie Pentz Realty Co.); *In re Compact Disc Minimum Advertised Price Litig.*, 2003 WL 22417252 (D. Me. 2003) (Pentz represented his wife and the was ordered to post an appeal bond to insure against his potentially frivolous appeal).

Whatley Drake, who faced off with Pentz in three different cases, says he has always paid Pentz to drop objections without making changes to the settlement. 'It's like having to pay a tax,' Whatley says." Ex. 2.   In *Park v. Thomson Corp.*, 633 F.Supp.2d 8 (S.D.N.Y. 2009), class counsel described Pentz's "practice of negotiating payoff fees for himself in exchange for dropping his canned objections and appeals that hold up settlements" as a "blatant abuse of the judicial process."  Ex. 5 at 5-6.  Similarly, in *Lipuma v. American Express Co.,* 406 F. Supp. 2d 1298 (S.D.Fla. 2005), counsel for *American Express* responded to Pentz's objection by saying "John Pentz is a professional objector and has a routine practice of filing these same baseless objections in an attempt to hold up settlements and extract fees." Ex. 6 at 10.  The counsel then illustrated that that Mr. Pentz's conduct was not an isolated event, but rather part of his pattern and practice around the country that should not be condoned.  *Id.* at 9-13.

Professional Objector Pentz's objection in this case illustrates his *modus operandi* and is only the latest chapter in his history of filing baseless objections as a means of extorting money from class counsel in exchange for his withdrawing his objection – as such, his objections must be thoroughly scrutinized.

### 2.   Objector Jeffrey Weinstein

Texas attorney Jeffrey L. Weinstein is also a professional objector.  He appears here, *pro se,* with fellow Texas attorney D.J. Powers. DE 95 (Weinstein and Powers Objection). Professional Objector Weinstein is no stranger to this Court, having filed an objection to the settlement in Fresco I, which was later withdrawn.  He has recently filed formulaic objections in several different class cases with disparate facts and parties and requested attorney's fees for

objecting.[19] He has represented his wife as an objector in a case in which the court found that "none of the Weinstein objections set forth a basis to set aside or modify the Settlement." *See McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448 (D.N.J. 2008).

Weinstein has an extensive history of professional chicanery.  In *Turner v. GE*, he filed a canned objection and literally suggested that class counsel engage in extortion to resolve his argument.  In a declaration, *Turner* class counsel described his interactions with Professional Objector Weinstein just after the fairness hearing in which Weinstein's objection was denied.  Declaration attached as Ex. 9.  The following excerpt is particularly enlightening:

> After the conclusion of the Fairness Hearing on August 21, 2006, I met Mr. Jeffrey Weinstein and Mr. Kayusa [local counsel for Mr. Jeffrey Weinstein] in the hallway outside the courtroom. Also present were my co-counsel Gary E. Mason and Alexander E. Barnett, and my associate Jordan Chalkin. Mr. Jeffrey Weinstein asserted, "I can't believe you had me come here and let it go this far." When I asked him what he meant, Jeffrey Weinstein responded, "Come on, Scott, you're smarter than that, you know how we could resolve this." As I knew that GE would not agree to modify the Settlement Agreement, I knew of no legal and ethical way to resolve the objection, and asked Jeffrey Weinstein for clarification. He suggested that I call him on his cellular phone later that day.

> That afternoon, I left a voicemail message on Jeffrey Weinstein's cell phone. He returned the call soon thereafter. I reiterated that I did not understand his comment that we could resolve his objection, in light of GE's position that the Settlement Agreement would not be modified. Mr. Jeffrey Weinstein responded that he "could always withdraw his objection." I told him that I was delighted he was willing to do so, but Jeffrey Weinstein then told me that he would drop his objection only if he was compensated. I reminded him that the Federal Rules of Civil Procedure prohibited undisclosed agreements in class actions. In response, he told me "we can work around the rules" if the Settlement Class Counsel agreed to make a $125,000 contribution to a charity of Mr. Jeffrey Weinstein's choosing. He named a specific charity to which he claimed a connection, and told me that his relationship with the charity was such that he would be able to share in the proceeds of the "contribution." Jeffrey Weinstein noted that time was of the essence as the matter of his objection was under advisement by the Court.

---

[19] *See, e.g.*, *Turner v. GE*, 2006 U.S. Dist. LEXIS 65144 at * 20-21 (M.D. Fla.);  *In re: The Progressive Corp. Ins. Underwriting and Rating Practices Litig.*, MDL No. 1519 (N.D. Fl.) (attached as Ex. 7); *Robert Lubitz, et al. v. DaimlerChrysler Corp.*, Docket No. BER-L-4883-04 (N.J. Super Ct. Law Div., Bergen Cty.) (attached as Ex. 8 hereto);  and *Park v. Thomson Corp.*, 633 F.Supp.2d 8 (S.D.N.Y. 2009).

Ex. 9.  Evidently, Professional Objector Weinstein has no problem engaging in such illegitimate conduct so long as there is an opportunity that he be paid for his efforts.  When Professional Objector Weinstein's extortion demand was brought to the *Turner* court's attention, and Mr. Weinstein's faced the possibility of sanctions, Weinstein withdrew his objection to the *Turner* settlement.  Unfortunately, this was not enough to curtail Weinstein's conduct.

Despite being outed in *Turner,* Professional Objector Weinstein continued to file virtually the same canned objections that he filed in *Turner* in totally different class actions. One of these objections was in *Park v. Thomson Corp.*, 633 F.Supp.2d 8 (S.D.N.Y. 2009) in which Mr. Weinstein needed to associate with local counsel.  Professional Objector Weinstein associated with Robert Margulies, who is no stranger to Rule 11 violations.  *See Pathe Computer Control Sys. Corp. v. Kinmont Indus. Inc.*, 955 F.2d 94, 98 (1st Cir. 1992) (Breyer, J.) (affirming imposition of Rule 11 sanctions on Mr. Margulies after finding that record supports the finding that "he was not aware of any plausible legal ground in support of the [motion], and, in fact, interposed his motion for 'purposes of delay.'").

Not surprisingly, Mr. Weinstein appeared with Mr. Powers in *Park v. Thomson Corp.* Plaintiffs' counsel made the court aware of Mr. Weinstein and Mr. Powers's status as professional objectors who had no basis for their "obviously exaggerated fee awards."  *See* Ex. 10. In that case, Mr. Weinstein and Mr. Powers claimed entitlement to a multiplier of four (4) over an "already suspect lodestar amount."  *Id.*  The district court ended up significantly decreasing Weinstein and Powers's request.  *Park v. Thomson Corp.,* 633 F. Supp. 2d 8 (S.D. N.Y. 2009).

Most recently, Professional Objector Weinstein was among the professional objectors admonished in the August 2009, *Ouellette. v. Wal-Mart,* case that was discussed above. *See* Ex.

4.  As stated above, Judge Peel criticized all of the objectors and their counsel for their lack of involvement "combined with their attempt to inject themselves at the last minute into this eight year litigation."  *Id*. at 5.  Judge Peel concluded that this conduct "constitutes an effort to extort money from the class and/or class counsel."  *Id*.  Like Judge Peel, this Court should disregard Professional Objector Weinstein's baseless attacks on the Settlement and end his long practice of extracting money from class counsel.

## III.    ALL OF THE OBJECTIONS ARE WITHOUT MERIT

### A.    The Settlement Benefits are Substantial

With barely any reference to the text of the Settlement, several Objectors call the Settlement "illusory" or a "facade" and assert that it only requires Defendants to comply with the DPPA.[20] Objector Ashby alleges that the Settlement allows Defendants to continue violating the DPPA and that the Settlement contradicts the allegations of certain Plaintiffs' class counsel in their recent lawsuit against West Publishing Corporation.  DE 97 at 2.  Interestingly, Objector Ashby's counsel, Patrick Geraghty, has, on many occasions, co-counseled with Ben Barnow who has a competing case against West Publishing Corporation which may have prompted Mr. Geraghty to object to the instant Settlement. Whatever Objector Ashby's motivations, his objection like the others are conclusory in nature; were filed without any support of evidence; and dismisses the Injunctive Relief as being meaningless when nothing could be further from the truth.[21]

A review of the Settlement and of the declarations of renowned privacy experts reveals that if finally approved and incorporated into a Final Order and Judgment, the Parties' Settlement

---

[20] DE 96 at 2 (Pio Objection); DE 97 at 3 (Ashby Objection); DE 98 at 10 (Taylor Objections); DE 95 at 3-6 (Weinstein and Powers Objections).  Mackenstadt Objection attached as Ex. 11.

[21] DE 96 at 6; DE 97 at 3; DE 98 at 10; DE 95 at 3-6.

would institute a legal regime for personal information protection that far exceeds the requirements of the DPPA.[22] Where a settlement calls for compliance exceeding statutory requirements this "weighs heavily in favor of the settlement's approval." *Amoco*, 211 F.R.D. at 469.

Indeed, this Court has found that the Injunctive Relief provided for in this Settlement "is multi-faceted and will benefit all Settlement Class Members by enhancing the protection afforded their DPPA-regulated information."  DE 90 at 9.  Collectively, the requirements of the Settlement far exceed those imposed by the DPPA or DPPA State Equivalents.   In fact, according to Professor Cate, "they exceed the compliance requirements imposed by any existing federal law concerning data privacy, even those applicable to highly regulated sectors such as financial information or healthcare."[23]

If finally approved, the Injunctive Relief will be overseen by the Court, Class Counsel, and an Independent Third-Party Assessor.  DE 82-1 at § VI.B.6.i.  After the DPPA Compliance Program is implemented, subject to the approval of Class Counsel, both Defendants **must** retain a properly-credentialed Independent Third-Party Assessor to confirm via written reports to the Court and Class Counsel that the Defendants have adopted the procedures required by Section VI of the Settlement and is implementing those procedures properly.   DE 82-1 at §§ VI.B.6. Pursuant to the Settlement, the costs of the Injunctive Relief will be borne solely by Defendants. DE 82-1 at § VI.E. Here are just a few of the provisions that require Defendants to go far beyond the requirements of the DPPA:

---

[22] *See* Declarations of Solove, Ponemon, Cate, and Mullenix filed concurrently with this Memorandum.

[23] Professor Cate noted that the injunctive relief would surpass the Gramm-Leach-Bliley Financial Services Modernization Act, 106 Pub. L. No. 102, tit. V, 113 Stat. 1338, 1436 (1999) (codified as amended in scattered sections of 12 and 15 U.S.C.) and Standards for Privacy of Individually Identifiable Health Information, 65 Fed. Reg. 82,462 (2000) (HHS, final rule), as amended by 67 Fed. Reg. 43,181 (2002) (HHS, final rule) (codified at 45 C.F.R. pt. 160, §§ 164.502, 164.506). Cate Decl. at ¶ 28.

- Defendants must adopt written compliance procedures, conduct internal assessments, and appoint a DPPA Compliance Director that reports to the highest levels of management;

- Defendants must educate employees by establishing educational programs; requiring confidentiality through non-disclosure agreements; and setting procedures to address suspected DPPA non-compliance;

- Defendants must establish procedures to address customer credentialing, compliance checks, and mandate contractual obligations regarding customers' use, disclosure and confidential treatment of DPPA Regulated Information;

- Defendants must vet and hire an Independent Third-Party Assessor who will assess Defendants' compliance programs and provides the results of the assessment to Class Counsel and this Court.

DE 82-1 at § VI.B.3-8.  In sum, Settlement Class Members will reap tangible benefits in the form of enhanced protection of their DPPA Regulated Information through the required changes to the business practices of Defendants.

Not a single objector discusses any of the foregoing relief provisions, and no objector has discerned that these provisions effectuate the intent of Congress in enacting the DPPA. Congress intended that the DPPA "protect the personal privacy and safety of licensed drivers consistent with the legitimate needs of business and government."  140 Cong. Rec. 7929 (1994) (statement of Rep. Goss);  139 Cong. Rec. 27,327 (1993) (statement of Rep. Moran); *see* Solove Decl. at 17.

Opposing the unsubstantiated objections are opinions of leading experts in the fields of privacy, security, and information law and policy.  Professor Solove concluded that the DPPA Compliance Program will ensure "that practices do not drift back to their old ways" and that the Injunctive Relief will "significantly improve" the way Defendants handle DPPA-regulated information.  Solove Decl. at 3, 22.  Professor Ponemon opined that the Injunctive Relief "clearly will lead to important and substantial improvements in privacy protections to the lasting benefit of over 200 million Americans, and will substantially reduce the risk of future misuse of DPPA regulated data by the defendants and their customers."  Ponemon Decl. at ¶ 17.  Finally,

Professor Cate concluded that the identical Fresco I injunctive relief substantially exceeds the privacy protections required by the DPPA and exceeded the compliance requirements required by **any** existing federal law governing data privacy – even those related to highly regulated areas such as financial or health care information.  Cate Decl. at 16, 23, 28.

Thus, objectors either ignore or misunderstand the Injunctive Relief when they claim that the Settlement is illusory and requires nothing more than compliance with the DPPA. "[I]in reviewing a proposed settlement, as here, the Court must take into account 'the clear policy in favor of encouraging settlements . . . particularly in an area where voluntary compliance by the parties over an extended period will contribute significantly toward ultimate achievement of statutory goals.'"[24]  Here, the Settlement will greatly benefit the more than 200,000,000 person Settlement Class through an exacting Injunctive Relief program that has garnered the support of the leading experts in privacy and weighs in favor of the Settlement's final approval.

### B.      Notice was more than Adequate

Objectors Weinstein and Powers contend that notice was inadequate because there was no first-class mail notice to individual members of the Settlement Class. DE 95 at 2.  Objector Mackenstadt also contended that the notice was inadequate.  Ex. 11 at 1. The objectors ignore, however, the notice requirements for Rule 23(b)(2) settlements:   "The court has complete discretion in determining what constitutes a reasonable notice scheme, both in terms of how notice is given and what it contains."[25] Since Rule 23(b)(2) certification does not require individual notice to class members, the Parties employed an effective publication Notice

---

[24]*Lipuma,* 406 F. Supp. 2d at 1314 (quoting *Patterson v. Newspaper & Mail Deliverers' Union*, 514 F.2d 767, 771 (2d Cir. 1975) (citations omitted); *see Amoco*, 211 F.R.D. at 466; *see also Cotton,* 559 F.2d at 1331; Mullenix Decl. at ¶ 42.

[25] 7B CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 1797.6 (3d ed. 2006); Finegan Decl.; Mullenix Decl. at ¶¶ 142-144.

Program that reached approximately eighty percent (80%) of the Settlement Class.[26]  As the Advisory Committee stated in its notes: "Notice calculated to reach a significant number of class members often will protect the interests of all. Informal methods [of notice] may prove effective . . . [and] [t]he court should consider the costs of notice in relation to the probable reach of inexpensive methods." FED. R. CIV. P. 23(c)(2)(A) advisory committee's notes.

In Rule 23(b)(2) settlements, this Court has approved publication notice rather than direct mail notice.  *See, e.g.*, Fresco I DE 629 (Final Judgment); *Collier v. Dickinson*, Case No. 04-21351 (S.D. Fla. 2005); *Amoco*, 211 F.R.D. at 466 (notice disseminated through publication and the posting of information on gas pumps).[27]  In line with this precedent, this Court found that the "settlement class [here] is estimated to include more than 200 million individuals, and the cost to identify individual class members and to provide them with individual notice is not reasonable in these circumstances."  DE 90 at 16.  The mere postage for such notice would be more than $88,000,000.00.[28]

Class Representatives and Defendants agreed on a Notice Program that brought notice to an estimated eighty percent (80%) of the more than 200,000,000 Settlement Class Members. Finegan Decl. at ¶ 7.  As recognized by the Court, the Notice Administrator for this Settlement, Garden City Group, "have extensive and specialized experience and expertise in class-action settlements and notice programs."  DE 90 at 13.  Garden City Group has "also served as expert witnesses on the issue of class action notice programs and have authored publications on that

---

[26] Finegan Decl. at 7; FED. R. CIV. P. 23(e)(1)(B); Mullenix Decl. at ¶¶ 142-144.

[27] *See also Access Now, Inc. v. AMH CGH*, Inc., No. 98-3004-CIV, 2001 U.S. Dist. LEXIS 12876, at *16, 21 (S.D. Fla. 2001) (notice to class members is not required under Rule 23(e)(1) where the settlement seeks injunctive relief and the expense of nationwide notice "would be extremely expensive and burdensome, to the detriment of the class itself");  *accord Parker v. Time Warner Entm't Co*., 239 F.R.D. 318, 330 (E.D.N.Y. 2007) (recognizing that Rule 23(e) does not require individual notice for a class settlement pursuant to Rule 23(b)(2))

[28] Assuming a single postage stamp for 200,000,000 notices.

subject."  *Id.* at 14.  Named Plaintiffs are concurrently submitting a memorandum in support of the Notice Program's adequacy that shows that the Notice Program clearly satisfies all Rule 23 and Due Process requirements.  The objections to the Notice Program should be overruled.

      **C.**     **A Waiver of Statutory Damages and the Class Action Mechanism is Fair and Reasonable in Light of the Injunctive Relief and Preservation of Actual and Punitive Damages Claims**

Several objectors assert that the Settlement is not fair, adequate, or reasonable because it waives the Settlement Class Members' liquidated damage claims in the amount of $2,500 and class action claims brought under the DPPA claims.[29] Objectors assert that any DPPA waiver requires monetary consideration.  This argument is misplaced and these objections should be overruled.  Mullenix Decl. at ¶¶ 132-135.

      **1.**     **The DPPA does not Automatically Provide for $2,500 in Statutory Damages**

Under the DPPA, 18 U.S.C. § 2724(a), "[a] person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains, who may bring a civil action in a United States district court."  18 U.S.C. § 2724(a).  Remedies for a DPPA violation are discretionary: the district court **may** award:  "(1) actual damages, but not less than liquidated damages in the amount of $2,500; (2) punitive damages upon proof of willful or reckless disregard of the law; (3) reasonable attorneys' fees and other litigation costs reasonably incurred; and (4) such other preliminary and equitable relief as the court determines to be appropriate." *See* 18 U.S.C. § 2724(b).

Despite the discretionary nature of DPPA remedies, Objector Pio relies on *Kehoe v. Fidelity Federal Bank & Trust*, 421 F.3d 1209, 1213 (11th Cir. 2005), *cert. denied*, 547 U.S.

---

[29] DE 95 at 3;  DE 96 at 2;  DE 97 at 2;  DE 98 at 3 and 10;  Ex. 11.

1051 (2006), for the assertion that the Settlement Class is **entitled to** statutory liquidated damages of $2,500.  DE 96 at 3. The actual holding of *Kehoe* was that a plaintiff need not prove actual damages to recover liquidated damages under the DPPA.  *Kehoe,* 421 F.3d at 1217.  But the *Kehoe* court emphasized that Section 2724(b) of the DPPA begins with, "[t]he Court **may** award." *Id.* at 1216 (citing 18 U.S.C. § 2724(b)) (emphasis in original).  Significantly, the Eleventh Circuit noted that, "[t]he use of the word 'may' suggests that the award of any damages is permissive and discretionary.  *Id.* at 1216-1217 (citing *DirecTV, Inc. v. Brown,* 371 F.3d 814, 818 (11th Cir. 2004) (concluding that the district court correctly determined that liquidated damages under the ECPA are discretionary).  The *Kehoe* court concluded that:  "[s]ince there is neither legislative history nor obvious inferences from the structure that suggests a contrary intent, we conclude that the use of the word 'may' implies a degree of discretion." *Id.* at 1217 (citing *DirecTV,* at 817).  Thus, the Eleventh Circuit Court of Appeals held that the district court, **in its discretion**, may fashion what it deems to be an appropriate award. *Id.* Consequently, contrary to some objectors' assertions, there is no automatic right to recover statutory liquidated damages.

Undeterred, Objector Pio cites the *Kehoe* class settlement for the further argument that the willingness and ability of the *Kehoe* defendant (Fidelity Bank and Trust) to pay damages suggests that Defendants should be willing and able to do the same. DE 96 at 3. Any analysis of this position demonstrates its speciousness. First, the defendant in *Kehoe* was a bank and was not in the information aggregation business like Defendants here.  Second, in *Kehoe*, there was evidence that the bank had obtained personal information from the state DMV to use for marketing the bank's lending services to the public, without the individuals' consent.  Unlike *Kehoe,* there is no such evidence that the Defendants obtained and used DPPA Regulated

Information for **marketing** purposes.  Moreover, in *Kehoe*, the class gave up their claims for actual damages.  Here, Settlement Class Member claims for actual and punitive damages and entitlement to attorneys' fees are being preserved.

Information aggregators like Defendants gather and house billions of bits of information stored in huge databases, some of which contain DPPA Regulated Information, that are sold in a number of data products.  *See* Ponemon Decl.; Solove Decl.  Defendants in this case are allowed to continue to receive, use, and disclose DPPA Regulated Information in compliance with the DPPA and pursuant to the requirements included in the Injunctive Relief, which exceeds DPPA requirements and establishes a legally binding privacy standard applicable to each company. *See* DE 82-1.

In contrast, the *Kehoe* defendant was a bank that no longer possessed any DPPA Regulated Information.  Hence, a Rule 23(b)(2) settlement requiring the Injunctive Relief obtained here was plainly not appropriate for a defendant not even in the information aggregation industry and that did not currently possess DPPA Regulated Information. Finally, any damage claim as in *Kehoe* would not have been effective or manageable under Rule 23(b)(3) here, given the enormous number of Settlement Class Members.  The *Kehoe* settlement, therefore, cannot serve as a model for this Settlement.

## 2.     The Waiver of Statutory Damages is Reasonable

It is axiomatic that parties include general releases as part of settlement agreements. Courts generally recognize, approve, and uphold general releases, and have done so for many years.  *Amoco*, 211 F.R.D. at 471 (citing numerous authorities). "[F]ederal class action settlements containing a release of state law claims are both common and presumptively valid."

*DeHoyos v. Allstate Corp.,* 240 F.R.D. 269 (D. Tex. 2007) (citing *Amoco*, 211 F.R.D. at 471.[30]

Likewise, it is common in class settlements for class definitions to be expanded to include members not originally included in the litigation.[31]  Such release "does not necessarily lead to a conclusion that there was collusion among the parties." *Lipuma,* 406 F. Supp 2d at 1316.  And it is not unusual for releases in class actions to cover not only the claims that have at one time or another actually been alleged, as here, but also "all claims that might be asserted in connection with the action." *In Re: Nasdaq Market-Makers Antitrust Litig.,* 187 F.R.D. 465, 482

---

[30] *See also In re Corrugated Container Antitrust Litig*., 643 F.2d 195, 221 (5th Cir. 1981)), *cert. denied, sub. nom., CFS Continento Inc. v. Adams Extract Company,* 456 U.S. 99 (1987); quoting *Patterson v. Stovall*, 528 F.2d 108, 110 n.2 (7th Cir. 1976)). "[T]he very nature of a general release is that the parties desire to settle all matters forever . . . [and a] general release . . . not only settles enumerated specific differences, but claims of every kind and character, known or unknown." *Zandford v. Prudential-Bache Sec., Inc*., 112 F.3d 723, 727 (4th Cir.1997) (quoting *Virginia Impression Products Co. v. SCM Corp*., 448 F.2d 262, 265 (4th Cir. 1971) cert. denied, 405 U.S. 936 (1972)); *see also Wal-Mart Stores, Inc. v. Visa U.S.A. Inc*., 396 F.3d 96, 106 (2d Cir. 2005) (recognizing "[b]road class action settlements are common, since defendants and their cohorts would otherwise face nearly limitless liability from related lawsuits in jurisdictions throughout the country") *cert. denied, sub. nom. Leonardo's Pizza by the Slice v. Wal-Mart Stores, Inc.,* 544 U.S. 1044 (2005). Where, as here, a "release provides that 'any and all claims,' 'past, present, or future' are to be extinguished,' a court is required to enforce its provisions both as to known and unknown claims . . . [because a] contrary result would not contribute significantly to the public policy of encouraging the settlement of differences and compromise of disputes in which the execution and exchange of releases is the common and legally accepted means of consummation." *Ingram Corp. v. J. Ray McDermott & Co., Inc.*, 698 F.2d 1295, 1312 (5th Cir. 1983*); see also Wal-Mart Stores*, 396 F.3d at 106 (concluding that "[c]lass action settlements simply will not occur if the parties cannot set definitive limits on defendants' liability"); *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 261 F.3d 355, 366-67 (3d Cir. 2001) (determining that refusing to grant broad settlement release would undermine multi-district class settlements because defendants would be concerned their exposure to liability would be too great).

[31] *See, e.g. Malchman v. Davis*, 588 F. Supp. 1047, 1058 (S.D.N.Y. 1984) (no purpose served by having further litigation on claims for injunctive relief; perfectly reasonable objective to expand class regarding the issues raised in the action), *cert. denied, sub. nom., Mountain Plains Congress of Senior Organizations v. Malchman*, 475 U.S. 1143 (1986); *Lipuma*, 406 F. Supp. 2d at 1316 ("defendants may properly 'insist upon amendments to the pleadings broadening the scope of the action prior to settlement, in an effort to cover everything' and insure that the settlement will in fact result in an end to litigation.") (quoting *Trotsky v. Los Angeles Fed. Savings and Loan Ass'n*, 48 Cal. App. 3d 134, 147-48 (2d Dist.1975) (citations omitted))

(S.D.N.Y. 1998).[32] As explained by the court in *In re Wireless Tel. Federal Cost Recovery Fees*

*Litigation*:

> Variations from state-to-state in the form of state law claims would always prevent a nationwide settlement, thereby defeating the efficiencies of the class action settlement mechanism. Such a position is plainly against the public policy favoring class action settlements and courts frequently and routinely approve nationwide class settlements, including consumer class actions involving state law claims.

2004 WL 3671053, at *15 (W.D. Mo. 2004).

In exchange for the Injunctive Relief, the general release in the Settlement contains a release of statutory damage claims and claims for Injunctive Relief under the DPPA and DPPA State Equivalent claims, which several Objectors have challenged with broad-brush assertions.[33] Importantly, Prof. Mullenix found this release to be reasonable. Mullenix Decl. at ¶¶ 132-135.

For the purposes of Rule 23(b)(2) settlements, earlier this year, the Court found in Fresco I that the statutory damages may be incidental to Injunctive Relief sought to enforce a federal statute.  Fresco I DE 629 at ¶ 9.[34] Along the same lines, in preliminarily approving the Settlement, this Court found that the statutory liquidated damages claims released by the Settlement are incidental to the Injunctive Relief. DE 90 at 6.

This Court in Fresco I and *Amoco*, 211 F.R.D. at 472, specifically found that release of statutory damage claims is permissible in the settlement Rule 23(b)(2) context, where injunctive relief and the achievement of a statutory goals were paramount.  Indeed, the Settlement release

---

[32] Quoting *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 459 (2d Cir. 1982) (affirming class action release that barred class members from pursuing appraisal proceedings in state court even if those claims could not have been asserted in the federal class action).

[33] DE 82-1 at § IX.A;  DE 95 at 3;  DE 96 at 2;  DE 97 at 2;  DE 98 at 10.

[34] *See also Amoco* 211 F.R.D. at 465 (applying *Murray v. Auslander*, 244 F.3d 807 (11th Cir. 2001)). Statutory liquidated damages under the DPPA flow directly from a violation of the Act, and thus are appropriately seen as incidental. *See Kehoe*, 421 F.3d at 1213; *Parus v. Kroeplin*, 2006 U.S. Dist. LEXIS 4157 (D. Wis. 2006);  *Pichler v. UNITE*, 228 F.R.D. 230, 247 (E.D. Pa. 2005).

of statutory damage claims here is identical to the release in *Fresco I* and is nearly identical to the release that this Court approved in the *Amoco*.  This *Amoco* court observed:

> [A]s the decisions cited make plain, it is permissible for class settlement releases to bar all related damage claims. Nonetheless, the Release here does not have such a wide ranging effect, because it does not bar clams for actual damages at all. Rather, the release is strictly limited to federal and state accessibility law claims for injunctive relief and statutory damages. . . . By statutory damages, the parties mean only to bar class members from claiming minimum or liquidated damages under statutes that require no proof for recovery. In short, to the extent some states have accessibility laws authorizing private suits for actual damages, the Release does not bar those claims.

*Amoco*, 211 F.R.D. at 472.

Statutory damages under the DPPA are designed to force defendants to comply with the DPPA and protect the privacy interest of consumers.  *See Pichler*, 457 F. Supp. 2d at 530; *Margan v. Niles*, 250 F. Supp. 2d 63, 74-75 (N.D.N.Y. 2003).  Here, because the Injunctive Relief serves that purpose and the statutory damages are incidental to the injunctive provisions of the DPPA, waiver of the statutory damages is appropriate consideration given in exchange for the substantial Injunctive Relief.

Importantly, the waiver of statutory damages is less significant because **the release under the Settlement does <u>not</u> bar all subsequent damages claims**; akin to *Fresco I* and *Amoco*, Settlement Class Members may bring individual actions for actual damages and individual punitive damage suits based on individual actual damages caused by a DPPA or DPPA State Equivalent violation.[35]  Thus, if a Settlement Class Member has suffered any actual damages, they are free to pursue the appropriate remedy.

---

[35] DE 82-1 at § IX.A. and C.; *see Luevano v. Campbell*, 93 F.R.D. 68, 86 (D.D.C. 1981) ((b)(2) settlement releasing class-wide monetary claims in exchange for extensive injunctive relief, but preserving some claims for damages and awarding $35,000 to each named plaintiff).

3. **The Waiver of the Class Action Mechanism is Reasonable**

In exchange for the Injunctive Relief, the Settlement release also includes a waiver of Settlement Class Members' ability to pursue subsequent claims through the class action mechanism. This waiver is sustainable and appropriate for at least three reasons. Mullenix Decl. at ¶¶ 136-141.

First, Rule 23 does not *per se* confer a legal right to class action treatment of legal claims. "Substantive remedies cannot be created by the availability of a class action."[36] Rule 23 and its state analogues are merely procedural mechanisms for aggregating disputes, *ergo* there is no substantive legal "right" being infringed through a waiver.[37]

Second, the class action waiver is part of the bargained-for consideration for the substantial Injunctive Relief. Mullenix Decl. at ¶ 140. By definition, a settlement embodies a compromise among the disputing parties resulting in bargained-for terms of agreement. "Above all, the court must be mindful that 'inherent in compromise is a yielding of absolutes and an abandoning of highest hopes.'" *Amoco,* 211 F.R.D. at 468 (citing *Ruiz v. McKaskle*, 724 F.2d 1149, 1152 (5th Cir. 1984) (quoting *Cotton,* 559 F.2d at 1330)). Accordingly, the class action waiver here is a bargained-for concession, in return for the highly beneficial Injunctive Relief provisions conferred on the entire Settlement Class. *Amoco,* 211 F.R.D. at 468.

Third, class actions waivers, as part of settlement agreements, serve the fundamental purposes of class litigation to achieve judicial efficiency and economy. Mullenix Decl. at ¶ 141. The Settlement **expressly preserves** the rights of Settlement Class Members to pursue subsequent individual litigation for actual and punitive damages. The goals of judicial efficiency

---

[36] *Marsh v. First USA Bank N.A.*, 103 F. Supp. 2d 909, 923 (N.D. Tex. 2000); Mullenix Decl. at ¶ 139.

[37] *See id.* at 923; *see also Randolph v. Green Tree Fin. Corp.-Ala.*, 244 F. 3d 814, 817 (11th Cir. 2001) ("there exists a difference between the availability of the class action tool, and possessing a blanket right to that tool").

and economy would be undermined if, in settling one class, the Settlement permitted subsequent cascading, duplicative class actions based on the same claims and theories.  Mullenix Decl. at ¶ 141.  For these reasons, any objection to the waiver of statutory damages and the class action mechanism should be overruled.

### D.    A Mandatory Class Is Most Appropriate

The Taylor Objectors assert that the Settlement is deficient because class members must have a right to opt out of the Settlement because of *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999). *See* DE 98.  This is a fundamental misunderstanding of Rule 23(b)(2) standards and *Ortiz*.  Unlike this case, *Ortiz* did not involve a Rule 23(b)(2) class, but was a mandatory "limited fund" class certified under Rule 23(b)(1)(b) involving a proposed settlement affording the class a limited pool of money damages, **not** injunctive relief.[38]  In contrast to this case, the *Ortiz* plaintiffs sought to aggregate amorphous, un-liquidated tort claims for asbestos exposure, which could have run into millions of dollars drawn upon a fund for certain severely injured class members.  *See Ortiz,* 527 U.S. at 842-43.

Moreover, the argument that an opt out should be provided here defeats the whole purpose of the Rule 23(b)(2) mechanism and the Injunctive Relief.  Given the nature of the Defendants' databases and information products derived there from, the Injunctive Relief could only be realistically and effectively implemented on a nationwide, uniform basis.[39]  In this regard, "all members of the class [must be] bound equally" and must benefit equally by the

---

[38] *Ortiz*, 527 U.S. at 846; *see Coleman v. GMAC.*, 220 F.R.D. 64, 66 (M.D. Tenn. 2004) (distinguishing *Ortiz* on (b)(2) grounds).

[39] *See Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 252-53 (3d Cir. 1975) (stating that allowing a (b)(2) class to be certified and opt out of a potential judgment would "permit the institution of separate litigation and would defeat the fundamental objective of (b)(2), to bind the members of the class with one conclusive adjudication."), *cert. denied*, 421 U.S. 1011 (1975);  *Amoco*, 211 F.R.D. at 473 ("the purpose of Rule 23(b)(2) . . . is to finally resolve class disputes.") (citation omitted).

injunctive terms of the Settlement.  *Warren v. Tampa*, 693 F. Supp. 1051, 1062 (M.D. Fla. 1988) (citation omitted), *aff'd*, 893 F.2d 347 (11th Cir. 1989).   "This feature prevents repetitious litigation over a single policy or event that may affect many individuals, and by the need to avoid conflicting remedial orders arising from the prosecution of multiple actions." *Id.* at 1062 (citing *Luevano*, 93 F.R.D. at 86).   Also, "allowing objectors to opt out [of a 23(b)(2) class] would discourage settlements because class action defendants would not be inclined to settle where the result would likely be a settlement applicable only to class members with questionable claims, with those having stronger claims opting out to pursue their individual claims separately."[40]

Defendants operate on a national basis and serve private and governmental clients throughout the United States.  Given the nature of Defendants' database businesses and the purpose of (b)(2) certification, the most effective and practical way to resolve this complex case is through injunctive relief that applies nationwide with no opt-out rights.  Because the proposed Rule 23(b)(2) Injunctive Relief exacts systemic changes to each Defendant's business practices, procedures, and databases, to break up this litigation and the proposed Settlement on a state-by-state basis as the Taylor Objectors contend, would be highly impractical, if not impossible.  DE 98 at 7.  The Court's preliminary approval of this Settlement and certification under Rule 23(b)(2) of a mandatory class with no right to opt out is not only legally correct, but it constitutes the most effective means of resolving this litigation.  *See* Mullenix Decl. at ¶¶ 123-130. Therefore, any objection based on the propriety of a Rule 23(b)(2) class should be overruled.

E.    **Requested Attorneys' Fees and Class Representatives' Incentive Awards are Fair and Reasonable**

Nearly all of the Objectors contend that the requested attorneys' fees and incentive

---

[40] *Kincade v. General Tire & Rubber Co.*, 635 F.2d 501, 506-508 (5th Cir. 1981);  *accord Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1220 (5th Cir. 1978), *cert. denied*, 439 U.S. 1115 (1979).

awards are excessive.[41]  However, their arguments are conclusory and unsubstantiated. Extensive declarations and memoranda have been concurrently submitted to the Court to support the requested incentive and attorneys' fee awards including that of experts in the relevant field. These declarations and memoranda make it clear that the attorneys' fees here are fair and reasonable.  Rather than duplicate these efforts, Named Plaintiffs only highlight a few points here and refer this Court to the memorandum and supportive declarations for an exhaustive analysis as to why the fees and incentive awards are reasonable.

First of all, the attorneys' fees and expenses here were the product of extensive, collusive-free negotiations, and Class Counsel's fee request is not grounded on a federal statute. *See* Declarations of Rodney Max and James Chaplin filed concurrently with this Memorandum. As Professor Theodore Eisenberg makes clear, attorneys' fees in class cases are calculated on a different basis from fee-shifting statutes.  *See* Eisenberg Decl.  Rule 23(h) of the Federal Rules of Civil Procedure incorporates the principle that parties to a class case may agree to the amount of attorney's fees awarded through their settlement:  "In an action certified as a class action, the court may award reasonable attorney fees and nontaxable costs authorized by law **or by agreement of the parties**." Fed. R. Civ. P. 23(h) (emphasis added).  Further, Professor Ponemon opined that the Settlement is valued at more than three billion dollars which makes the fee award only a fraction of the benefits obtained for the class.  *See* Ponemon Decl. Finally, as Steven Schwartz opined, Class Counsel will incur substantial costs in monitoring the Settlement over the next ten years.  *See* Schwartz Decl.

Objector Pio challenges the attorneys' fees here by relying on *City of Burlington v. Dague,* 505 U.S. 557 (1992).  DE 96 at 7-8.  *Dague*, though, is not controlling.  Unlike *Dague,*

---

[41] DE 95 at 6; DE 96 at 8; DE 97 at 1.

this case is not being resolved under the fee-shifting provisions of the Resource Conservation and Recovery Act.  Objector Pio and Mr. Pentz raised *Dague* in *In re Relafen Antitrust Litig.* in an attempt to reduce attorneys' fees in that class settlement.  The *Relafen* court rejected this argument about the applicability of *Dague* to a settlement and found *Dague* distinguishable, because "the [*Dague*] case had gone to final judgment, the plaintiffs received fees as a 'prevailing party,' and the district judge 'enhanced' the lodestar calculation because the attorneys had taken the case on a contingency basis."  *In re Relafen Antitrust Litig.,* 231 F.R.D. at 79 (citing *Dague*, 505 U.S. at 557).

Like *Relafen*, this is a settlement class and fees are not been sought pursuant to a fee-shifting statute where a party has prevailed at trial or summary judgment.[42]  Here the attorneys' fees and expenses, subject to Court approval, are being paid according to the Parties' agreement in the Settlement from Defendants' pockets and not from some fund which will benefit Settlement Class Members if not awarded to Class Counsel.  *Dague* does not stand for the proposition that a court cannot award attorney's fees according to equitable principles and/or the terms of a settlement.  *Cf. Cook v. Niedert*, 142 F.3d 1004 (7th Cir. 1998).  Along these lines, the Supreme Court noted in *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240 (1975), that the existence of a fee-shifting statute did not disturb the equitable power of a court to award attorneys' fees:

> [T]he 1853 Act [referring to 28 U.S.C. § 1920 and § 1923, limiting the amount a prevailing party may recover from the loser] was read as not interfering with the historic power of equity to permit the … party preserving or recovering a fund for the benefit of others in addition to himself, to recover his costs, including his attorneys' fees, from the fund …These exceptions are unquestionably assertions

---

[42]Even if this were a fee-shifting case (which it is not), the DPPA, as noted *supra*, allows the Court a degree of discretion in fashioning awards in a case, which ostensibly could include its methods for calculating awards for attorney's fees. *Kehoe*, 421 F.3d at 1217 (citation omitted).

> of inherent power in the courts to allow attorneys' fees in particular situations
> unless forbidden by Congress…

*Id.* at 257-59.  The Second, Third, Seventh, Ninth, and Tenth Circuits have since followed the

Supreme Court's lead and allowed the use of the common-fund doctrine in granting attorneys'

fees even where a fee-shifting statute existed.[43]

　　　As shown in submissions to the Court, Class Representatives and Class Counsel have

been successful in reaching a Settlement where the relief obtained is substantial and goes well

beyond the requirements of the DPPA.  *See* Solove Decl.; Cate Decl.; Ponemon Decl.; Mullenix

Decl.  None of the objectors has even sought to address the actual details of the proposed

comprehensive scheme, other than to say in conclusory fashion it has no meaning.  In contrast,

Plaintiffs have shown the Court that the relief is meaningful and substantial and their efforts have

been herculean in this Litigation and Settlement.  Moreover, the attorneys' fees and expenses are

being paid pursuant to an agreement between the Parties and have garnered the support of

several experts.  As a result, Class Counsel clearly deserve the agreed-upon amount of attorneys'

fees. In the same vein, Class Representatives certainly deserve their modest incentive awards in

light of the more than six years of work they have done on behalf of the class including

---

[43] *Staton v. Boeing Comp.*, 327 F.3d 938, 969 (9th Cir. 2003) (fee-shifting under 42 U.S.C. § 1988); *Florin v. Nationsbank of Ga.*, 34 F.3d 560, 562 (7th Cir. 1994) (fee-shifting under ERISA);  *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1327 (2d Cir. 1990) (fee-shifting under RICO); *Skelton v. General Motors Corp.,* 869 F.2d 250, 255 (7th cir. 1989)(fee-shifting under the Magnuson-Moss Act);  *In re Fine Paper Antitrust Litig.,* 751 F.2d 562, 582-83 (3d Cir. 1984) (fee-shifting under Clayton Act);  *Eaves v. Penn*, 587 F.2d 453, 465 (10th Cir. 1978)(fee-shifting under ERISA);  *see also McLendon v. Continental Group, Inc.*, 872 F. Supp. 142, 151 n.5 (D.N.J. 1994) (fee-shifting under ERISA and RICO).  District courts in the Eleventh Circuit have also concluded that the use of the common-fund doctrine is not precluded in litigation that began as a statutory fee-shifting case.  *Diaz v. Hillsborough County Hosp. Auth.*, No. 8:90-CV-120-T-25B, 2000 WL 1682918, at *7 (M.D. Fla. Aug. 7, 2000) (fee-shifting under 42 U.S.C. § 1988);  *Bowen v. Southtrust Bank of Ala.*, 760 F.Supp. 889, 895 (M.D. Ala. 1991) (fee-shifting under ERISA).

participating in discovery, discussing legal theories, and advising Class Counsel of their thoughts on the negotiation process.

## V.      CONCLUSION

For the foregoing reasons, this Court should deny the objections and approve the Settlement.

DATED:  November 9, 2009                    Respectfully submitted,

By: _/s/ Tod Aronovitz_____

**Tod Aronovitz**
**ARONOVITZ LAW**
777 Brickell Avenue, Suite 850
Miami, FL 33131
305-372-2772 Telephone
305-397-1886 Facsimile

**John A. Yanchunis**
**JAMES HOYER NEWCOMER & SMILJANICH, P.A.**
One Urban Center, Suite 550
4830 West Kennedy Boulevard
Tampa, Florida 33609
813-286-4100 Telephone
813-286-4174 Facsimile

**David D. Welch**
**DAVID D. WELCH LAW OFFICES**
2211 East Sample Road, Suite 203
Lighthouse Point Professional Building Lighthouse
Point, Florida 33064
954-943-2020 Telephone
954-782-1552 Facsimile

**Joel S. Perwin**
**JOEL S. PERWIN, P.A.**
169 E. Flagler Street
Alfred I. DuPont Building, Suite 1422
Miami, Florida 33131
305-779-6090 Telephone
305-779-6095 Facsimile

**Peter A. Portley**
**PORTLEY AND SULLIVAN**
Lighthouse Point Professional Building
2211 E. Sample Road, Suite 204
Lighthouse Point, Florida 33064
954-781-7600 Telephone
954-941-3469 Facsimile

**Lawrence D. Goodman**
**DEVINE GOODMAN  RASCO & WELLS, P.A**.
777 Brickell Avenue, Suite 850
Miami, Florida 33131
305-374-8200 Telephone
305-374-8208 Facsimile

**James K. Green**
**JAMES K. GREEN, P.A.**
Suite 1650, Esperanté
222 Lakeview Avenue
West Palm Beach, Florida 33401
561-659-2029 Telephone
561-655-1357 Facsimile

**Jack Scarola**
**David J. Sales**
**SEARCY DENNEY SCAROLA**
**BARNHART & SHIPLEY, P.A.**
2139 Palm Beach Lakes Boulevard
P. O. Drawer 3626
West Palm Beach, Florida 33402
800-780-8607 Toll free
561-686-6300 Telephone
561-478-0754 Facsimile

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been electronically filed with the Clerk of the Court using CM/ECF this 9th day of November, 2009. I further certify that the foregoing document is being served on all counsel of record identified on the attached Service List, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel who are not authorized to receive electronically Notices of Electronic Filing.

By: *   /s/ Tod Aronovitz*

34

<u>SERVICE LIST</u>
<u>Fresco vs. R L Polk & Co. and Acxiom Corp.</u>
<u>Case No. 07-60695 Civ-Martinez/Brown</u>

<u>**ATTORNEYS FOR PLAINTIFFS:**</u>

**Tod Aronovitz**
ta@aronovitzlaw.com
**ARONOVITZ LAW**
777 Brickell Avenue, Suite 850
Miami, FL 33131
305-372-2772 Telephone
305-397-1886 Facsimile

**John A. Yanchunis**
jyanchunis@jameshoyer.com
**JAMES HOYER NEWCOMER &**
**SMILJANICH, P.A.**
One Urban Center, Suite 550
4830 West Kennedy Boulevard
Tampa, Florida 33609
813-286-4100 Telephone
813-286-4174 Facsimile

**David D. Welch**
ddw@123@bellsouth.net
**DAVID D. WELCH LAW OFFICES**
2211 East Sample Road, Suite 203
Lighthouse Point Professional Building
Lighthouse Point, Florida 33064
954-943-2020 Telephone
954-782-1552 Facsimile

**Joel S. Perwin**
jperwin@perwinlaw.com
**JOEL S. PERWIN, P.A.**
169 E. Flagler Street
Alfred I. DuPont Building, Suite 1422
Miami, Florida 33131
305-779-6090 Telephone
305-779-6095 Facsimile

**Peter A. Portley**
pportley@portleysullivan.com
**PORTLEY AND SULLIVAN**
Lighthouse Point Professional Building
2211 E. Sample Road, Suite 204
Lighthouse Point, Florida 33064
954-781-7600 Telephone
954-941-3469 Facsimile

**Lawrence D. Goodman**
lgoodman@devinegoodman.com
**DEVINE GOODMAN  RASCO & WELLS,**
**P.A.**
777 Brickell Avenue, Suite 850
Miami, Florida 33131
305-374-8200 Telephone
305-374-8208 Facsimile

**James K. Green**
jameskgreen@bellsouth.net
**JAMES K. GREEN, P.A.**
Suite 1650, Esperante´
222 Lakeview Avenue
West Palm Beach, Florida 33401
561-659-2029 Telephone
561-655-1357 Facsimile

**Jack Scarola**
jsx@searcylaw.com
**David J. Sales**
djs@searcylaw.com
**SEARCY DENNEY SCAROLA**
**BARNHART & SHIPLEY, P.A.**
2139 Palm Beach Lakes Boulevard
P. O. Drawer 3626
West Palm Beach, Florida 33402
800-780-8607 Toll free
561-686-6300 Telephone
561-478-0754 Facsimile

**ATTORNEYS for Defendant, R.L. Polk & Co.**

**Lewis F. Collins, Jr.**
lcollins@butlerpappas.com
**Scott J. Frank**
sfrank@butlerpappas.com
**BUTLER PAPPAS WEIHMULLER KATZ CRAIG LLP**
777 S. Harbour Island Boulevard
One Harbour Place, Suite 500
Tampa, Florida 33602
813-281-1900 Telephone
813-281-0900 Facsimile

*Of Counsel:*
**Christopher M. Mason**
(Admitted *Pro Hac Vice*)
cmason@nixonpeabody.com
**NIXON PEABODY, LLP**
437 Madison Avenue
New York, NY 10021
212-940-3017 Telephone
212-940-3111 Facsimile

**ATTORNEYS for Defendant, Acxiom Corporation**

**Barry R. Davidson**
bdavidson@hunton.com
**Juan C. Enjamio, Esq**.
jenjamio@hunton.com
**Gustavo J. Membiela, Esq.**
gmembiela@hunton.com
**HUNTON & WILLIAMS LLP**
Mellon Financial Center, Suite 2500
1111 Brickell Avenue
Miami, Florida 33131
305-810-2500 Telephone
305-810-2460 Facsimile

**ATTORNEYS for Objectors, Jeffrey Weinstein and D.J. Powers**

Jeffrey L. Weinstein
518 Tyler Street
Athens, TX 75751
903-677-5333 Telephone
903-677-3657 Facsimile

**ATTORNEYS for Objectors, Jacqueline Pio and Anthony Pio**

John Pentz
2 Clock Tower Place, Suite 260G
Maynard, MA 01754
978-461-1548  Telephone
707-276-2925 Facsimile


- and –

Nicolas Gutierrez
Gutierrez & Zarraluqui, LLP
283 Catalonia Avenue, Suite 200
Coral Gables, Florida 33134
305-397-2005 Telephone

**Attorneys for Objector, Scott Owen Ashby**

Patrick Geraghty
Geraghty, Dougherty & Edwards, P.A.
P. O. Box 1605
Fort Myers, FL 33902-1605
239-334-9500 Telephone
239-334-8940 Facsimile

**ATTORNEYS for Objectors, James Patrick
Roberts, James Booker, Willie Booker,
Lowry Briley, Twilah Brown, James Clary,
Sharon Clary, Alice cooks, Arlando Thomas
Cooks, Elizabeth DeWitt, Kennety Gossip,
Sr., Kennice Gossip, Pamela Hensley, Robert
Holliness, Carolyn Holub, Brandi Jewell,
Tracy Lynn Karp, Venisia McGuire, David
Lee Patterson, Ronnie Phillips, Luz Ann
Roberts, Sharon Taylor, Kimberly
Underwood, Marilyn Whitaker, and
William Wilson**

Jeremy Wilson
The Corea Firm PLLC
Renaissance Tower
1201 Elm Street, Suite 4150
Dallas, Texas 75270
214-953-3900 Telephone
214-953-3901 Facsimile