UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-60695-Civ-Martinez/Brown

RICHARD FRESCO, *et al.*,

      Plaintiffs,

          vs.

R.L. POLK & CO., a Delaware corporation;
and ACXIOM CORPORATION, a Delaware
corporation,

      Defendants.

---

## FINAL JUDGMENT CERTIFYING SETTLEMENT CLASS, APPROVING SETTLEMENT, AWARDING INCENTIVE FEES TO CLASS REPRESENTATIVES, AND AWARDING ATTORNEYS' FEES AND EXPENSES TO CLASS COUNSEL

This matter came before the Court on the Plaintiffs' Motion for Final Certification of

Settlement Class, Final Approval of Class Action Settlement, and Entry of Final Judgment and

Order **(D.E. No. 110)** and Plaintiffs' Motion for Entry of an Order Approving Defendants'

Payment of Agreed Upon Incentive Awards to Class Representatives and Attorneys' Fees and

Expenses **(D.E. No. 114)**. The "Settling Parties" consist of Class Representatives, Richard

Fresco, Carlos Barrett, Jeffrey Hy, Mary Ann Collier, Roy McGoldrick, Robert Pino, Joel

Levine, Kenneth W. Heretick, and Russell V. Rosen ("Plaintiffs" or "Class Representatives") and

Defendants, R.L. Polk & Co. and Acxiom Corporation ("Defendants").

On March 10, 2009, Plaintiffs filed their Motion for Preliminary Approval (D.E. No. 81)

asking the Court to approve a proposed Settlement Agreement and Release ("Settlement

Agreement") (D.E. No. 82-2).  On June 16, 2009, the Court preliminarily certified the Settlement

1

Class and approved the Settlement Agreement. (D.E. No. 90). Plaintiffs now seek final certification of the Settlement Class and final approval of the Settlement Agreement. Class Representatives also seek approval of incentive awards to the Class Representatives and attorneys' fees and costs for Class Counsel, which Settling Defendants have agreed not to object up to the amount requested in the application. A Final Fairness hearing was held on all of these issues on December 7, 2009 ("Fairness Hearing").

The Court has considered evidence including: (i) all motions, memoranda and papers filed in support of the Settlement Agreement; (ii) all formal written objections; (iii) the declarations of Class Representatives, Class Counsel, Mediators Rodney Max and James Chaplin, Professors Fred Cate, Theodore Eisenberg, Daniel Solove, Linda Mullenix, and Larry Ponemon, and Attorneys Steven Schwartz and Ervin Gonzalez; as well as the live testimony of Professors Theodore Eisenberg, Daniel Solove, and Linda Mullenix; and Attorneys Steven Schwartz and Ervin Gonzalez at the Fairness Hearing; and (iv) arguments of counsel for Plaintiffs, counsel for Defendants, and the Objectors[1] at the Fairness Hearing and in their respective closing briefs.

For the reasons set forth below, the Court continues and makes final its certification of the Settlement Class, approves the Settlement Agreement; approves incentive awards to Class Representatives in the amount of $4,500.00 each; and approves attorney's fees and costs to Plaintiffs' counsel in the amount of $7,500,000. Being otherwise fully advised in the premises, the Court orders and adjudges as follows:

---

[1] "Objectors" refers to all members of the Settlement Class and their respective counsel who submitted timely objections to the Settlement Agreement.

2

## I.   HISTORY OF THE LITIGATION

This case stems from a class action complaint that Plaintiffs filed against several major information service provider companies, including Defendants, in April 2003, styled *Fresco, et al. v. Automotive Directions, et al.*, Case No. 03-cv-61063-JEM ("Fresco I"). Plaintiffs alleged that Defendants and the other companies were acting in violation of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. §§ 2721-2725, which regulates the obtainment, use, and disclosure of "Personal Information" and "Highly Restricted Personal Information" from motor vehicle and driver's license records maintained by state departments of motor vehicles ("DMV").

After four years of adversarial litigation and a lengthy mediation, Plaintiffs reached a settlement with six defendants in Fresco I that was subsequently approved by the Court. Defendants did not agree to the Fresco I settlement and as a result, the Settling Parties asked this Court to sever Plaintiffs' claims against Defendants, resulting in the creation of the instant case. Thereafter, the Settling Parties litigated for almost another two years before finally reaching the Settlement Agreement that is the subject of this Order.

## II.   FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.   CERTIFICATION OF THE SETTLEMENT CLASS

1.   "A class may be certified 'solely for purposes of settlement where a settlement is reached before a litigated determination of the class certification issue.'" *Lipuma v. American Express Co.*, 406 F.Supp.2d 1298, 1314 (S.D. Fla. 2005) (quoting *Woodward v. NOR-AM Chem. Co.*, 1996 WL 1063670 *14 (S.D.Ala.1996)); *see also Borcea v. Carnival Corp.*, 238 F.R.D. 664, 671 (S.D. Fla. 2006). Whether a class is certified for settlement or for trial, the Court must find that the prerequisites for class certification under Rule 23(a) and (b) of the Federal Rules of Civil Procedure

3

are met. *Lipuma,* 406 F. Supp. 2d at 1314. The Court hereby makes final its prior certification of the following Settlement Class in this action:

> All persons whose Personal Information or Highly Restricted Personal Information was obtained, used, or disclosed by either of the Defendants from April 1, 1998 through Final Judgment. All federal judges and members of their families within the first degree of consanguinity, and officers and directors of the Defendants, are excluded from the class definition.

The reasons for this Court's order follow below.

2.      Rule 23(a) of the Federal Rules of Civil Procedure has the following requirements for class certification: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a). Courts often refer to these factors as numerosity, commonality, typicality, and adequacy. *See, e.g., Davis v. Coca-Cola Bottling Co.,* 516 F.3d 955, 966 (11th Cir. 2008).

### 1.      Numerosity

3.      The numerosity requirement under Rule 23(a)(1) requires "that the class is so numerous that joinder is impracticable, not impossible." *Lipuma,* 406 F.Supp.2d at 1314 (citing *Kreuzfeld, A.G. v. Carnehammar,* 138 F.R.D. 594, 599 (S.D. Fla. 1991)); *see also Armstead v. Pingree,* 629 F.Supp. 273, 279 (M.D. Fla. 1986) (explaining that the focus of the numerosity inquiry is not whether the number of proposed class members are "too few" to satisfy the Rule, but "whether joinder of proposed class members is impractical."). There is no definite standard as to the size of a given class. *Fabricant v. Sears Roebuck,* 202 F.R.D. 310, 313 (S.D.Fla.2001). As explained in *Evans v. U.S. Pipe & Foundry Co.,* 696 F.2d 925, 930 (11th Cir. 1983), a plaintiff need not show

4

the precise number of members of the class to substantiate numerosity: "[W]hile there is no fixed numerosity rule, 'generally less than 21 is inadequate, more than 40 is adequate, with numbers between varying according to other factors.'" *Id.* (quoting *Cox v. American Cast Iron Pipe Co.,* 784 F.2d 1546, 1552 (11th Cir. 1986) *cert. denied*, 479 U.S. 883 (1986)).

4.      The Court finds that the Settlement Class is estimated to include more than 200 million individuals. *See* U.S. Dept. of Transp., Nat'l Ctr. For Statistic and Analysis of Nat'l Highway Traffic Safety Admin.: Traffic Safety Facts 2007, http://www.nrd.nhtsa.dot.gov/Pubs/811002.PDF (205,741,845 licensed drivers). Under any standard, the Court concludes that the numerosity requirement set forth in Rule 23(a)(1) is met in this case.

### 2.      Commonality

5.      The commonality inquiry requires that plaintiffs' claims raise "at least one" question of law or fact common to the members of the class. *Fabricant,* 202 F.R.D. at 313. Commonality will be satisfied where questions of law refer to standardized conduct by the defendants. *In re Amerifirst Sec. Litig.,* 139 F.R.D. 423, 428 (S.D. Fla. 1991). Establishing commonality does not require complete identity of the plaintiffs' claims. *CV Reiz, Inc., v. Levy,* 144 F.R.D. 690, 696 (S.D. Fla. 1992). "[I]t is not necessary that all questions of fact or law be common, but only that some questions are common..." *Klay v. Humana, Inc.,* 382 F.3d 1241, 1254 (11th Cir. 2004), *cert. denied,* 543 U.S. 1081 (2005).

6.      In this case, the Court finds that the Settlement Class members are commonly united because, at a minimum, Plaintiffs have alleged common violations under the DPPA and the Court finds that Defendants obtained the Settlement Class's DPPA-regulated information

5

originating from state DMV records, and used or made some of that information available for use

or disclosure. Mullenix Decl. at ¶¶ 63-64 (D.E. No. 116-1). In the case presented, the Court notes

that all members of the Settlement Class are protected by the DPPA and DPPA State

Equivalents, and share a common legal remedy: substantive injunctive relief and compliance

with the DPPA. Therefore, the Court concludes that there is legal and factual cohesiveness

among Settlement Class members to satisfy the commonality requirement of Rule 23(a)(2).

Mullenix Decl. at ¶ 65.

### 3.    Typicality

7.       The typicality inquiry under Rule 23 (a)(3) requires the Court to determine that the claims

of the class representatives are "typical of the claims or defenses of the class." FED. R. CIV. P.

23(a)(3). "Typicality requires a nexus between the class representative's claims or defenses and

the common questions of fact or law which unite." *Fabricant,* 202 F.R.D. at 313 (citing

*Kornberg v. Carnival Cruise Lines,* 741 F. 2d 1332, 1337 (11th Cir. 1984)). Typicality, however,

does not mean that class representatives' claims must be identical to the class members. Rather,

typically is satisfied where the interests of the named parties arise from the same course of

conduct that give rise to the claims of the class they seek to represent and are based on the same

legal or remedial theory. *Appleyard v. Wallace,* 754 F.2d 955, 958 (11th Cir. 1985); *Brinkerhoff

v. Rockwell International Corp.,* 83 F.R.D. 479, 480 (N.D. Tex. 1979) (typicality requires "that

the claims or defenses of the class 'resemble' or 'exhibit the essential characteristics' of those of

the representatives"). A plaintiff's claims are typical of the class "if they stem from the same

event, practice, or course of conduct that forms the basis of the class claims and are based upon

the same legal or remedial theory." *Walco Investments, Inc. v. Thenen,* 168 F.R.D. 315, 326 (S.D.

Fla. 1996).

8.        In this case, the Court finds that Class Representatives' claims are typical of the

Settlement Class members. Class Representatives and Settlement Class members are protected

by the DPPA and the DPPA state equivalents and each individual provided "personal

information" or "highly restricted personal information," within the meaning of 18 U.S.C. §

2725, to a state DMV to obtain drivers licenses and/or vehicle registrations. The crux of the

allegations in this case is that Defendants obtained, used, or disclosed DPPA personal

information of the Settlement Class members without their express consent. The Court notes that

the injunctive relief remedies sought by Class Representatives would apply to the Settlement

Class members equally. Thus, Class Representatives' interest in protecting the privacy of

Settlement Class members' personal information is typical of the claims of the Settlement Class

members. The Court also agrees with the analysis of Professor Mullenix in this regard. Mullenix

Decl. at ¶¶ 66-69.

### 4.        Adequacy of Representation.

9.        Rule 23 also requires that "the representative parties will fairly and adequately protect the

interests of the class." FED. R. CIV. P. 23(a)(4). What constitutes adequacy is a question of fact

that depends upon the circumstances of each case and is entrusted to the discretion of the trial

court. *Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718, 727 (11th Cir. 1987); *see also,* 7A

CHARLES A. WRIGHT, ARTHUR R. MILLER AND MOSEY K. KANE, FED. PRACTICE &

PROCEDURE § 1765, at 271 (1986). Rule 23(a)(4)'s adequacy requirement has two

components: (1) the class representatives have interests in common; and (2) class counsel are

qualified, experienced, and generally able to conduct the litigation. *Kirkpatrick,* 827 F.2d at 726;

7

*Griffin v. Carlin,* 755 F.2d 1516, 1533 (11th Cir. 1985); *Fabricant,* 202 F.R.D. at 314. The Supreme Court has held that a district court must determine that class representatives and class counsel are free from conflicts of interest with absent class members. *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 625-26 (1997). The Court finds that the record well supports the adequacy requirements in this case.

a.     **Class Representatives are Adequate**

10.     Looking first to Class Representatives, the Court finds that they have dutifully fulfilled their obligations. All of the nine Class Representatives actively participated in this case for the benefit of the Settlement Class. *See* Fresco Decl. at ¶¶ 6-10; Barrett Decl. at ¶¶ 7-10; Collier Decl. at ¶¶4-6; Pino Decl. at ¶¶ 6-7; Hy Decl. at ¶¶ 5, 7-8; Heretick Decl. at ¶¶ 12-16; Levine Decl. at ¶¶ 7-10; McGoldrick Decl. at ¶¶ 6-7; Rosen Decl. at ¶¶11-13, 15) (DE 112-1 through 8 and DE 124); *see* Mullenix Decl. at ¶¶87-92. The undisputed evidence demonstrates that Class Representatives have shown their commitment to the claims they share with the Settlement Class. *Id.*; *see* Mullenix Decl. at ¶¶93-94. Each Class Representative had significant involvement in all facets of the litigation, including the extensive mediation negotiations that led to the proposed settlement. *Id.*

11.     As to the Settlement Agreement, the Court finds that Class Representatives understood the privacy issues at issue and each was motivated to protect the privacy of the Settlement Class members and themselves, through the proposed injunctive relief. The Court notes that, pursuant to their declarations, Class Representatives appreciated the terms, nature, and scope of the Settlement, the ramifications of the proposed injunctive relief, the release and class action waiver of statutory claims, the risks associated with further litigation, and the fact that the settlement

8

preserves Settlement Class members' claims for actual and punitive damages. Collier Decl. at ¶ 6; Fresco Decl. at ¶¶ 8-10; Heretick Decl. at ¶¶ 15-16; McGoldrick Decl. at ¶¶ 6-7; Pino Decl. at ¶¶ 6-8; Barrett Decl. at ¶ 9-11; Hy Decl. at ¶ 7-9; Levine Decl. ¶¶ 9-11; Rosen Decl. ¶¶ 14-16; *see also* Aronovitz Decl. at ¶¶ 12, 29-30 (DE 115-3); Yanchunis Decl. at ¶¶ 14, 24 (DE 115-2). Class Representatives have sworn that the Settlement Agreement is a benefit to the Settlement Class as it provides important privacy protection. *Id.* Class Representatives further testified that their motivation in participating and undertaking this case was to change the behavior of the Defendants and to protect the privacy interests of the Settlement Class – not financial remuneration. Fresco Decl. at ¶¶ 5, 10; Heretick Decl. at ¶¶ 3-6, 17; Collier Decl. at ¶¶ 3-5; Hy Decl. at ¶¶ 3-4; McGoldrick Decl. at ¶¶ 2-3; Pino Decl. at ¶¶ 4-5; Barrett Decl. at ¶ 5-6; Rosen Decl. at ¶¶ 6, 17; Levine Decl. at ¶¶ 6, 10.

12.     Thus, the Court finds that Class Representatives are not being treated differently than the Settlement Class members and are not receiving a damage award for their DPPA violation claims. Although Class Representatives seek an incentive award, the incentive award is not to compensate the Class Representatives for damages but to reward them for their efforts on behalf of the Settlement Class. The Court finds it significant that the incentive awards were negotiated only after the terms of the settlement were reached among the Settling Parties. Chaplin Decl. ¶¶ 9-11 (D.E. No. 117-2); Aronovitz Decl. at ¶ 23; Yanchunis Decl. at ¶ 23.

13.     The Court has reviewed the arguments against adequacy made by the Objectors and finds that such arguments were asserted in a conclusory fashion and that Class Representatives did not collude with Defendants to settle the case and reward themselves at the expense of the Settlement Class. *See e.g.,* Taylor, *et al,* Objections at 3, 7 (D.E. No. 98); Ashby Objection at 1, 3 (D.E. No.

97); Pio Objection at 3-4 (D.E. No. 96). The Objectors brought forth no evidence to support their charges, nor did they contradict the evidence establishing the absence of collusion that was provided to the Court by the Settling Parties. The Court overrules Objectors' conclusory contentions and concludes that Class Representatives are adequate and have demonstrated their commitment to the case.

### b.   Class Counsel are Adequate

14.   The Court now turns to Class Counsel's adequacy. The Class Counsel attorneys have extensive experience in complex litigation and class actions. *See* Declarations of Class Counsel. The Court has observed them exhibit extensive knowledge of the law applicable to the Settlement Class members' claims. The Court finds that Class Counsel has expended substantial effort to achieve the results proposed in the Settlement Agreement. The quality of the legal work, which the Court has viewed for six years, has been excellent.

15.   The Court notes that the six year long record reflects Class Counsel's commitment to this case and the Settlement Class. Class Counsel engaged in extensive pre-suit investigation and informal discovery practice. Aronovitz Decl. at ¶¶ 4-12, 21-22; Yanchunis Decl. at ¶¶ 3-4, 7, 12-13, 21-22; Welch Decl. at ¶ 6 (DE 115-5); Portley Decl. at ¶2 (DE 115-6). The Court has presided over extensive document discovery and finds that Class Counsel reviewed thousands of pages of documents produced during the litigation. *Id.*; Goodman Decl. at ¶ 8; Joint Decl. at ¶ 6 (DE 115-1). The Court understands that Class Counsel prepared for and took the depositions of five corporate representatives of each Defendant and propounded hundreds of requests for admissions and numerous requests for production. Aronovitz Decl. at ¶ 21; Yanchunis Decl. at ¶ 21; Joint Decl. at ¶ 7. The Court also observed the extensive motion practice, including motions

for judgment on the pleadings, and discovery motions and recognizes that Class Counsel have a true expertise in DPPA and privacy issues. Aronovitz Decl. at ¶¶ 21-22; Yanchunis Decl. at ¶ 21-22; Goodman Decl. at ¶ 12. The Court is further aware that during the pendency of the case, Class Counsel retained a number of experts in the substantive areas of this case. Joint Decl. at ¶ 11.

16.     The Court reviewed the declarations of the mediators and finds that during the extensive and lengthy mediations that lasted for almost two years, Class Counsel participated in numerous face-to-face meetings and phone conferences with Defendants. Mediator James Chaplin stated that his "optimism of predicting the parties would achieve a final proposed agreement rose and fell from time to time" as the parties were "aggressive" and "adversarial." Chaplin Decl. at ¶ 16, 18. The mediator further swore that the topics of incentive awards for the Class Representatives and attorneys' fees for Class Counsel were not raised until after all of the material settlement terms were negotiated and reduced to a signed, term sheet. Chaplin Decl. at ¶¶ 9-12; Joint Decl. at ¶¶ 17-18. These facts are undisputed by any contrary evidence. As such, the Court concludes that Class Counsel are adequate.

### 5.     Class Certification under Rule 23(b)(2) is Appropriate

17.     In addition to the requirements of Rule 23(a), a proposed class action must satisfy one of the subsections of Rule 23(b). In this case, certification was and is proper for purposes of settlement under Rule 23(b)(2). Rule 23(b)(2) requires a finding that the defendants have "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief . . . with respect to the class as a whole." FED. R. CIV. P. 23(b)(2). Any request for monetary relief must be "incidental" to the injunctive relief, *Murray v. Auslander*, 244 F.3d

807 (11th Cir. 2001), and statutory damages claims may be included in Rule 23(b)(2) classes as incidental to injunctive relief. *See, e.g., Ass'n for Disabled Ams., Inc., v. Amoco Oil Co.,* 211 F.R.D. 457, 465 (S.D. Fla. 2002) (applying *Murray*). Under the DPPA, statutory damages flow directly from a violation of the act. *See Kehoe v. Fid. Fed. Bank & Trust,* 421 F.3d 1209, 1213 (11th Cir. 2005), *cert. denied,* 547 U.S. 1051 (2006).

18.    Pursuant to the aforementioned standards, the Court determines that certification of a Settlement Class under Rule 23(b)(2) was and is appropriate in this case. The Court finds, for example, that Defendants have acted on grounds generally applicable to the Settlement Class as a whole by obtaining the Settlement Class members' DPPA-regulated information originating from state DMV records, and using or making some of that information available for use or disclosure. The Court has been informed that Defendants are "information service providers" whose businesses involve the systematic collection, comparison, and storage of information in huge databases and that they serve private and government clients throughout the United States. *See* Solove Decl at ¶ VI.A. Given the nature of Defendants' database businesses and the purpose of (b)(2) certification, The Court concludes that the most effective and practical way to resolve this case is through a 23(b)(2) certification to implement the nationwide injunctive relief provided by the Settlement Agreement. *See* DE 82-1 at § VI; Cate Decl. at ¶ 24; Solove Decl. at ¶ V.D.

19.    The Court further determines that the DPPA statutory damages that are being released are "incidental" to the injunctive relief in the Settlement Agreement sought here. Mullenix Decl. at ¶ 130. As in *Amoco*, this litigation centers on the alleged violations and need for the enforcement of a federal statute rather than seeking money damages. DE 35 at 12-14; Joint Decl. at ¶¶ 12-18; Mullenix Decl. at ¶¶ 127, 130; *see, e.g.,* Declarations in Fresco I of Collier at ¶¶ 2-3; Fresco at

12

¶¶2-3, 5, 8-9; Heretick at ¶¶ 3, 14; Hy at ¶¶ 2, 8; Pino at ¶¶2-3, 7-9. Indeed, the Court finds that

the heart of the Settlement Agreement is the injunctive relief, which experts have opined

provides substantial, nationwide benefits by protecting the Settlement Class members' privacy

interests and ensuring Defendants' DPPA compliance. Solove Decl. at ¶ II.7.; Ponemon Decl. at

¶¶ 16-17; Mullenix Decl. at ¶ 36; Cate Decl. at ¶¶ 2.

20.     The Court finds it significant that any claims that the Settlement Class members may

have for individual actual damages are preserved and thus do not preclude Rule 23(b)(2)

certification. As supported by the testimony of Professor Linda Mullenix, the Court finds that the

claims for actual damages under the DPPA would not be certifiable as a class because such

claims would require an individualized inquiry into each class member's circumstances.

Consequently, the Court determines that the requirements for certification of a Settlement Class

under Rule 23(b)(2) are satisfied.

## B.     THE SETTLEMENT AGREEMENT

21.     Under Rule 23(e), the Court will approve a class-action settlement if it is "fair,

reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Factors to consider in determining whether a

settlement is fair, reasonable, and adequate include: "(1) the likelihood of success at trial; (2) the

range of possible recovery; (3) the point on or below the range of possible recovery at which a

settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation;

(5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at

which the settlement was achieved." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir.

1984). In considering whether the proposed settlement should be approved as fair, reasonable,

and adequate, the Court considered these factors as well as the absence of any collusion and the

judgment of experienced counsel for the parties. *Id.*; *Lipuma v. Am. Express Co.,* 406 F. Supp. 2d 1298, 1314 (S.D. Fla. 2005).

22.     Beginning with the likelihood of success at trial, the Court finds that Plaintiffs' likelihood of success is not certain in this case. The DPPA "sets forth three elements giving rise to liability, i.e., that a defendant (1) knowingly obtained, disclosed or used personal information, (2) from a motor vehicle record, (3) for a purpose not permitted." *Thomas v. George, Hartz, Lundeen, Fulmer, Johnstone, King, and Stevens, P.A.,* 525 F.3d 1107, 1111 (11th Cir. 2008). A host of uses are delineated in 18 U.S.C. $ 2721(b). The burden of demonstrating that Defendants improperly obtained or used the information falls on Plaintiffs. *Id.* at 1112. Defendants, who have superior knowledge of their own business practices, deny they improperly obtained or used the information in question. An expensive and time consuming trial on the merits is the only way that these issues can be resolved. Thus, the Court concludes that because success at trial is not certain for Plaintiffs, this factor weighs in favor of accepting the settlement.

23.     "The second and third considerations of the *Bennett* test are easily combined." *Behrens,* 118 F.R.D. at 541. In terms of the range of possible recovery, the DPPA provides that "[t]he court may award -- (1) actual damages, but not less than liquidated damages in the amount of $2,500; (2) punitive damages upon proof of willful or feckless disregard of the law; (3) reasonable attorney's fees and other litigation costs reasonably incurred; and (4) such other preliminary and equitable relief as the court determines to be appropriate." 18 U.S.C. § 2724(b). The Eleventh Circuit held in *Kehoe* v. *Fidelity Federal Bank & Trust,* 421 F.3d 1209 (11th Cir.2005) that liquidated damages of $2,500 under § 2724(b)(l) do not require a showing of actual damages. The Eleventh Circuit stated, however, that the phrase "may award" in the statute

provides that "the district court, in its discretion, may fashion what it deems to be an appropriate award," which *as an option* may include the actual damages and liquidated damages provided for in 18 U.S.C. § 2724(b)(1). *Kehoe,* 421 F.3d at 1217. Other options for relief include punitive damages and equitable relief. *Id.* This proposed settlement and release does not encompass actual or punitive damages and preserves the right of individual plaintiffs to pursue claims for actual damages and punitive damages. Therefore, because relief is awarded at the discretion of the district court, the range of possible recovery is up to $2,500 in statutory liquidated damages per plaintiff, injunctive relief, and attorneys' fees and costs. Accordingly, the Court finds the proposed settlement is within the range of possible recovery, because statutory damages are not mandated recovery in a DPPA case and the injunctive relief which is described below is very substantial. *See id.*

24.     As stated in the third *Bennett* factor, even a settlement point below the range of possible recovery may qualify as fair, adequate, and reasonable. *Bennett,* 737 F.2d at 986. In this case, the Court finds that the Settlement Agreement's injunctive relief requires Defendants to implement business changes with respect to DPPA protected information. Along with the measures obtained in Fresco I against the other significant information aggregation companies, the Court finds that the changes in Defendants' business practices will result in meaningful reform of the information aggregation industry concerning the obtainment, use and disclosure of DPPA information. Eisenberg Decl. at ¶ 48; Solove Decl. at 21-22; Ponemon Decl. at ¶ 17; Cate Decl. at ¶ 45. The Court finds it persuasive that numerous, highly regarded legal and privacy experts have given sworn testimony in support of the Settlement Agreement unopposed by any testimony from any other legal or privacy expert. *See* declarations and testimony of all expert witnesses. The Court

finds this expert testimony to be both credible and persuasive.

25.     The Court notes that the proposed injunctive relief will mandate a comprehensive compliance program to assure that Defendants comply with the letter and spirit of the DPPA. The compliance program will be reviewed and updated annually and will require the designation of a DPPA compliance director. The program will require that each Defendant conduct an internal assessment to evaluate its DPPA compliance and a qualified third party assessor will conduct an evaluation of each Defendant's compliance efforts. The third party assessor will report to senior management so that any material deficiencies can be addressed. After reassessment, Class Counsel and the Court will be provided a summary of the third party assessment. There will be three such assessments, once after approval of the Settlement Agreement, and the next two at 24- and 48-month intervals. In addition, each Defendant must develop written procedures for customer credentialing and notification to customers of DPPA requirements. The customer restrictions will be written into customer contracts and Defendants will have the right to terminate any such contract if DPPA violations are discovered. Defendants are also required to develop and implement employee education concerning DPPA compliance.  The program, which is set forth in detail in the Settlement Agreement, will continue for seven years and Defendants are required to comply with the DPPA for ten years. *See* Settlement Agreement at 17-33 (DE 82-1). The economic value of the injunctive relief, according to Dr. Larry Ponemon, a leading privacy expert, exceeds $3 billion. *See* Ponemon Decl. (DE 116-2 at ¶13). Given the wide-ranging injunctive relief, the second and third *Bennett* considerations weigh in favor of approving the settlement.

26.     As to the fourth *Bennett* factor, the Court finds the complexity, expense, and duration of

16

this litigation favor approval of the proposed settlement. As the record itself supports, this is a very complex case and there are significant risks of continuing the six-year long litigation. Plaintiffs have advanced a novel claim based on a statute with relatively little case law interpreting it. The Court notes that the lawsuit challenged a fundamental aspect of Defendants' business practices and thus it follows that Defendants vigorously resisted at each step of the case. Further, the Court is aware that while Defendants have acknowledged that they obtain DPPA-regulated information, Plaintiffs have yet to establish any statutory violations or Plaintiffs' entitlement to damages. Even if statutory violations were established, the Court would have discretion to determine the amount of liquidated damages under Eleventh Circuit precedent. *Kehoe,* 421 F.3d at 1216-17.

27.     The Court also acknowledges that all of the issues that have been litigated in this case have consumed huge quantities of time, money, and judicial resources. If the case were to continue, the Court believes that the Settling Parties would engage in continued motion practice, including the important issue of class certification, and appellate practice and that any trial would have been long, complicated, expensive, and fraught with risk. Accordingly, even if Plaintiffs were ultimately to prevail, the Settlement Class would only benefit after years of trial and appellate proceedings and the expenditure of millions of dollars in expenses by both sides, millions of dollars in fees by Defendants and thousands of hours of attorney time on behalf of Plaintiffs. Moreover, the benefit obtained might not be any different than the important and significant relief being provided to Settlement Class members through this settlement. Thus, the Court finds that the Settlement Agreement provides the Settlement Class with certainty of result and a high level of assurance regarding the protection of their private information. *See Lipuma,*

406 F. Supp. 2d at 1324 (approving settlement that would "'alleviate the need for judicial exploration of these complex subjects, reduce litigation cost, and eliminate the significant risk that individual claimants might recover nothing'") (citation omitted). Therefore, the Court concludes that the fourth *Bennett* factor weighs in favor of the settlement's approval.

28.      As to the fifth *Bennett* factor, the Court finds that the substance and amount of opposition to the settlement weighs in favor of the settlement's approval. The Settlement Class of more than 200 million persons was given notice of the settlement through a series of nationwide publications in Spanish and English, the Internet, and postings in state driver's license bureaus. *See* Finegan Decl.; Mullenix Decl. at ¶¶ 142-144. In addition, CAFA notice was provided to the relevant state and federal officials. *Id.* To date, the notification process to the Settlement Class has generated only a few dozen objectors. The number of objectors represents less than one-millionth of the entire Settlement Class, a minuscule percentage of the Class, which weighs in favor of approving the settlement. See, *Figueroa v. Sharper Image Corp.*, 517 F.Supp.2d 1292, 1328 (S.D. Fla. 2007). Further, the Court finds that many of these objectors are professionals who are offering canned, unhelpful objections. The Court finds it noteworthy that not a single state or federal governmental official has filed an objection. These government officials are most knowledgeable about the DPPA and DPPA State Equivalents, and would have an interest in protecting their motor vehicle departments and their citizens. Mullenix Decl. at ¶ 146.

29.      In substance, the few filed objections focused most often on the proposed attorneys' fees and incentive awards, which the Court discusses below, the injunctive relief, certification under Rule 23(b)(2), the lack of direct mail notice, and the waiver of statutory damages and the class action device. The Court finds that these meritless objections do not warrant denying the

18

settlement. For the reasons discussed in this Order and in this Court's earlier Order preliminarily approving the class settlement, the Court has found that the injunctive relief is indeed substantial and significant, class certification under Rule 23(b)(2) is appropriate, and that notice was more than adequate. The objection that a waiver of the class action device is unconscionable is also without merit. Mullenix Decl. at ¶¶ 136-141. The Court agrees with Professor Mullenix's analysis that the waiver is of a procedural rather than substantive right, the waiver was bargained-for consideration for the substantial injunctive relief, and the waiver serves the fundamental purposes of class litigation to achieve judicial efficiency and economy. *Id.*; *see also Randolph v. Green Tree Fin. Corp.-Ala.*, 244 F. 3d 814, 817 (11th Cir. 2001) ("there exists a difference between the availability of the class action tool, and possessing a blanket right to that tool"). With respect to the waiver of statutory rights, the Court finds that this release is reasonable. Mullenix Decl. at ¶¶ 132-135. The statutory damages are incidental to the injunctive relief and can be released in the settlement Rule 23(b)(2) context, where injunctive relief and the achievement of a statutory goals were paramount. *Amoco*, 211 F.R.D. at 472. For the reasons stated throughout this Order, each and every objection is overruled and the Court concludes that the lack of credible opposition to the settlement weighs in favor of its approval.

30.     As to the sixth *Bennett* factor, the Court finds that the advanced stage of the litigation favors approval. The predecessor to this case was filed six years ago and this case was severed from it more than two years ago and the Settling Parties have engaged in substantial discovery and contentious motion practice including Plaintiffs' motions to compel discovery, Defendants' joint motion to preclude evidence, Defendants' motion for summary judgment, and, most recently, Defendants' motion for judgment on the pleadings. Therefore, the Settling Parties and

19

the Court are well positioned and well-briefed to assess the strengths and weaknesses of this case and the benefits of the proposed settlement.

31.     Importantly, the Court finds that there is no evidence of collusion. The Settling Parties litigated this case for many contentious years. During that time, the Settling Parties submitted to more than a year of mediation before Rodney Max and when that mediation reached an impasse, the Settling Parties severed the case and eventually submitted to a second lengthy mediation before James Chaplin. Both Mr. Max and Mr. Chaplin are eminently qualified, experienced, and highly skilled mediators who were appointed by this Court. As Mr. Chaplin stated, the negotiation sessions "were very difficult and contentious" as "the parties and their counsel [were] in an adversarial posture where each attorney/client team acted in their own best interests." *Id.* at ¶¶ 9, 16. Like Mr. Chaplin, Mr. Max "never witnessed or sensed any collusiveness between the parties. To the contrary, at each point during these negotiations, the settlement process was conducted at arm's-length and, while professionally conducted, was quite adversarial." Max Decl. at ¶ 14.

32.     Further the Court is personally aware of the professionalism and integrity of the Settling Parties' attorneys. Class Counsel have provided sworn declarations that an agreement was reached only after considering such factors as: (1) the benefits to Plaintiffs and the Settlement Class; (2) the strength of Plaintiffs' case weighed against the settlement offer; (3) the attendant risks and uncertainty of litigation; (4) the attendant risks and uncertainty of establishing liability and damages; (5) Defendants' vigorous defense of the litigation and continued denial of the claims; (6) the desirability of consummating this Settlement Agreement promptly to safeguard the privacy and security of Plaintiffs and the Settlement Class members' personal information;

20

(7) the preservation of claims for actual damages; and (8) the potential for the recovery of liquidated and punitive damages against third parties as a consequence of other similar violations of the DPPA. *See* Joint Decl. Based on all of these factors and the Court's personal observations, the Court concludes that there is no evidence of collusion here. *See also* Mullenix Decl. at ¶¶ 102, 109, and 113.

33.     Finally, this Settlement Agreement is supported by seasoned counsel for the Settling Parties. The Court finds that Plaintiffs are represented by many highly respected attorneys from eight different, highly regarded law firms, including attorneys with significant experience in other class actions. Similarly, Defendants are represented by several leading class action trial lawyers and some of the most respected corporate law firms in the country. The Court finds that the unanimous support of counsel for this settlement weighs in favor of its approval. Based on the foregoing, the Court concludes that the proposed settlement is fair, reasonable, and adequate.

## C.     INCENTIVE AWARDS

34.     The Settling Parties have negotiated an incentive award of $4,500 for each Class Representative. The Court finds that such an amount is reasonable and approves the Defendants' payment of an incentive award of $4,500 to each Class Representative. First, as discussed above, the Court finds Class Representatives are adequate. Each faithfully fulfilled their fiduciary obligations to the Settlement Class and were not motivated to do so by financial reward. They have been active participants in all aspects of this time-consuming case and were committed to addressing a problem each of them believed was important. Moreover, they understood the tensions inherent in the case, the benefits and risks associated with continuing litigation, and the need to protect the rights of Settlement Class members. *See* Discussion and cited declarations at

§II.A.4.a. *supra.*

35.      The Court further finds that the incentive award is not tantamount to a payment for

damages; rather the award represents remuneration for the services performed for the benefit of

the Settlement Class. Finally, the Court notes that the record is clear that Class Representatives

negotiated the settlement terms before there was a discussion of incentive awards to Class

Representatives and all negotiations were free from fraud or collision. Chaplin Decl. at ¶¶ 9-12;

Joint Decl. at ¶¶ 17-18. The evidence was established by the impartial mediators, Messrs.

Chaplin and Max, by Class Representatives, and the attorneys for Class Representatives. The

Court finds that the incentive award of $4,500 per Class Representative for the significant work

and responsibility that went into this case is fair and reasonable.

### D.      ATTORNEYS FEES AND EXPENSES

36.      The Settling Parties agreed in the Settlement Agreement that Class Counsel would seek

the Court's approval of an award of attorneys' fees, costs and other expenses of $7,500,000.00,

in the aggregate, to be paid by Defendants. Defendants agreed further to not oppose such amount

so long as the application approved by the Court did not exceed the amount of $7,500,000.00.

37.      The DPPA is a statute that permits an award of "reasonable attorney's fees and other

litigation costs reasonably incurred" to prevailing plaintiffs.  18 U.S.C. § 2724(b).  "The court's

order on attorney's fees must allow meaningful review—the district court must articulate the

decisions it made, give principled reasons for those decisions, and show its calculation."

*Norman v. Housing Authority of City of Montgomery*, 836 F.2d 1292, 1304 (11th Cir. 1988)

(citing *Adams v. Mathis*, 752 F.2d 553, 554 (11th Cir.1985)).  Even when there is a settlement, as

in this case, "the district court has a supervisory role and ultimately must calculate and set the

attorneys' fees award up to a maximum of the [negotiated] cap." *Dikeman v. Progressive Exp.*

*Ins. Co.*, 312 Fed. Appx. 168, 172 n.3 (11th Cir. 2008).[2]  "A district court is not bound by the

agreement of the parties as to the amount of attorneys' fees.  In fixing the amount of attorneys'

fees the court must, of course, take all [appropriate] criteria into account, including the difficulty

of the case and the uncertainty of recovery.  [The Court] is not, however, merely to ratify a

pre-arranged compact." *Piambino v. Bailey*, 610 F.2d 1306, 1328 (5th Cir. 1980) (internal

citations omitted).[3]

38.     Plaintiffs' attorneys have submitted affidavits showing the following fees and costs:

| LAW FIRM | RATES[4] | HOURS | LODESTAR | COSTS |
|----------|----------|-------|----------|-------|
| Aronovitz Law | $115 to $550 | 1,670.40 | $760,015.00 | $134,581.71 |
| Devine Goodman Rasco & Wells | $125 to $550 | 659.50 | $327,040.00 | $3,785.14 |
| James K. Green | $500 to $575 | 245.80 | $134,045.00 | $5,926.50 |

---

[2] Plaintiffs cite *Dikeman* for the proposition that "the district court is not limited to applying a lodestar analysis for a statutory fee-shifting award because the suits were resolved by a class settlement agreement. . . ." *Dikeman*, 312 Fed. Appx. at 172.  In that case, however, the Eleventh Circuit remanded to the district court because the court simply awarded the amount negotiated by the parties without articulating its decisions and reasoning and showing its calculation. *Id.* at 171.  As an alternative to the lodestar method, the Eleventh Circuit noted that the court could have applied the percentage-of-the-common-fund method. *Id.* at 172.  In this case, the parties have not sought a percentage of a common fund.

[3] *See Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting all decisions of the former Fifth Circuit announced prior to October 1, 1981, as binding precedent in the Eleventh Circuit).

[4] A range of rates reflects when attorneys with different billing rates, such as partners and associates, both did work on the case and also reflects the change in billing rates over the lengthy period of time that this case was pending.  Details regarding the individual hourly rates and hours of partners, associates, and paralegals in the firms listed above are contained in their affidavits at D.E. Nos. 115, 126, 146.

| Portley & Sullivan | $550 | 325.30 | $178,915.00 | $0.00 |
| David D. Welch | $550 | 214.50 | $117,975.00 | $215.50 |
| Searcy Denney Scarola Barnhard & Shipley | $250 to $800 | 156.90 | $93,620.00 | $1,495.90 |
| Joel Perwin | $600 | 41.00 | $24,600.00 | $0.00 |
| James, Hoyer, Newcomer, Smiljanich & Yanchunis | $180 to $600 | 2,489.70 | $979,661.00 | $64,401.62 |
| | TOTALS | 6,339.60 | $2,878,069.00 | $298,844.65 |

39.     Having considered the *Johnson* factors and the testimony at the hearing, the Court finds that these hours and hourly rates provide a reasonable basis for calculating the lodestar in this case. *See Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).  In so finding, the Court notes that this case was novel, that it required significant legal effort and acumen from skilled and experienced counsel, and that counsels' performance in this case has been excellent in the face of stiff and ardent opposition.

40.     The parties have also agreed to a fee award that will cover Plaintiffs' counsel's ten years of post-judgment monitoring work.  Mr. Schwartz stated that the costs of monitoring sophisticated defendants is rather high and that the fee in this case was a very modest estimate of reasonable compensation for the services likely to be required of Class Counsel over the next ten years. Schwartz Decl. at ¶ 19, 30-31. Mr. Schwartz opined that a fixed fee of $5 million for ten years of monitoring would be "rather low compared to what [he and his] co-counsel spend in [their] cases that are, by any measure, less complicated and demanding." *Id.* at 30.  The Court

24

also considered the declaration and live testimony of Professor Eisenberg. Professor Eisenberg

opined that based upon this Court's lodestar award in Fresco I, the allocation of fees for each of

the six Fresco I defendants for post-final judgment monitoring was approximately $2.5 million.

Eisenberg Decl. at ¶ 50. As such, Professor Eisenberg extrapolated that "with two additional

defendants, that approach would yield $5 million in fees and costs." *Id.* The Court agrees with

Professor Eisenberg that the likely cost of post-judgment monitoring "when combined with the

pure lodestar [of $2,878,069.00] based on plaintiffs' counsels' declarations, supports the

reasonableness of the negotiated $7.5 million fee award." *Id.* Because this Circuit has recognized

the judicial approval of attorney's fees "for post-judgment monitoring," the Court considered the

future endeavors of Class Counsel for the Settlement Class in approving the attorneys' fee.

*Mills v. Freeman*, 118 F.3d 727, 733-34 (11th Cir. 1997). The Court is, however, still obligated

to provide a calculation for an award of fees for post-judgment monitoring. At $450 per hour,

which is slightly above the average hourly rate charged to litigate this case, for a likely 10,000

hours over the next ten years based upon the requirements for compliance, post-judgment

monitoring will likely justify an additional fee of $4,500,000. This fee will be reflected in the

enhancement.

42.     Eleventh Circuit precedent has established that "exceptional" results—results that are

"out of the ordinary, unusual, or rare"— may result in an enhancement of a fee above the

lodestar. *Norman v. Housing Authority of Montgomery*, 836 F.2d 1292, 1302 (11th Cir.1988).

"Any enhancement begins with a finding that the results were exceptional." *Id.* at 1306. "Even

if the court found the results obtained to be exceptional, no enhancement for these results would

be justified unless the court also finds that class counsel's representation was superior to that

25

which would have been expected considering the rates requested." *Id.* (citing *Blum*, 465 U.S. at 899). In other words, in order to award attorney's fees in excess of the lodestar, the Court must find that "the superb quality of their representation *far exceeded what could reasonably be expected for the standard hourly rates* used to calculate the lodestar." *Kenny A. ex rel. Winn v. Perdue*, 547 F.3d 1319, 1324 (11th Cir. 2008) (Wilson, J., concurring ) (emphasis in original).

In this case, Professors Larry Ponemon and Daniel Solove opined as to the negative economic consequences of data breaches. *See* Ponemon Decl.; Solove Decl. Professor Ponemon specifically found that the injunctive relief will reduce the number of data breaches by half over the next seven years. *See* Ponemon Decl.; *see also* Solove Decl. (discussing the value of privacy in economic (identify theft and data breaches) and personal terms (dignitary harm and physical danger). Dr. Ponemon opined that the economic value to the Settlement Class will result in an economic benefit of $3.34 billion dollars. Ponemon Decl at ¶ 17. Professor Solove similarly found that the Settlement Agreement "will significantly improve the way Defendants handle DPPA-regulated information and ensure that the laudable goals of DPPA are effectively carried out in practice." Solove Decl. at 5. In light of the value of this settlement, in addition to the exceptional work done by the attorneys in relation to their hourly fees and the proportionally extremely low lodestar total, as well as the likely need for $4,500,000 worth of post-judgment monitoring, the Court finds that a 2.6 multiplier enhancement is appropriate, bringing the total awarded fees to $7,500,00.

43.     According to the declarations of Class Counsel, they incurred $298,844.65 in expenses in litigating this matter. The Court finds that the $298,844.65 in expenses are reasonable, and, together with the lodestar fees of $2,878,069.00 from the date of severance to the present date,

and projected fees and expenses of $4,500,000.00 to be incurred over the next ten years, provide

ample justification for the court's award of the full $7.5 million negotiated compensation to cover

all attorneys' fees and costs incurred to date and to be incurred in the future.

## III.    FINAL JUDGMENT AND ORDER

**NOW THEREFORE,** after consideration of all motions, memoranda in support and

opposition, testimony, declarations, argument of counsel, and being otherwise duly advised in the

premises, it is **ORDERED** and **ADJUDGED** as follows:

1.    The objections raised by all objectors have been considered and are overruled.

2.    Plaintiffs' Motion for Entry of an Order Approving Defendants' Payment of Agreed

Upon Incentive Awards to Class Representatives and Attorneys' Fees and Expenses **(D.E. No.**

**114)** is **GRANTED.**  The Court awards $7,500,000.00 in attorneys' fees and costs, and incentive

awards in the amount of $4,500 to each class representative: Richard Fresco, Carlos Barrett,

Jeffrey Hy, Mary Ann Collier, Roy McGoldrick, Robert Pino, Joel Levine, Kenneth W. Heretick,

and Russell V. Rosen.  Defendants shall pay the award of attorneys' fees and expenses to Class

Counsel and incentive awards to Class Representatives in accordance with the terms of the

Settlement Agreement.

3.    For purposes of this Final Judgment and Order, the Court adopts and incorporates the

definitions and meanings of the defined terms set forth in Section II of the Parties' Settlement

Agreement.

4.    Plaintiffs' Motion for Final Certification of Settlement Class, Final Approval of Class

Action Settlement, and Entry of Final Judgment and Order **(D.E. No. 110)** is **GRANTED.**

5.    The Court expressly approves each and every term contained in the Parties' Settlement

27

Agreement and finds that the Settlement Agreement is, in all respects, fair, reasonable and adequate to members of the Settlement Class. The Court directs the implementation of the Settlement Agreement pursuant to its terms and conditions, and orders that the Plaintiffs, members of the Settlement Class, and Defendants are each to comply with each and every term of the Settlement Agreement.

6.     Injunctive Relief: Each Defendant is required to comply with the following:

      6.1    Compliance with Law

          a.    Defendants are obtaining, and will continue to obtain, DPPA Regulated Information for themselves or their customers only in accordance with the DPPA and the DPPA State Equivalents.

          b.    Defendants are using, and will continue to use, DPPA Regulated Information for themselves or their customers only in accordance with the DPPA and the DPPA State Equivalents.

          c.    Defendants are disclosing, and will continue to disclose, DPPA Regulated Information only in accordance with the DPPA and the DPPA State Equivalents.

          d.    Because 18 U.S.C. § 2721(c) permits resale and redisclosure for all permissible uses of the information (except for 18 U.S.C. § 2721 (b)(11) or (b)(12)) in whatever format, Defendants may continue to resell or disclose DPPA Regulated Information only as permitted by the DPPA and the DPPA State Equivalents.

      6.2    Internal Assessment Mechanism

          a.    Each Defendant will conduct a confidential internal assessment to evaluate its compliance with the DPPA.

b.      Each Defendant will conduct the confidential internal assessment within 180 days following the Effective Date.

c.      The confidential internal assessment of each Defendant will be conducted under the auspices of its General Counsel's Office, and any documents or other work product generated by that confidential internal assessment will be protected by all applicable privileges or protections, including but not limited to the attorney-client privilege and the self-evaluative privilege.

d.      Each Defendant will provide a confidential report of the internal assessment to its senior management within 30 days from its completion.

e.      Each Defendant will evaluate the internal assessment and will address any material deficiencies identified in the assessment in implementing its DPPA Compliance Program (discussed below).

6.3.    DPPA Compliance Program

a.      Each Defendant will have a written DPPA Compliance Program that will be approved by senior management or its designee within the earlier of 60 days of the report of the internal assessment to senior management or 240 days of the Effective Date.

b.      Each Defendant shall designate a DPPA Compliance Director who will oversee its DPPA Compliance Program on an ongoing basis. The DPPA Compliance Director will report to senior management. The DPPA Compliance Director will be independent and objective in that the DPPA Compliance Director may have other responsibilities, so long as those other responsibilities do not conflict with his or her role as DPPA Compliance Director.

c.      Within 180 days from approval of the DPPA Compliance Program, the

29

DPPA Compliance Director will report to senior management that the DPPA Compliance Program has been implemented. The DPPA Compliance Director will continue to oversee the implementation of the DPPA Compliance Program and make adjustments to the DPPA Compliance Program as necessary to address any material deficiencies.

        d.     Each Defendant's DPPA Compliance Program will be periodically reviewed no less than annually and updated as appropriate by the DPPA Compliance Director or his or her designee. The DPPA Compliance Director shall provide a written confidential report to the company's General Counsel's Office and senior management, and any documents or other work product generated by that periodic review, including but not limited to the written report, will be protected by all applicable privileges or protections, including but not limited to the attorney-client privilege and the self-evaluative privilege.

    6.4.    <u>Written Procedures</u>

        a.     Each Defendant shall have written procedures for its DPPA Compliance Program that will be designed to enable each Defendant to identify: (i) existing DPPA Products; (ii) DPPA Products undergoing material modifications, if applicable; and (iii) DPPA Products under development for commercial release.

        b.     Each Defendant shall have written procedures for its DPPA Compliance Program that will govern each Defendant's DPPA Compliance Review of its existing DPPA Products: (i) for conducting a DPPA Compliance Review; (ii) for determining compliance with any restrictions imposed by the DPPA and the DPPA State Equivalents; (iii) for determining whether modifications that materially alter existing DPPA Products are in compliance with the DPPA and the DPPA State Equivalents; (iv) for determining whether the implementation of a

product design complies with the DPPA and the DPPA State Equivalents; (v) for requiring that modifications implemented prior to review due to necessity or emergency be reviewed for compliance with the DPPA and the DPPA State Equivalents as soon as reasonably practicable after implementation; and (vi) for communicating the DPPA Compliance Program and the employee's role relative to the program to employees involved in the design or material modification of DPPA Products.

   c.  Each Defendant shall have written procedures for its DPPA Compliance Program that will govern the DPPA Compliance Review before commercial release of any new product in a manner or method materially different from existing DPPA Products: (i) for identifying DPPA Products under development and intended for commercial release; (ii) for conducting a DPPA Compliance Review before commercially releasing any new product; (iii) for applying the DPPA Compliance Program to the design and development of any new product under development and intended for commercial release; and (iv) for communicating the DPPA Compliance Program and the employee's role relative to the program to employees involved in the design and development of DPPA Products under development and intended for commercial release.

   d.  Each Defendant shall have written procedures for its DPPA Compliance Program that will require each Defendant to include language in customer contracts authorizing access to DPPA Products, entered into after the implementation of the DPPA Compliance Program: (i) requiring customers to maintain the confidentiality of the DPPA Regulated Information provided and to use it only for purposes permitted by the DPPA; (ii) permitting the Defendant to take remedial action if it becomes aware of evidence indicating that one of its

31

customers may have used DPPA Regulated Information in a manner not permitted by the DPPA; and (iii) requiring customers to identify their DPPA permitted use.

e.      Each Defendant shall have written procedures for its DPPA Compliance Program that will require each Defendant, in the event of amendments to the DPPA, to review its customer contracting practices to maintain compliance with the DPPA.

f.      Each Defendant shall have written procedures for its DPPA Compliance Program that will require each Defendant to educate employees whose job responsibilities materially relate to DPPA Regulated Information regarding the DPPA Compliance Program: (i) for communicating the DPPA Compliance Program to employees whose job responsibilities materially relate to the design and development of DPPA Products; (ii) for communicating the DPPA Compliance Program to employees involved in the sale, training, and customer service of DPPA Products; (iii) for communicating material changes in the DPPA Compliance Program to employees whose job responsibilities materially relate to DPPA Regulated Information; and (iv) for requiring employees with access to DPPA Regulated Information to sign a Confidentiality and Nondisclosure Agreement.

g.      Each Defendant shall have written procedures for its DPPA Compliance Program that will require each Defendant to address suspected DPPA non-compliance issues in accordance with the DPPA Compliance Program.

h.      Each Defendant shall have written procedures for its DPPA Compliance Program that will require each Defendant to publish information regarding how consumers may contact their state DMV to correct inaccurate information in their Motor Vehicle Records.

i.      Each Defendant shall have written procedures for its DPPA Compliance

Program that will require each Defendant to perform confidential compliance checks of customers' use of DPPA Products, done under the auspices of the General Counsel's Office, which may include: (i) reviewing the customer's use of DPPA Regulated Information; (ii) identifying actions to be taken as a result of the compliance check, if any; and (iii) recording the date of the compliance check and the action taken, if any.

j.      Each Defendant shall have written procedures for its DPPA Compliance Program that will require each Defendant to comply with 18 U.S.C. § 2721(c) to maintain a record, for five years from the date of disclosure of DPPA Regulated Information, that contains: (i) the identity of the customer; (ii) the date of disclosure; and (iii) the DPPA permissible use identified by the customer to access the DPPA Regulated Information.

k.      Each Defendant shall have written procedures for its DPPA Compliance Program that will require each Defendant to have reasonable written customer credentialing procedures for DPPA Products: (i) for registering and authorizing new customers; (ii) for developing minimum requirements to qualify for access to Personal Information; (iii) for developing minimum requirements to qualify for access to Highly Restricted Personal Information; (iv) for modifying an existing customer's access to DPPA Products where necessary; (v) for ceasing a customer's access to DPPA Products where the Defendant becomes aware of information indicating that the customer no longer qualifies for access to such DPPA Products; and (vi) for updating customer profiles and permissible uses when necessary.

l.      Each Defendant shall have written procedures for its DPPA Compliance Program that will require each Defendant to address suspected DPPA non-compliance issues involving the Defendant's employees: (i) for identifying employees whose job responsibilities

33

materially relate to DPPA Products; (ii) for reporting suspected non-compliant employee activity; (iii) for conducting a confidential review of the suspected non-compliant activity under the auspices of the General Counsel's Office; and (iv) for taking remedial or corrective action in response, if necessary.

      m.    Each Defendant shall have written procedures for its DPPA Compliance Program that will require each Defendant to review and update the DPPA Compliance Program: (i) for determining the appropriate periodic review interval, which shall occur at least annually; (ii) for identifying the individual or group charged with review; and (iii) for identifying changes in the DPPA and the DPPA State Equivalents.

      n.    Each Defendant shall have written procedures for its DPPA Compliance Program that will require each Defendant to apply the DPPA Compliance Program to a newly acquired business or entity if the new business or entity obtains, uses, or discloses DPPA Regulated Information, including: (i) procedures to review the existing practices of the acquired business or entity in light of the DPPA Compliance Program; (ii) application of the DPPA Compliance Program to existing DPPA Products at the acquired business or entity within a commercially reasonable time after the acquisition; and (iii) identification of the individual or group responsible for conducting the review and noting compliance with the DPPA Compliance Program.

    6.5.   <u>Customer Procedures</u>

      a.    Each Defendant will inform its customers of DPPA Products of applicable permitted use requirements of the DPPA. Upon request of a customer, each Defendant shall provide an explanation of the appropriate uses of DPPA Regulated Information and general types

34

of users qualified to access DPPA Regulated Information.

b. Each Defendant will include in customer contracts authorizing access to DPPA Products entered into after the implementation of the DPPA Compliance Program provisions that: (i) require its customers to maintain the confidentiality of the DPPA Regulated Information provided; (ii) require its customers to use DPPA Regulated Information only for purposes permitted by the DPPA; and (iii) provide that access to DPPA Regulated Information may be terminated if the Defendant becomes aware of information indicating that the customer used DPPA Regulated Information in an impermissible way.

c. Each Defendant will make available to its customers, upon request, the language of the DPPA.

6.6.   Assessment by the Independent, Third-Party Assessor

a. After the completion of the steps outlined above, each Defendant will engage an Independent, Third-Party Assessor to assess the Defendant's written procedures for its DPPA Compliance Program, referred to in Section VI.B.4, above, and to confirm that the procedures have been implemented ("First Assessment").

b. The assessment by the Independent, Third-Party Assessor will occur three times: the First Assessment will begin 60 days from the date the DPPA Compliance Director reports to senior management that the DPPA Compliance Program has been implemented as outlined in Section VI.B.3.c, above; and the last two assessments will occur at the 24-month ("Second Assessment") and 48-month ("Final Assessment") anniversaries of completion of the First Assessment.

c. The Independent, Third-Party Assessor retained by each Defendant to assess

35

its compliance with the Injunctive Relief will be qualified (1) to perform evaluations under the American Institute of Certified Public Accountants (AICPA) framework, (2) as a Certified Information System Security Professional (CISSP), (3) as a Certified Information Systems Auditor (CISA), (4) as a Certified Information Privacy Professional (CIPP), or (5) as a Global Information Assurance Certification (GIAC) from the Sysadmin, Audit, Network, Security Institute (SANS), or qualified by a similar organization.

      d.     Each Defendant shall provide to Class Counsel a list of prospective Independent, Third-Party Assessors that meet the qualifications described in Section VI.B.6.c, above. Within fourteen days of receipt of the above-described list, Class Counsel shall identify in writing and provide a reasonable basis for excluding any person or entity on the list.

      e.     The Independent, Third-Party Assessor will be provided, subject to an agreement to protect proprietary and confidential information, with a list of written procedures that each Defendant will have adopted for its DPPA Compliance Program.

      f.     The Independent, Third-Party Assessor will evaluate whether each Defendant's DPPA Compliance Program addresses the issues referred to in Section VI.B.4, above, and whether the program has been implemented.

      g.     Within 30 days of commencing each assessment, the Independent, Third-Party Assessor will provide to the Compliance Director a confidential report setting forth his, her, or its preliminary conclusions as to each Defendant.

      h.     After receiving the Independent, Third-Party Assessor's confidential report setting forth his, her, or its preliminary conclusions, each Defendant will then have a reasonable period of time to address or remedy any potential issues raised by the Independent, Third-Party

36

Assessor.

i.      The Independent, Third-Party Assessor will then reassess material deficiencies, if any, and provide to the subject Defendant, and to the Court filed under seal, and to Class Counsel, a summary of his, her, or its report in the form set forth below within 20 days after initiating the reassessment.

j.      The provisions of Sections VI.B.6.e through VI.B.6.i shall apply to the First, Second, and Final Assessments.

k.      The report of the Independent, Third-Party Assessor for the First Assessment shall be in substantially the following form:

> To the Management of [Defendant Company]:
>
> We were engaged by [Defendant Company] as an independent, Third-Party Assessor to assess [Defendant Company]'s written procedures for its DPPA Compliance Program and its implementation of those procedures. We are qualified to make this assessment [Independent, Third-Party Assessor to pick one of the following: (1) under the American Institute of Certified Public Accountants (AICPA) framework, (2) as a Certified Information System Security Professional (CISSP), (3) as a Certified Information Systems Auditor (CISA), (4) as a Certified Information Privacy Professional (CIPP), or (5) as a Global Information Assurance Certificated (GIAC) assessor from the Sysadmin, Audit, Network, Security Institute (SANS), or qualified by a similar organization.]
>
> We have examined management's assertion that [Defendant Company] has instituted a DPPA Compliance Program that meets the Injunctive Relief requirements established in the Final Judgment and Order entered by the Court in *Richard Fresco, et al. v. R.L. Polk & Co. and Acxiom Corp.,* Case No. 07-cv-60695-JEM, filed in the United States District Court for the Southern District of Florida. This assertion is the responsibility of [Defendant Company]. Our responsibility is to express an opinion based on our examination.
>
> Our examination was conducted by obtaining an understanding of the Injunctive Relief requirements set forth in the

37

Final Judgment and Order; by reviewing the DPPA Compliance Program adopted by [Defendant Company] to satisfy the Injunctive Relief requirements of that Order; and by reviewing [Defendant Company]'s policies and procedures. We believe that our examination provides a reasonable basis for our opinion.

[Defendant Company] has provided us with the written procedures [Defendant Company] adopted as part of its DPPA Compliance Program, and the company is implementing those procedures. Based upon our assessment, [Defendant Company] [is / is not] meeting its Injunctive Relief obligations as set forth specifically in the Final Judgment and Order. Additionally, [Defendant Company] has conducted a confidential internal assessment; has created a written DPPA Compliance Program overseen by a designated DPPA Compliance Director, and which includes written procedures governing [Defendant Company]'s DPPA compliance with new and existing products and customer procedures and employee education designed to enhance DPPA compliance; and [is / is not] in compliance with its obligations as set forth specifically in the Injunctive Relief provisions of the Final Judgment and Order entered in this cause.

In our opinion, [Defendant Company]'s management's assertion referred to above [is / is not] fairly stated, in all material respects.

l.      The report of the Independent, Third-Party Assessor for the Second and Final

Assessments shall be in substantially the following form:

To the Management of [Defendant Company]:

This report is in follow-up to our prior [date of first assessment] report regarding [Defendant Company]'s DPPA Compliance Program, and ongoing obligations set forth in that Program.

Specifically, we were engaged by [Defendant Company] as an Independent, Third-Party Assessor to assess [Defendant Company]'s written procedures for its DPPA Compliance Program and its implementation of those procedures. We are qualified to make this assessment [Independent, Third-Party Assessor to pick one of the following: (1) under the American Institute of Certified Public Accountants (AICPA) framework, (2) as a Certified Information

38

System Security Professional (CISSP), (3) as a Certified Information Systems Auditor (CISA), (4) as a Certified Information Privacy Professional (CIPP), or (5) as a Global Information Assurance Certified (GIAC) assessor from the Sysadmin, Audit, Network, Security Institute (SANS), or qualified by a similar organization].

We have examined management's assertion that [Defendant Company] has instituted [and is currently maintaining] a DPPA Compliance Program that meets the Injunctive Relief requirements in the Final Judgment and Order entered by the Court in *Richard Fresco, et al. v. R.L. Polk & Co. and Acxiom Corp.*, Case No. 07-cv-60695-JEM, filed in the United States District Court for the Southern District of Florida. This assertion is the responsibility of [Defendant Company]. Our responsibility is to express an opinion based on our examination.

Our examination was conducted by obtaining an understanding of the Injunctive Relief requirements set forth in the Final Judgment and Order; by reviewing the DPPA Compliance Program adopted by [Defendant Company] to satisfy the Injunctive Relief requirements of that Order; and by reviewing [Defendant Company]'s policies and procedures. We believe that our examination provides a reasonable basis for our opinion.

[Defendant Company] has provided us access to the DPPA Compliance Director, and relevant, material, non-privileged documents or information as we have specifically requested to allow the completion of this assessment. Based upon our assessment, [Defendant Company] [continues to meet / has not met] its obligations as set forth specifically in the Injunctive Relief provisions of the Final Judgment and Order.

6.7.    Employee Education

a.    Each Defendant will provide employee education as outlined in the DPPA Compliance Program.

b.    Each Defendant will communicate the DPPA Compliance Program (and any material changes) to employees whose job responsibilities materially relate to DPPA products within a reasonable time after commencement of the DPPA Compliance Program.

      c.      Each Defendant will require employees whose job responsibilities materially relate to DPPA Products to confirm their agreement to comply with the DPPA Compliance Program.

      d.      Each Defendant will require employees with access to DPPA Regulated Information to sign a Confidentiality and Nondisclosure Agreement.

      e.      Each Defendant will address employee non-compliance with the DPPA Compliance Program, as set forth in Section VI.B.4.1, above.

    6.8.    <u>Procedures For Corrective Action</u>

Each Defendant will institute processes for addressing DPPA non-compliance issues in accordance with Section VI.B.4, above.

    6.9.    <u>Sunset Provision</u>

      a.      The obligations of Section VI.B.1 of the Injunctive Relief (Compliance with Law) will extend ten (10) years from the Effective Date.

      b.      The obligations of Section VI.B.2 (Internal Assessment Mechanism) will be required only once, consistent with the time frame set forth in Section VI.B.2 above.

      c.      Section VI.B.3 to Section VI.B.8 will extend seven (7) years from the Effective Date.

7.    <u>Commencement of Injunctive Relief:</u> Pursuant to § VI.A. of the Settlement Agreement, Defendants shall commence the Injunctive Relief set forth in Paragraph 6 above within 30 days of the Effective Date as defined in the Settlement Agreement.

8.    <u>Limitations on Injunctive Relief:</u> Any action by Defendants reasonably necessary to comply with any federal, state or local law, enactment, regulation, or judicial ruling shall not constitute a breach of the Settlement Agreement to the extent that it was reasonably necessary in taking such

40

action that it conflict with the terms or conditions of this Settlement Agreement. In the event that any obligation Defendants have agreed to undertake in the Injunctive Relief becomes unlawful under any future federal, state or local law, enactment, regulation, or judicial ruling, Defendants shall be released from performing such obligation in all jurisdictions in which it would be unlawful.

9.    Release: As provided in § IX of the Settlement Agreement, upon the Effective Date, the Released Parties shall be fully, finally, and forever released and discharged from any and all equitable Claims, known or unknown, arising on or before the Effective Date that Named Plaintiffs and the Settlement Class had based on: (1) the DPPA; (2) any DPPA State Equivalents; or (3) any Defendant's obtainment, use, or disclosure of DPPA Regulated Information. Upon the Effective Date, the Released Parties also shall be fully, finally, and forever released and discharged from any and all Claims, known or unknown, arising on or before the Effective Date that Named Plaintiffs and the Settlement Class had for: (1) statutory liquidated damages under the DPPA or DPPA State Equivalents; and (2) punitive damages predicated on either the equitable Claims or statutory liquidated damages Claims referenced above. Named Plaintiffs and the Settlement Class Members expressly waive and fully, finally, and forever settle and release any known or unknown, suspected or unsuspected, contingent or noncontingent Claim with respect to the Released Claims, whether or not concealed or hidden, without regard to the subsequent discovery or existence of such other, different, or additional facts.

9.1    Plaintiffs and all members of the Settlement Class are hereby permanently barred and enjoined from instituting, maintaining, or prosecuting either directly or indirectly, any lawsuit that asserts Released Claims.

9.2    Plaintiffs and all members of the Settlement Class are hereby permanently barred and

41

enjoined from seeking to use the class action procedural device in any future lawsuit against any Released Party, where the lawsuit asserts Claims that were or could have been brought in the Litigation prior to the entry of this Final Judgment and Order and that are not otherwise released and discharged by the Settlement Agreement.

  9.3 Plaintiffs and all members of the Settlement Class do not release and discharge, but instead preserve, the right of Settlement Class Members to file individual lawsuits under the DPPA or DPPA State Equivalents for actual monetary damages sustained before the Effective Date, subject to the waiver of the class action procedural device described in Paragraph 9.2 above. In addition, Plaintiffs and all members of the Settlement Class do not release and discharge, but instead preserve, the right of Settlement Class Members to seek (in individual lawsuits under the DPPA and DPPA State Equivalents) punitive damages based on actual monetary damages, subject to the waiver of the class action procedural device described in Paragraph 9.3.

  10. The action is dismissed with prejudice and without costs and the Court directs the entry of Final Judgment pursuant to Federal Rules of Civil Procedure 54 and 58.

  11. The Court reserves continuing and exclusive jurisdiction over the parties with respect to all matters relating to this Settlement Agreement, including the administration, interpretation, effectuation, and enforcement of the Settlement Agreement and this Final Judgment and Order.

  DONE AND ORDERED in Miami, Florida, this ⟍27⟋ day of July, 2010.

             _____
             JOSE E. MARTINEZ
             UNITED STATES DISTRICT JUDGE

Copies provided to:
Magistrate Judge Brown
All Counsel of Record